# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 15-22395-TBM |
| ESCALERA RESOURCES CO., a Maryland corporation, | ) | |
| | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DEBTOR'S EXPEDITED MOTION
## FOR AUTHORITY TO USE CASH COLLATERAL

Escalera Resources LLC ("Debtor"), as the debtor and debtor-in-possession in this chapter 11 case, pursuant to 11 U.S.C. §§ 363(c)(2) and Federal Rule of Bankruptcy Procedure 4001(b)(1) and Local Bankruptcy Rule 4001-3, moves for authority to use cash collateral and provide adequate protection to Société Générale as administrative agent and to the financial institutions participating with and led by Société Générale, (collectively the "Lender") and in support thereof states:

### Background

1.     On November 5, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"). No trustee has been appointed. The Debtor continues to operate its oil exploration and production business and properties as debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

2.     As of the date hereof, no creditors' committee has been appointed in this case. In addition, no trustee or examiner has been appointed or applied for.

3.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper pursuant to 28 U. S .C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. §157(b).

4.      The statutory predicates for the relief requested herein are §§ 361 and 363 of the Bankruptcy Code and Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure.

## The Debtor and its Affiliated/Related Entities

5.      The Debtor hereby incorporate by reference the factual background set forth in the *Declaration of Adam Fenster in Support of Motions Seeking Expedited Entry of First Day Orders* attached as Exhibit A to the Debtor's Motion Seeking Expedited Entry of First Day Orders filed concurrently herewith, which includes, *inter alia*, a detailed description of the Debtor's business and affairs, the Debtor's capital structure and prepetition indebtedness, and the events leading to the commencement of this case.

6.      The Debtor is an independent energy company engaged in the exploration, development, production and sale of natural gas and crude oil, primarily in the Rocky Mountain basins of the western United States. The Debtor was incorporated in Wyoming in 1972 and reincorporated in Maryland in 2001. It is a publicly-traded company with two classes of equity interests: Series A Preferred with an estimated 1,610,000 shares outstanding and common stock of an estimated 14,300,000 shares outstanding. Both stock issues are widely held.

7.      The Debtor's corporate offices are located at 1675 Broadway, Suite 2200, Denver, Colorado 80202. As of October 2015, the Debtor had 22 employees. None of the employees are subject to a collective bargaining agreement. The Debtor leases an executive office in Houston, Texas, and a regional office in Casper, Wyoming.

8.      Current production consists primarily of natural gas from one core area in southern Wyoming. The Debtor has coalbed methane ("CBM") reserves and production in the Atlantic Rim Area of the eastern Washakie Basin.

9.      Substantially all of the Debtor's revenues are generated through the sale of natural

gas and oil production at market prices and the settlement of commodity hedges. In addition to acreage in the Atlantic Rim Area, the Debtor also holds acreage with exploration potential in the Greater Green River Basin of Wyoming. Approximately 98% of 2014 production volume was natural gas. As an exploration and development company, the Debtor's assets, revenue, and general financial condition are directly correlated to price of natural gas and oil.

### Lender Debt Obligations

**A.  Société Générale Credit Facility**

10.     The Debtor is a party to a Credit Facility dated as of August 29, 2014 (as amended, restated or otherwise modified from time to time, the "Credit Facility") among the Debtor as Borrower, and Société Générale and the financial institutions listed therein led by Société Générale (collectively the "Lender"). Société Générale serves as the Administrative Agent under the Credit Facility. The Credit Facility is generally a revolving credit facility, under which the amount of credit available for borrowing is determined by a borrowing base that is in turn determined by the value of the Debtor's oil and gas reserves on a periodic basis. As of the Petition Date, the Debtor was indebted to the Lender in the aggregate amount of not less than: (i) $36,886,300.00 in aggregate principal amount; (ii) accrued and unpaid interest and fees which were $195,118.00 as of September 30, 2015; and (iii) additional amounts claimed as owed under the Credit Facility. These amounts substantially exceed the borrowing base redetermined as of September 30, 2015.

11.     The Credit Facility is collateralized by substantially all of the Debtor's oil and gas producing properties, and substantially all other assets.  Specifically, since the Credit Facility's inception, the Lender asserts that the mortgages granted under the Credit Facility applied to over

90% percent of the Debtor's oil and gas leases and current coverage is approximately 95% of Debtor's oil and gas leases.

12.     On May 19, 2015, the Lender declared an event of default, and, as provided in the Credit Facility, the loans began accruing interest at 2.00% above the otherwise applicable rates effective as of May 19, 2015.[1]

13.     The Debtor and the Lender executed a Forbearance Agreement on July 31, 2015, in which the Borrower and the Guarantors acknowledge the existence of events of default under the Credit Facility.  The Forbearance Agreement provided for the increase in the percentage of Debtor's Reserves that are pledged to the Lender from 80% to 85%, addressed certain lien perfection issues, and imposed certain milestones for actions by the Debtor.

### B.  Trade Debt and Other Debt

14.     In addition to the secured debt outstanding under the Credit Facility, the Debtor anticipates scheduling approximately $3.1MM in outstanding unsecured debt.  Of that amount, the Debtor believes that approximately $1.9MM are joint interest billings that are subject to recoupment by the joint operators of the properties in which the Debtor has a working interest. Another $650,000 is severance claimed by two former employees. A material portion of the remaining debt is or may be secured by well liens, mechanics liens and materialmen's liens.  The Debtor will be seeking Court permission to pay a portion of the foregoing prepetition secured claims on a postpetition basis as critical vendors.

---

[1] The Borrowings under the Credit Facility bear non-default interest at a daily rate based on the interest rate election of either the Base Rate or the LIBOR Rate. Under the Base Rate option, interest is calculated at an annual rate equal to the highest of (a) the base rate for Dollar loans for such day, the Federal Funds rate for such day, or the LIBOR for such day plus (b) a margin ranging between 0.75% and 1.75% (annualized) depending on the level of funds borrowed. Under the LIBOR Rate option, interest is calculated at an annual rate equal to LIBOR, plus a margin ranging between 1.75% and 2.75% (annualized) depending on the level of funds borrowed. The average interest rate on the facility at December 31, 2014, was 3.1%.

15.     Finally, based on current valuations, the Debtor believes that Société Générale may have a general unsecured deficiency claim under the Credit Facility against the Debtor in the amount of approximately $21MM.

### C.  Taxes

17.     Estimated ad valorem taxes are and will be coming due during the case of approximately $2,572,000.  These taxes are due to Carbon, Campbell and Natrona Counties in Wyoming. Since outstanding ad valorem taxes accrue interest at a rate of 18% per annum, the Debtor intends to pay the taxes that are currently due as soon as practicable upon obtaining authority from this Court.

### The Plan Term Sheet

18.     The Debtor and Société Générale have agreed to a term sheet outlining the substantive terms of a plan of reorganization (the "Term Sheet").  Under the Term Sheet,[2] administrative claims and priority non-tax claims shall be paid in full in cash as soon as practicable after the plan effective date.  Unsecured priority tax claims not paid in the ordinary course shall be treated in accordance with section 1129(a)(9)(C).  Mineral lien claimants holding secured mechanic or materialmen liens senior to the liens under the Credit Facility shall be paid in cash or otherwise left unimpaired.  The Lender will receive a new secured note in the principal amount of $15MM (which may be increased to $17MM under certain circumstances), as well as a deficiency claim of approximately $21.9MM, which deficiency claim will be entitled to share *pro rata* in a new second lien payment-in-kind note ("PIK Note").  General unsecured claimants other than Société Générale shall have the option to share in the PIK Note, share in a cash

---

[2] The Term Sheet remains subject to final documentation and Lender approval and the discussion herein is provided for summary purposes only and is not intended to alter the terms of the Term Sheet.  In the case of any discrepancy between this summary and the Term Sheet, the Term Sheet controls.

distribution, or share in up to 49% of new common equity of the reorganized Debtor, which will be a privately owned company.  The remaining 51% of new common equity will be retained by the reorganized Debtor for distribution under a management incentive plan.  Existing equity as of the Petition Date will be extinguished.

19.     The Debtor anticipates filing a chapter 11 plan conforming to the Term Sheet within two weeks of the Petition Date.

<u>**Reasons for Filing Chapter 11**</u>

20.     As an exploration and development company, the Debtor's assets, revenue, and general financial condition are directly correlated to the price of oil and natural gas. The sharp decrease in oil and natural gas prices, in excess of 50%, eroded the values of reserves on which its borrowing capacity is calculated and made it difficult to obtain capital for operations and for further development of the Debtor's leasehold interests. With declining asset values and shrinking revenue while costs remain relatively constant, the Debtor has faced decreasing liquidity.

21.     Given the decreases in operating cash flows due primarily to the declines in natural gas prices and the corresponding decrease in its borrowing base, the Debtor has focused on near-term business strategies: 1) attempting to identify potential merger candidates which might offer improved opportunities to obtain capital to develop its natural gas and oil properties and to acquire natural gas properties; 2) maintaining production while efficiently managing and in some cases reducing its operating and general and administrative costs; 3) evaluating asset divestiture opportunities to allow the Debtor to reduce its overall indebtedness; and 4) pursuing the acquisition of certain oil and gas properties that would result in overall lower operating costs in comparison with the resulting added revenue. To these ends, in April 2015, the Debtor retained Petrie Partners, LLC, as its investment bankers.

22.      On July 31, 2015, the Debtor completed the sale of its tight gas reserves and production on the Pinedale Anticline in the Green River Basin of Wyoming to Vanguard Operating, LLC for a total price of $12,000,000.  The net proceeds of $10,500,000 from this sale were used to reduce the secured debt owed to the Lender.

23.      As natural gas prices remained low, the Debtor continued discussions on maximizing value to the Lender and all stakeholders in the Debtor's business and ultimately determined that relief under Chapter 11 of the Bankruptcy Code would allow the Debtor the best opportunity to restructure its liabilities and reposition assets to maximize their value. Because the Debtor has been unable to raise additional capital in this environment and with its current Lender unwilling to advance further funds, the Chapter 11 filing was necessitated to protect any going concern value.

### Cash Collateral and the Relief Sought by the Debtor

24.      In order to continue operations and allow for a successful reorganization, the Debtor will require the use of funds on hand and funds to be received. The Debtor believes those funds are cash collateral within the meaning of § 363(a) subject to a senior lien in favor of the Lender. The cash collateral which the Debtor seeks to use is comprised of funds held in various bank accounts at Vectra Bank and its ongoing revenues, along with receivables owed to the Debtor (collectively, the "Cash Collateral").

25.      Pursuant to the Credit Facility, the Debtor granted to the Lender a security interest in and continuing lien ("Prepetition Liens") on almost all of the Debtor's assets and property ("Prepetition Collateral"), including the Cash Collateral. The Debtor believes the Prepetition Liens in the Prepetition Collateral, including the Cash Collateral, are legal, valid, binding, enforceable, non-avoidable and perfected.

26.     The Debtor is not aware of any party with an interest in Cash Collateral other than the Lender.

27.     Consequently, prior to filing this Motion, the Debtor sought and obtained consent to use of Cash Collateral from the Lender. Such consent is conditioned upon the court's entry of an order in the form attached to this Motion as **Exhibit 1** (the "proposed order"). The following is a summary of provisions of the proposed order only, and reference should be made to the proposed order for all of its terms. Nothing in this Motion is intended to modify terms of the proposed order.

28.     A budget showing estimated receipts and disbursements (the "Approved Budget") for the Debtor for the next thirteen weeks is attached to the proposed order as **Exhibit A**. Under the proposed order, the Debtor's use of Cash Collateral shall be subject to and governed by the terms of the Approved Budget; provided, however, that: (i) the Debtor shall be permitted to exceed the Approved Budget by an amount up to fifteen percent (15%) measured weekly; (b) unused budget amounts for any week may be carried forward; and (ii) the Debtor and the Lender may agree to exceptional unanticipated expenditures that will not be counted against the permitted variance.

29.     As adequate protection for the use of Cash Collateral, the Debtor proposes to grant the Lender replacement liens on all tangible and intangible property of the Debtor now existing or hereafter acquired in an amount equal to any post-petition diminution in the value of its Prepetition Collateral (the "Adequate Protection Liens"), all as set forth with more particularity in the proposed order.

30.     The Adequate Protection Liens will be subject to any valid, perfected and unavoidable liens existing as of the Petition Date that are senior to the Lender's prepetition liens, and any valid and senior liens that may arise or be perfected post-petition under § 546(b).  The

Adequate Protection Liens will otherwise prime all other liens, including any liens preserved for the benefit of the Debtor's estate under § 551.

31.     The Adequate Protection Liens will be subject to "Carve Outs" as more particularly described in the proposed order, but which include amounts for payment of: (i) all statutory fees required to be paid by the Debtor to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code; (ii) all accrued and unpaid fees, disbursements, costs, and expenses incurred by professionals or professional firms retained by the Debtor or its estate pursuant to Bankruptcy Code sections 327, 328, or 363 and any statutory Committee appointed in the Chapter 11 Case pursuant to Bankruptcy Code section 1103 to the extent (and only to the extent) set forth in the Approved Budget, incurred before the termination of cash collateral use, and allowed or approved by the Court (including on an interim basis); (iii) professional fees incurred following the termination of cash collateral use and allowed by this Court in an aggregate amount not exceeding $100,000; and (iv) fees and expenses of up to $15,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; provided that: (x) the Carve Out shall not be available to pay any Professional Fees incurred by any party, including the Debtor, a trustee or any Committee or any Professionals engaged thereby, in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Lender, it being understood that up to an aggregate of $20,000 shall be made available to any Committee for investigation costs.

32.     To the extent that the adequate protection described above proves to be insufficient, the Lender, subject to the Carve-Out, shall be granted first priority superpriority administrative expense claims under section 507(b) of the Bankruptcy Code with priority in payment over any other administrative expenses of the kinds specified or ordered pursuant to any provision of the

Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims arise in these Chapter 11 Cases or in any subsequent case or proceedings under the Bankruptcy Code that may result therefrom.

33.     As additional adequate protection, the Debtor is required to provide certain specified financial and operating information to the Lender and to pay the fees and expenses of the Lender's professionals on an ongoing basis without further order of court, provided that this Court will determine any dispute about the reasonableness of such fees raised by the Debtor.

34.     The authority to use Cash Collateral will be subject to an enumerated set of termination events. The occurrence of a termination event will give the Lender the right to exercise its contractual remedies after seven (7) days' notice to counsel for the Debtor, the U.S. Trustee and counsel to the Committee (and if no Committee, to the 20 largest creditors).

35.     The proposed order includes provisions generally not approved without a demonstration of need or cause within the terms of L.B.R. 4001-3, as follows:

    A.  L.B.R. 4001-3APP(a)(2): proposed order ¶ 17 provides that the Debtor stipulates to the validity and perfection of the Lender's liens, which stipulations will be binding on all other parties in interest, subject to the right to challenge as described below.

        <u>Need or cause</u>: the Debtor, after investigation, concurs with this finding of validity and perfection the proposed order, and parties in interest, including any Committee, are provided a minimum of 60 days to investigate and challenge the liens, which is a reasonable period to investigate and mount a challenge to the liens. For this purpose, a separate investigation budget of

$20,000 is established, but otherwise Cash Collateral cannot be used to prosecute any action against the Lender, which is a typical provision of cash collateral orders.

B.   L.B.R. 4001-3APP(a)(5): the proposed order ¶ 8(e) provides that it is a termination event if the Debtor does not propose a plan of reorganization in substantial conformity with the Term Sheet attached to the proposed order as **Exhibit B**.

Need or cause: the Term Sheet reflects the plan treatment of the Lender that has been negotiated between the Debtor and the Lender and that the Debtor supports as being in the best interests of the creditors and its estate, i.e. the Debtor would propose these terms in all events.

C.   L.B.R. 4001-3APP(a)(8): the proposed order ¶ 9 provides that upon a default, the Lender will be automatically granted relief from stay seven (7) days after notice.

Need or cause: the Debtor believes that seven days is sufficient notice for it or a party in interest to bring a motion to continue the stay until a hearing may be had, if for example there is any dispute about a default.

D.   L.B.R. 4001-3APP(a)(10): the proposed order does not create a lien on most avoidance claims, but proposed order ¶ 5(b)(i) does create a lien on recoveries under § 549 (impermissible post-petition transfers), and proposed order ¶ 5(b)(iii) provides that the Lender's adequate protection liens will be senior to any lien avoided and preserved for the benefit of the estate under § 551.

Need or cause: A lien on recoveries for impermissible transfers is appropriate because the property in question must have been property of the estate subject to the Lender's adequate protection lien prior to its transfer to fall within §

549. The seniority of the lien on preserved liens should not materially affect the distribution priorities since the Lender has a superpriority claim in the event there is a failure of adequate protection.

E.  L.B.R. 4001-3APP(a)(11): the proposed order ¶ 18 provides that no Cash Collateral is to be used to modify the Lender's rights under the proposed order before or after a termination of the proposed order.

> Need or cause: this provision does not waive any party's rights to move under § 363.

WHEREFORE, the Debtor respectfully requests this Court enter the proposed order and grant such further relief as is just and proper.

Dated:  November 5, 2015.               Respectfully submitted,

> **Onsager | Guyerson | Fletcher | Johnson LLC**
> *s/ Christian C. Onsager*
> Christian C. Onsager, #6889
> Michael J. Guyerson, #11279
> Andrew D. Johnson, #36879
> 1801 Broadway, Suite 900
> Denver, Colorado 80202
> Ph: (303) 512-1123
> Fax: (303) 512-1129
> consager@OGFJ-law.com
> mguyerson@OGFJ-law.com
> ajohnson@OGFJ-law.com