## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: ) | |
| ) | Case No. 15-22395-TBM |
| ESCALERA RESOURCES CO., a Maryland ) | |
| corporation, ) | Chapter 11 |
| ) | |
| Debtor. ) | |
| ) | |

### COVERSHEET FOR MOTION SEEKING EXPEDITED ENTRY OF FIRST DAY ORDERS

The Debtor in the above-captioned Chapter 11 case filed on November 5, 2015, requests the Court to enter the Orders listed below on an expedited basis, pursuant to L.B.R. 2081-1.

**THE DEBTOR HAS FILED A MOTION SEEKING EXPEDITED ENTRY OF THE FOLLOWING ORDERS:**

1. Order Authorizing Payment of Prepetition Wages, Salaries, Expenses and Benefits;

2. Interim Order Authorizing Use of Cash Collateral;

3. Order Authorizing Payment of Prepetition Claims of Certain Critical Vendors;

4. Interim Order Determining Adequate Assurance of Payment for Future Utility Services and Restraining Utility Companies from Discontinuing, Altering or Refusing Service; and

5. Order Establishing Interim Notice, Case Management and Administrative Procedures Pursuant to 11 U.S.C. § 105, Rules 2002 and 9007 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 2081-2.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re: ) | |
| ) | Case No. 15-<u>22395-TBM</u> |
| ESCALERA RESOURCES CO., a Maryland ) | |
| corporation, ) | Chapter 11 |
| ) | |
| Debtor. ) | |
| ) | |

**MOTION SEEKING EXPEDITED ENTRY OF FIRST DAY ORDERS**

Escalera Resources Co. (the "Debtor"), through its proposed counsel, hereby submits its Motion Seeking Expedited Entry of First Day Orders (the "Motion"), and in support thereof, state as follows:

**INTRODUCTION**

1. The Motion is filed pursuant to 11 U.S.C. §§ 105, 363, 366, and 1107, Fed. R. Bankr. P. 6003, and L.B.R 2081-1. The Debtor seeks the entry of the following orders from this Court (the "Bankruptcy Court") on an expedited basis:

    a. Order Authorizing Payment of Prepetition Wages, Salaries, Expenses and Benefits;

    b. Interim Order Authorizing Use of Cash Collateral;[1]

    c. Order Authorizing Payment of Prepetition Claims of Certain Critical Vendors;

    d. Interim Order Determining Adequate Assurance of Payment for Future Utility Services and Restraining Utility Companies from Discontinuing, Altering or Refusing Service; and

---

[1] Debtor has separately filed an Expedited Motion for Authority to Use Cash Collateral (the "Cash Collateral Motion").

2

e. Order Establishing Interim Notice, Case Management and Administrative Procedures Pursuant to 11 U.S.C. § 105, Rules 2002 and 9007 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 2081-2

2. In support of the Motion, the Debtor relies upon and incorporates by reference the Affidavit of Adam Fenster in Support of the Motion Seeking Expedited Entry of Orders (the "Fenster Affidavit") attached hereto as Exhibit "A."

3. The Debtor asserts that the relief requested herein is needed on an expedited basis to ensure uninterrupted operations. As set forth more fully below, Debtor believes that irreparable harm would occur if expedited relief were not granted. Proposed orders in substantial conformity with applicable Local Bankruptcy Rules have been submitted herewith.

4. With respect to the Debtor's Expedited Motion for Authority to Use Cash Collateral, which requests relief on an interim basis, the Debtor also requests the scheduling of a final hearing ("Final Hearing") to consider the relief requested and entry of a final order and approval of the form of notice with respect to the Final Hearing.

## BACKGROUND OF THE DEBTOR

5. The Debtor is an independent energy company engaged in the exploration, development, production and sale of natural gas and crude oil, primarily in the Rocky Mountain basins of the western United States. The Debtor was incorporated in Wyoming in 1972 and reincorporated in Maryland in 2001. Debtor's corporate offices are located at 1675 Broadway, Suite 2200, Denver, Colorado 80202.

6. Debtor has approximately 14,300,000 shares of common stock (symbol "ESCR") and 1,610,000 shares of Series A Cumulative Preferred Stock (symbol "ESCRP") outstanding. All Series A Cumulative Preferred Stock are currently publicly traded on the NASDAQ Capital

Market, all shares of common stock are now traded on the OTC Market's Pink Sheet marketplace.

7. Although Debtor has six wholly owned subsidiaries, and one of these subsidiaries, PetroSearch Energy Corporation, a Nevada corporation ("PetroSearch"), has nine wholly owned subsidiaries, only two of Debtor's subsidiaries, PetroSearch and Eastern Washakie Midstream LLC, a Wyoming corporation ("Eastern Washakie") are considered to be operating in any fashion. None of the subsidiaries have filed voluntary petitions for bankruptcy relief.

8. Debtor maintains an office in Houston, Texas and a regional office in Casper, Wyoming.

9. As of October 2015, the Debtor had 22 employees. The Debtor's employees are not subject to a collective bargaining agreement.

10. On July 31, 2015, the Debtor completed the sale of its tight gas reserves and production on the Pinedale Anticline in the Green River Basin of Wyoming to Vanguard Operating, LLC, for a total price of $12,000,000. The net proceeds of $10,500,000 from this sale were used to reduce secured debt.

11. Substantially all of the Debtor's revenues are generated through the sale of natural gas and oil production at market prices and the settlement of commodity hedges. Current production primarily consists of natural gas from one core area in southern Wyoming. The Debtor has coalbed methane reserves and production in the Atlantic Rim Area of the eastern Washakie Basin. In addition to acreage in the Atlantic Rim Area, the Debtor holds acreage with exploration potential in the Greater Green River Basin of Wyoming. Approximately 98% of 2014 production volume was natural gas. As an exploration and development company, the Debtor's assets, revenue, and general financial condition are directly correlated to the price of

natural gas and oil.

12. The Debtor's working interests are generally held pursuant to leases from third parties or in various properties subject to joint operating agreements.

## LENDER DEBT OBLIGATIONS

13. The Debtor is a party to a Credit Agreement dated as of August 29, 2014 (as amended, restated or otherwise modified from time to time, the "Credit Facility") among the Debtor as Borrower, and Société Générale and the financial institutions listed therein led by Société Générale (collectively the "Lender"). Société Générale serves as the Administrative Agent under the Credit Facility. The Credit Facility is generally a revolving credit facility, under which the amount of credit available for borrowing is determined by a borrowing base that is in turn determined by the value of the Debtor's oil and gas reserves on a periodic basis. As of November 5, 2015 (the "Petition Date"), the Debtor was indebted to the Lender in the aggregate amount of not less than: (i) $36,886,300.00 in aggregate principal amount; (ii) accrued and unpaid interest and fees which were $193,828.57 as of September 30, 2015; and (iii) additional amounts claimed as owed under the Credit Facility. These amounts substantially exceed the borrowing base re-determined as of September 30, 2015.

14. The Credit Facility is collateralized by substantially all of the Debtor's oil and gas producing properties, and substantially all other assets. Specifically, since the Credit Facility's inception, the Lender asserts that the mortgages granted under the Credit Facility applied to over 90% percent of the Debtor's oil and gas leases and current coverage is approximately 95% of Debtor's oil and gas leases.

15. On May 19, 2015, an event of default was declared by the Lender and as provided in the Credit Facility, effective as of May 19, 2015, the interest rate under the Credit Facility

increased to two percent (2.00%) above the otherwise applicable rates.[2]

16. The Debtor and the Lender executed a Forbearance Agreement on July 21, 2015 in which the Borrower and the Guarantors[3] acknowledge the existence of events of default under the Credit Facility. The Forbearance Agreement provided for the increase in the percentage of the Debtor's reserves that are pledged to the Lender from 80% to 85%, addressed certain lien perfection issues, and imposed certain milestones for actions by the Debtor.

17. Debtor filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on the Petition Date. As of the Petition Date, the Debtor was indebted to the Lender in the approximate amount of $36,886,300.00 plus accrued and unpaid interest and fees, and additional amounts claimed as owed under the Credit Facility.

18. Prior to the Petition Date, the Debtor sought and obtained consent to use of Cash Collateral (as defined in the Cash Collateral Motion) from the Lender and a proposed cash collateral budget as set forth in the Cash Collateral Motion. A budget showing estimated receipts and disbursements (the "Approved Budget") for the Debtor for the next thirteen weeks is attached to the Cash Collateral Motion as Exhibit "A" and is incorporated herein by reference.

## EVENTS LEADING TO CHAPTER 11 FILING

19. As an exploration and development company, the Debtor's assets, revenue, and general financial condition are directly correlated to the price of oil and natural gas. The sharp decrease in oil and natural gas prices, in excess of 50%, eroded the values of reserves on which

---

[2] The borrowing under the Credit Facility bears non-default interest at a daily rate based on an interest rate election of either the "Base Rate" or the "LIBOR Rate." Under the Base Rate option, interest is calculated at an annual rate equal to the highest of (a) the base rate for Dollar loans for such day, the Federal Funds rate for such day, or the LIBOR for such day plus (b) a margin ranging between 0.75% and 1.75% (annualized) depending on the level of funds borrowed. Under the LIBOR Rate option, interest is calculated at an annual rate equal to LIBOR, plus a margin ranging between 1.75% and 2.75% (annualized) depending on the level of funds borrowed. The average interest rate on the facility at December 31, 2014, was 3.1%.

[3] The "Guarantors" are PetroSearch and Eastern Washakie.

6

Debtor's borrowing capacity is calculated and made it difficult to obtain capital for operations and for further development of the Debtor's leasehold interests. With declining asset values and shrinking revenue while costs remained relatively constant, the Debtor faced decreasing liquidity.

20. Given the decreases in operating cash flows due primarily to the declines in natural gas prices and the corresponding decrease in its borrowing base, the Debtor has focused on near-term business strategies: 1) attempting to identify potential merger candidates which might offer improved opportunities to obtain capital to develop its natural gas and oil properties and to acquire natural gas properties; 2) maintaining production while efficiently managing, and in some cases reducing, its operating and general and administrative costs; 3) evaluating asset divestiture opportunities to allow the Debtor to reduce its overall indebtedness; and 4) pursuing the acquisition of certain oil and gas properties that would result in overall lower operating costs in comparison with the resulting added revenue. To these ends, in April 2015, the Debtor retained Petrie Partners, LLC, as its investment bankers.[4]

21. On July 31, 2015, the Debtor completed the sale of its tight gas reserves and production on the Pinedale Anticline in the Green River Basin of Wyoming to Vanguard Operating, LLC for a total price of $12,000,000. The net proceeds of $10,500,000 from this sale were used to reduce the secured debt owed to the Lender.

22. As natural gas prices remained low, the Debtor continued discussions on maximizing value to the Lender and all stakeholders in the Debtor's business and ultimately determined that relief under chapter 11 of the Bankruptcy Code would allow the Debtor the best opportunity to restructure its liabilities and reposition assets to maximize their value. Unable to raise additional capital in this environment and with its current Lender unwilling to advance

---

[4] Debtor does not anticipate retaining Petrie Partners postpetition.

7

further funds, Debtor commenced this case to protect any going concern value.

## RELIEF SOUGHT ON AN EXPEDITED BASIS

### A. Interim Order for Authority to Use Cash Collateral

23. In order to continue operations and allow for a successful reorganization, the Debtor will require the use of funds on hand and funds to be received. The Debtor believes those funds are subject to a lien in favor of the Lender and that no other party has an interest in cash collateral. Debtor filed the Cash Collateral Motion to obtain authority to use Cash Collateral.

### B. Order Authorizing Payment of Prepetition Wages, Salaries, Expenses and Benefits

24. The Debtor makes this Request for Authority to Pay Prepetition Benefits, Honor Prepetition Vacation Time, Reimburse Prepetition Employee Business Expenses, and Pay Prepetition Wages ("Employment Request").

25. Debtor has approximately 22 employees, of which twelve are wage earners and ten are salaried (collectively, the "Employees"). Prior to the Petition Date, Debtor paid its salaried employees their normal salary through November 6, 2015. The salaried employees are not owed any pre-petition wages at this time. Debtor paid its wage earners their wages through the Petition Date; however, the wage earners are paid one week in arrears and thus are still owed for seven (7) days of prepetition wages.

26. Debtor funds on an on-going basis various sums for 401(k) plan match obligations, all of which are current. Debtor's and the Employees' share of all 401(k) plan contributions are made at the time wages and salaries are paid. Employees are also entitled to certain accrued but unpaid vacation.

27. Amounts owed for unpaid wages are generally small and under the amount of $12,475.00 per individual. Debtor's payment of wage claims will be capped at the statutory maximum under § 507(a)(4) of the Bankruptcy Code.

28. The Debtor provides a group health insurance plan for its Employees. On average, the Debtor pays 90% of the premium costs and the employee 10%. All Employee contributions are deducted from their earnings. Additionally, the Debtor may also owe various amounts to certain of the Employees for reimbursement of reasonable prepetition business expenses, such as mileage, meals and other reimbursements, many of whom work in remote locations in the field. Not all accrued employee benefits for services rendered prior to the Petition Date became due prior to the Petition Date, but will become due in the ordinary course in the immediate future.

29. Debtor uses an external payroll service and does not process payroll or hold proceeds or funds for Employees. Debtor's payroll is outsourced to Discovery Outsourcing ("Discovery"). Every other week, Discovery automatically withdraws payroll from Debtor's operations account to cover the prior two weeks' pay period. Discovery pays Employees directly either through direct deposits or checks drawn on Discovery's account. In each case, the direct deposits and checks are generally received by Employees on the Friday following Debtor's payroll remittance to Discovery.

30. The Debtor seeks authority to, in the ordinary course of business and consistent with Debtor's employment policies: (i) honor its prepetition payroll obligations and pay its employer 401(k) match obligations; (ii) honor accrued, but unused paid time off; (iii) pay all employee business expenses that accrued prepetition; and (iv) maintain its group health insurance plan and pay the employer share of the premiums (collectively, the "Prepetition Benefit Obligations"). Prepetition Benefit Obligations also includes the fees, charges, and

obligations Debtor may owe to third parties, including, but not limited to, Discovery, who administers Debtor's employee benefits.

31. If the Debtor is not permitted to maintain its group health plan and 401(k) plan and to pay employee benefits to its Employees in the ordinary course of business, Employees will not receive full payment for services already performed. Such a result would seriously undermine the morale and loyalty of the employees and, as a result, the Debtor's reorganization efforts would be impaired.

32. The Lender has consented to the proposed payments, which are reflected in the Approved Budget.

33. No single Employee will receive payment in excess of the limitations set forth in §§ 507(a)(4) and (a)(5) of the Bankruptcy Code.

34. As set forth in the Fenster Affidavit, the Debtor believes it is in the best interests of the Debtor, the estate and its creditors to grant the Employment Request. Debtor believes that granting the Employment Request will promote continuity of Debtor's operations and foster the stability of its Employees. The continuance of the Employee benefits offered by the Debtor is an integral part of that effort.

35. Accordingly, Debtor requests that this Court enter an expedited order granting this Employment Request to honor and pay its pre-petition benefits and wages to its Employees, in the ordinary course of operations.

### C. Request for Order Authorizing Payment of Prepetition Claims of Certain Critical Vendors

36. As set forth in more detail in the Fenster Affidavit, Debtor is seeking authority to pay (a) the operating critical vendors, (b) the unit operators for the amounts due under Joint Interest Billings, as that term is defined below, and (c) certain prepetition vendors whose

services, if interrupted, could irreparably harm the Debtor (together with the operating critical vendors and the unit operators, the "Prepetition Critical Obligations").

37. Debtor has identified three (3) critical vendors who provide essential operational services in areas where substitute service providers are either not available due to geographical remoteness or simply do not have the level of skill and diligence to be replaced without causing a delay and disruption to Debtor's gas well operations. The vendors deemed critical are Winchester Well Service, Inc. ("Winchester"); Dunn Trucking, Inc. ("Dunn"); and Warrior Welding and Backhoe Service, LLC ("Warrior") (collectively, the "Operating Critical Vendors"). The amount owed to the Operating Critical Vendors totals $122,623.77 in the aggregate as of the Petition Date, not including Joint Interest Billings, as defined below.

38. In addition, Debtor is a participant in approximately 21 unitized fields.[5] The unitized fields are subject to "Unit Agreements" and/or "Unit Operating Agreements." The Unit Operating Agreements require Debtor to pay on a monthly basis its share of unit operating costs billed by the unit operator, commonly called "Joint Interest Billings," or "JIBs." In some circumstances, the costs of production are "trued up" on an annual basis as well. If Debtor fails to pay the JIBs in a timely manner, the other parties to the Unit Operating Agreement have, among other legal default remedies, the right to recoup the amount owed against the proceeds from the sale of the defaulting party's share of production.[6] Any recoupment against Debtor's interests would result in a reduction in net revenue to Debtor and negatively impact relations with other parties to the Unit Operating Agreement.

---

[5] Unitized fields are those in which a number of parties share production of oil or gas from the field and the costs associated with the production based on each party's proportionate interest in the field, regardless of where (or on whose property) the wells are located.
[6] Debtor believes that such recoupment would not violate the automatic stay.

39. The total pre-petition JIBs billed but unpaid ("Billed JIBs") total $1,890,095.05. In addition, there are likely prepetition JIB costs that have not yet been billed by the unit operators (the "Unbilled JIBs"), which Debtor estimates total approximately $197,000. Both Billed and Unbilled JIBs need to be paid to maintain the viability of Debtor's business operations. Debtor requests authority to pay these in the ordinary course of business.

40. In addition to the Prepetition Critical Obligations, Debtor may have prepetition obligations that are not subject to §§ 365 and 366, for which the holders may discontinue or terminate services or products (with or without right), the uninterrupted provision of which are essential to Debtor's business, such as cell phone and data services. The prepetition obligation for any such service or product is $500.00 or less (the "Prepetition Convenience Obligations"). The cost of the time and effort required to ensure the continuation of such services would exceed the cost of cure. Accordingly, the Debtor requests authority to pay Prepetition Convenience Obligations at its discretion in amount not to exceed $500.00 to each holder of a Prepetition Convenience Obligation.

41. The Lender has consented to the payment of the Operating Critical Vendors, the JIBs, and the Prepetition Convenience Obligations.

### D. Interim Order Determining Adequate Assurance of Payment for Future Utility Services and Restraining Utilities Companies from Discontinuing, Altering, or Refusing Service

42. Debtor requests an order setting a process to determine whether adequate assurance of payment to utility providers is proper and prohibiting utility providers from altering, discontinuing, or refusing utility service to Debtor (the "Utility Request").

43. In connection with its business, the Debtor receives utility service from multiple vendors in Colorado and Wyoming (the "Utility Companies") as follows:

| UTILITY | REMITTANCE ADDRESS | ACCT NO. | TYPE OF SERVICE | SERVICE LOCATION |
|---|---|---|---|---|
| CenturyLink | P.O. Box 29040, Phoenix, AZ 85038-9040 | 307-237-9330 011B; 307-472-5481 975B | Phone & Internet | 777 Overland Plaza, Casper, WY 82602 |
| PAETEC (Windstream) | P.O. Box 9001013, Louisville, KY 40290-1013 | 63259119201 | Toll Call Service | 777 Overland Plaza, Casper, WY 82602 |
| ShoreTel Inc. | 4921 Solution Center, Chicago, IL 60677-4009 | 6426 | IP Phone Service | 675 Bering Dr., Ste 850, Houston, TX 77057 |
| Integra Telecom | P.O. Box 2966, Milwaukee, WI 53201-2966 | 896370 | Phone & Internet | 1675 Broadway, Ste 2200, Denver CO 80202 |
| Comcast | P.O. Box 660618, Dallas, TX 75266-0618 | 8777 70 317 4545780 | TV & Internet | 675 Bering Dr., Ste 850, Houston, TX 77057 |
| Powder River Energy Group | P.O. Box 930, Sundance, WY 82729-0930 | 2168025 | Electric Service, Rabourn 11-5 | 50-69-05-006 NWNW |
| Rocky Mountain Power | P.O. Box 26000, Portland, OR 97256-0001 | 55369371-0012 | Electric Service | Hwy 789 S of Creston # Gas Wamsutter, WY |
| Rocky Mountain Power | P.O. Box 26000, Portland, OR 97256-0001 | 55369371-0038 | Electric Service | Creston 27 Miles South Rawlins WY, Pipe Yard Office & Equipment |
| Rocky Mountain Power | P.O. Box 26000, Portland, OR 97256-0001 | 53449206-0015 | Electric Service | 1) Creston Jct 25 Miles S Rawlins WY; 2) Creston Jct 18 Miles S Rawlins WY; 3) Creston Jct 25 Miles S Rawlins WY |

| Dubois Telephone Exchange | P.O. Box 246, Dubois, WY 82513 | 17699 | Office Phone & Internet Service | 2747 Wyoming HWY 789, Baggs, WY 82321 |
|---|---|---|---|---|
| Verizon Wireless | P.O. Box 660108, Dallas, TX 75266-0108 | 7420731714-00001; 942056499-00001 | Phone & data service for Scada | Wyoming Field |
| Union Telephone Company | P.O. Box 160, Mountain View, WY 82939 | 70067004 | Mobile Phones & Service | Wyoming Field |

44. The Debtor has not been required to post any deposits and is current with its obligations to the Utility Companies. As reflected in the Approved Budget, the Debtor anticipates sufficient cash post-petition to assure the Utility Companies of prompt and continued payment of their invoices on an ongoing basis.

45. Some of the listed Utility Companies are internet and telephone providers that, while perhaps not technically a utility under the Bankruptcy Code, provide critical communication and other related services for which payment and continuation of the service is critical. Continuity of the Debtor's utility services is essential for continued operation of its business and to prevent irreparable damage to the value of its estate.

46. The Debtor seeks entry of an order pursuant to § 366 of the Bankruptcy Code to: (i) determine adequate assurance for the payment of utility service to the Utility Companies; and (ii) preclude the Utility Companies from altering, refusing, or discontinuing service.

47. The Debtor requests an interim order setting the following procedures for determining adequate assurance of payment (the "Interim Utility Order"):

    a. Prior to entry a final order (the "Final Utility Order") with respect to the Utility Request, pursuant to section 366(c)(3) of the Bankruptcy Code, Debtor is not required to pay to the Utility Companies listed on Exhibit A hereto any security deposit or other adequate assurance payments, each of whom were served a copy

14

of the Motion. To the extent any Utility Company requests adequate assurance of payment, such Utility Company may file an objection within the time provided in paragraph 12(c) of the Interim Utility Order.

b. Debtor is authorized, but not directed, to pay on a timely basis in accordance with its prepetition practices all undisputed invoices for postpetition utility services rendered by the Utility Companies to the Debtor.

c. To the extent any entity that is not listed above believes it provides Debtor with a utility service within the meaning of 11 U.S.C. § 366, that entity must make a written request to be added to the list within twenty (20) days of the date of this Interim Utility Order. Failure to make a written request within the twenty-day time period bars such entity from altering, discontinuing, or refusing the services it provides to Debtor pursuant to 11 U.S.C. § 366.

48. Accordingly, the Debtor requests that, absent further order of this Court, the Utility Companies, including any subsequently added Utility Companies, are prohibited from altering, refusing, or discontinuing service to or discriminating against Debtor on account of unpaid pre-petition invoices or requiring Debtor to pay a deposit or other security in connection with the provision of postpetition utility services, other than in accordance with the procedures herein.

**E.     Order Establishing Interim Notice, Case Management and Administrative Procedures Pursuant to 11 U.S.C. § 105, Rules 2002 and 9007 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 2081-2**

49. The Debtor seeks an order of this Court pursuant to 11 U.S.C. § 105, Bankruptcy Rules 2002 and 9007, and Local Bankruptcy Rule 2081-2(c) limiting notice in this case; and (ii) establishing the manner of service with respect to all matters for which the Bankruptcy Code and the Bankruptcy Rules authorize the Court to designate or limit the parties entitled to notice and the manner of service, including matters subject to Bankruptcy Rules 2002(i), 4001, 6004, 6006, or 6007 (the "Notice Request").

50. The list of possible parties in interest in this case includes not only creditors, but also many parties to executory contracts such as royalty interest holders, leases and joint operators. The total number exceeds 190.

51. The size of this case does not warrant the expense of an outside claims and noticing service, though counsel anticipates using a mailing service to reduce overall costs. Given the administrative costs of mailing notices to all of the Debtor's creditors and parties in interest in this Chapter 11 proceeding, the Debtor requests that the required notice list be limited to those parties set forth in Local Bankruptcy Rule 2081-2(c)(2) (the "Limited Notice List").

52. For all matters for which notice to all creditors is required under Fed. R. Bankr. P. 2002(a)(2), (3), and (6), the Debtor shall not be required to provide notice to all creditors so long as a committee is appointed under 11 U.S.C. § 1102 and Debtor provides notice to the committee.

53. For all electronic filers, as defined in L.B.R. 9036, an order should provide that it constitutes consent to service of pleadings filed in this case on the CM/ECF system by the Court's electronic transmission facility, unless such electronic filer elects to receive service by first class U.S. mail and delivers notice of the same to counsel for the Debtor. This consent to receive electronic service would apply to this case only.

54. The creditors' matrix lists employees that had prepetition priority claims that are expected to be satisfied in connection with the Employment Request or are part of the Debtor's executive team and have, by virtue of their role, either constructive or actual knowledge of matters filed in this case. Second, excluding employees from the creditors' matrix protects their home addresses from public disclosure and reduces the administrative burden upon the Debtor of maintaining more than one creditors' matrix (i.e. redacted and non-redacted). Debtor believes that

removing Employees from the creditors' matrix once they have been paid pursuant to the Debtor's Motion serves several purposes and will not prejudice them.

55. Nothing in the Notice request is intended to alter Debtor's obligation to give notice to all creditors, parties in interest, and, where applicable, equity security holders of the meeting of creditors, the dismissal or conversion of this case to a case under another chapter, the time fixed to accept or reject a proposed modification of a plan of reorganization, the time fixed for filing proofs of claim as required by Bankruptcy Rule 2002(a), the time fixed for filing objections to and the hearing on the disclosure statement and the plan of reorganization required by Bankruptcy Rule 2002(b), or entry of an order of confirmation of the plan of reorganization, Bankruptcy Rule 2002(d), (f) and 7004(h).

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court enter

    a. the Order Authorizing Payment of Prepetition Wages, Salaries, Expenses and Benefits;

    b. the Interim Order Authorizing Use of Cash Collateral;

    c. the Order Authorizing Payment of Prepetition Claims of Certain Critical Vendors;

    d. the Interim Order Determining Adequate Assurance of Payment for Future Utility Services and Restraining Utility Companies from Discontinuing, Altering or Refusing Service;

    e. the Order Establishing Interim Notice Procedures; and

    f. otherwise granting such further relief as the Court deems proper.

| | |
|---|---|
| Dated November 5, 2015 | Respectfully submitted, |
| | |
| | **ONSAGER | GUYERSON |**<br>**FLETCHER | JOHNSON, LLC** |
| | |
| | *s/ Andrew D. Johnson*<br>Andrew D. Johnson, #36879<br>Christian C. Onsager, #6889<br>Michael J. Guyerson, #11279<br>1801 Broadway, Suite 900<br>Denver, Colorado 80202<br>Ph: (303) 512-1123<br>Fax: (303) 512-1129<br>consager@OGFJ-law.com<br>mguyerson@OGFJ-law.com<br>ajohnson@OGFJ-law.com<br>**Proposed Counsel for Debtor** |