UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: ) | |
| ) | Case No. 15-15-22395-TBM |
| ESCALERA RESOURCES CO., a Maryland ) | |
| corporation, ) | Chapter 11 |
| ) | |
| Debtor. ) | |
| ) | |

AFFIDAVIT OF ADAM FENSTER IN SUPPORT OF MOTION SEEKING
EXPEDITED ENTRY OF FIRST DAY ORDERS

CITY AND COUNTY OF DENVER      )
                               )
STATE OF COLORADO              )

Adam Fenster, of full age, being duly sworn, deposes and says:

1. I am the Chief Financial Officer ("CFO") of Escalera Resources Co. (the "Escalera").

2. As CFO of Escalera, I have personal knowledge of the matters set forth herein.

3. This affidavit (the "Affidavit") is submitted in support of the (i) Motion Seeking Expedited Entry of First Day Orders (the "First Day Motion") and (ii) the Expedited Motion for Authority to Use Cash Collateral (the "Cash Collateral Motion"). Except as otherwise indicated, all facts set forth in the Affidavit are based upon my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of Escalera's operations.

COMPANY OVERVIEW

4. Escalera is an independent energy company engaged in the exploration, development, production and sale of natural gas and crude oil, primarily in the Rocky Mountain basins of the western United States. Its core operations are natural gas wells in Wyoming. Escalera

was incorporated in Wyoming in 1972 and reincorporated in Maryland in 2001. Its corporate offices are located at 1675 Broadway, Suite 2200, Denver, Colorado 80202. In addition to Escalera's leased office space in Denver, Escalera leases executive office space in Houston, Texas and a regional office space in Casper, Wyoming.

5. Although Escalera has six wholly-owned subsidiaries, and one of these subsidiaries, PetroSearch Energy Corporation, a Nevada corporation ("PetroSearch"), has nine wholly-owned subsidiaries, only two of these companies, PetroSearch and Eastern Washakie Midstream LLC, a Wyoming corporation ("Eastern Washakie") are considered to be operating in any fashion.

6. As of October 31, 2015, Escalera had 22 employees. None of the employees are subject to a collective bargaining agreement.

7. Escalera has approximately 14,300,000 shares of common stock (symbol "ESCR") and 1,610,000 shares of Series A Cumulative Preferred Stock (symbol "ESCRP") outstanding. All Series A Cumulative Preferred Stock are currently publicly traded on the NASDAQ Capital Market, all shares of common stock are now traded on the OTC Market's Pink Sheet marketplace.

8. Escalera is a party to a Credit Agreement dated as of August 29, 2014 (as amended, restated or otherwise modified from time to time, the "Credit Facility") among Escalera as Borrower, and Société Générale and the financial institutions listed therein led by Société Générale (collectively the "Lender"). Société Générale serves as the Administrative Agent under the Credit Facility. The Credit Facility is generally a revolving credit facility, under which the amount of credit available for borrowing is determined by a borrowing base that is in turn determined by the value of Escalera's oil and gas reserves on a periodic basis. As of the Petition Date, Escalera was indebted to the Lender in the aggregate amount of not less than: (i) $36,886,300.00 in aggregate

principal amount; (ii) accrued and unpaid interest and fees which were $195,118.00 as of September 30, 2015; and (iii) additional amounts claimed as owed under the Credit Facility. These amounts substantially exceed the borrowing base as re-determined as of September 30, 2015.

9. The Credit Facility is collateralized by substantially all of Escalera's oil and gas producing properties, and substantially all other assets. Specifically, since the Credit Facility's inception, the Lender asserts that the mortgages granted under the Credit Facility applied to over 90% percent of the Debtor's oil and gas leases and current coverage is approximately 95% of Debtor's oil and gas leases.

10. Escalera currently has other outstanding debts (some of which are disputed) of over $3.1 million: (i) about $1.9 million joint interest billings that are subject to recoupment by the joint operators of the properties in which the Debtor has a working interest. Another $650,000 is severance claimed by two former employees. A material portion of the remaining debt is or may be secured by well liens, mechanics liens and materialmen's liens.

11. Estimated ad valorem taxes are and will be coming due during the case of approximately $2,572,000. These taxes are due to Carbon, Campbell and Natrona Counties in Wyoming. Since outstanding ad valorem taxes accrue interest at a rate of 18% per annum, the Debtor intends to pay the taxes that are currently due as soon as practicable upon obtaining authority from this Court.

12. Escalera's current production consists primarily of natural gas from one core area in southern Wyoming, the Atlantic Rim area of the eastern Washakie Basin (the "Atlantic Rim Area"), in which it has coalbed methane ("CBM") reserves. Escalera also holds acreage with exploration potential in the Greater Green River Basin of Wyoming.

13. Approximately 98% of Escalera's 2014 and 2015 production volume was natural gas. Substantially all of Escalera's revenues are generated through the sale of natural gas and oil production at market prices and the settlement of commodity hedges.

14. Escalera currently has estimated proved reserves of 65.5 Bcf (billion cubic feet) of natural gas and 134.4 MBbl (1,000 barrels of oil) of oil, for a total of 66.3 Bcfe (billion cubic feet equivalent). Of these estimated proved reserves, 56% were proved developed and 99% were natural gas.

15. Beginning in the second half of 2014, natural gas and oil commodity prices decreased substantially compared to prices during the first half of 2014, and pricing has continued to decline or remain low through the first three quarters of 2015. As a result, these lower prices and its depleting asset base, Escalera's cash flow from operations has decreased while its level of indebtedness has increased.

16. Given the decreases in Escalera's operating cash flows, Escalera focused on the following near-term business strategies: 1) attempting to identify potential merger candidates which might offer improved opportunities to obtain capital to develop its natural gas and oil properties and to acquire natural gas properties; 2) maintaining production while efficiently managing and in some cases reducing its operating and general and administrative costs; 3) evaluating asset divestiture opportunities to allow Escalera to reduce its overall indebtedness; and 4) pursuing the acquisition of certain oil and gas properties that would result in overall lower operating costs in comparison with the resulting added revenue.

17. Escalera also explored raising additional capital in order to pursue its objective of acquiring and developing natural gas properties; however, given its current capital structure and the recent declines in natural gas and oil commodity prices, raising such capital is unlikely.

Escalera's current capital structure inhibits raising capital due primarily to certain terms and provisions of its Series A preferred stock.

18. On May 19, 2015, the Lender declared an event of default, and, as provided in the Credit Facility, the loans began accruing interest at 2.00% above the otherwise applicable rates effective as of May 19, 2015.[1]

19. Escalera and the Lender executed a Forbearance Agreement on July 21, 2015, in which the Borrower and the Guarantors acknowledge the existence of events of default under the Credit Facility. The Forbearance Agreement provided for the increase in the percentage of Debtor's Reserves that are pledged to the Lender from 80% to 85%, addressed certain lien perfection issues, and imposed certain milestones for actions by Escalera.

20. In May 2015, Escalera engaged Petrie Partners, LLC as its investment banker to serve as financial advisor, as might be needed, for matters Escalera was addressing, including the negotiations for a prospective acquisition, asset sales, and identifying potential merger candidates This financial advisor assisted Escalera entering into a purchase and sales agreement in June 2015 for certain assets held by Warren Resources, Inc. ("Warren"). These assets are adjacent to Escalera's Catalina Unit and would allow for operational efficiencies when operated together.

21. On July 31, 2015, Escalera completed the sale of its tight gas reserves and production on the Pinedale Anticline in the Green River Basin of Wyoming to Vanguard Operating, LLC for a total price of $12,000,000. The net proceeds of $10,500,000 from this sale were used to reduce the secured debt owed to the Lender.

---

3. The Borrowings under the Credit Facility bear non-default interest at a daily rate based on the interest rate election of either the Base Rate or the LIBOR Rate. Under the Base Rate option, interest is calculated at an annual rate equal to the highest of (a) the base rate for Dollar loans for such day, the Federal Funds rate for such day, or the LIBOR for such day plus (b) a margin ranging between 0.75% and 1.75% (annualized) depending on the level of funds borrowed. Under the LIBOR Rate option, interest is calculated at an annual rate equal to LIBOR, plus a margin ranging between 1.75% and 2.75% (annualized) depending on the level of funds borrowed. The average interest rate on the facility at December 31, 2014, was 3.1%.

22.     In connection with the prospective acquisition of the Warren assets, Escalera engaged an additional advisor in July 2015 to assist Escalera in raising debt capital to close the acquisition. This acquisition contemplated a purchase price of $47 million based on Escalera's valuation at the time. Since prices for natural gas continued to decline during 2015, the value of this acquisition continued to decline and so did the amounts Escalera was going to be able to borrow to fund the acquisition or recapitalize. Warren and Escalera have continued to negotiate concerning a revised purchase price, but the acquisition is no longer under contract.

23.     Escalera is pursuing this chapter 11 case after exploring all reasonable alternatives. Escalera's chapter 11 filing is accompanied by a proposal for use of cash collateral that has been negotiated prepetition with the Lender and that will enable Escalera to continue operating in the ordinary course of business.

24.     Escalera intends to file a plan of reorganization in November 2015 based on a term sheet negotiated with the Lender, which term sheet is attached to the Cash Collateral Motion as Exhibit B.

25.     Escalera's objective is to maintain Escalera as a going concern, since Escalera believes that a liquidation of the assets would not be in the best interest of the creditors of Escalera. Escalera intends to focus on:

- identifying alternative ways to enhance the value of its natural gas reserves;
- investing in and enhancing its existing production wells and field facilities on operated and non-operated properties in the Atlantic Rim Area (hereinafter defined);
- selectively pursuing acquisitions of abundant, low cost natural gas assets that are currently undervalued or underutilized; and

- pursuing high quality exploration and strategic development projects with potential for providing long-term drilling inventories that generate above average returns.

*Derivative Instruments*

26. As a hedge against negative market forces and commodity prices for natural gas Escalera previously entered into various derivative instruments - such as forward contracts, costless collars and swaps - to mitigate the risk associated with downward fluctuations in the prices of natural gas and oil and the resulting impact on cash flow, net income, and earnings per share. The duration of the various derivative instruments depended on senior management's view of market conditions, available contract prices and Escalera's operating strategy. In accordance with the Credit Agreement, Escalera hedged at least 85% of its projected production through 2016 based on its most recent third-party prepared reserve report (December 31, 2014). At this time Escalera has liquidated all of its 2016 hedges; the remaining 2015 hedges will remain in place but will mature in the normal course over the coming months.

## PROPERTIES AND OPERATIONS

27. As of September 30, 2015, Escalera owned interests in over 700 producing wells. As of December 31, 2014, it leased 343,947 gross (112,219 net) acres, of which 268,820 gross (95,661 net) acres are undeveloped in what Escalera believes are natural gas prone basins primarily located in the Rocky Mountains.

28. As of September 30, 2015, Escalera's total estimated acreage holdings by basin were:

| Basin | Gross Acres | Net Acres |
|---|---|---|
| Washakie Basin | 146,641 | 28,870 |

| | | |
|---|---:|---:|
| Wind River Basin | 18,847 | 3,966 |
| Powder River Basin | 18,252 | 12,812 |
| Utah Overthrust | 46,475 | 14,746 |
| Greater Green River Basin | 15,707 | 1,929 |
| Hanna Basin | 10,488 | 5,764 |
| Total | 256,410 | 68,088 |

Escalera's project development focus is in areas where it believes its core competencies can provide it with competitive advantages.

*Eastern Washakie Midstream, LLC*

29. Escalera's subsidiary Eastern Washakie owns a 13-mile pipeline and related gathering assets ("EWM Pipeline") which connect the Catalina Unit with the pipeline system owned by Southern Star Central Gas Pipeline, Inc.[2] The EWM Pipeline provides Escalera with access to the interstate gas markets and the ability to move third party gas. Escalera has attempted to sell the EMW pipeline with no success.

*Marketing and Major Customers*

30. Oil and natural gas are marketed and sold primarily to purchasers that have access to nearby pipeline facilities. Typically, oil is sold at the wellhead at field-posted prices and natural gas is sold both (i) under contract at negotiated prices based upon factors normally considered in the industry (such as distance from well to pipeline, pressure and quality) and (ii) at spot prices. Escalera currently has no long-term delivery contracts in place.

31. The marketing of most of Escalera's products are performed by a third-party marketing company, Summit Energy, LLC. Although a substantial portion of such production is purchased by one customer, Escalera does not believe the loss of this customer would likely have

---

[2] Legal title to some or all of the easement for the EMW Pipeline is held by Escalera for the benefit of Eastern Washakie.

a material adverse effect on its business because there are other customers in the area that are accessible to it.

*Reserves*

32. Reserve estimates are inherently imprecise and are subject to revisions based on production history, results of additional exploration and development, prices of oil and gas, and other factors. Accordingly, reserves estimates may vary from the quantities of oil and natural gas that are ultimately recovered.

33. Assuming that the prices Escalera is currently receiving for its products do not recover during the remainder of 2015, Escalera expects significant negative revisions to its estimated proved natural gas and oil reserves based upon this low pricing environment. Further, any further decrease in the expected future natural gas prices could potentially result in impairment charges after Escalera estimates the 2015 year-end discounted future net cash flows from its proved properties and compares them with their respective net book values. Additionally, the low natural gas and oil prices will affect the economic feasibility of developing Escalera's proved undeveloped reserves and will also likely limit the Escalera's access to capital resources to develop its proved undeveloped reserves, including borrowing capacity.

## ESCALERA'S EXPEDITED MOTION FOR AUTHORITY TO USE CASH COLLATERAL

34. Escalera has, by separate motion (the "Cash Collateral Motion") moved for authority to use cash collateral.

35. In order to continue operations and allow for a successful reorganization, Escalera will require the use of funds on hand and funds to be received. Escalera believes those funds are cash collateral within the meaning of § 363(a) subject to a senior lien in favor of the Lender. The cash collateral which Escalera seeks to use is comprised primarily of funds held in various bank

accounts at Vectra Bank and its ongoing revenues, along with receivables owed to Escalera (collectively, the "Cash Collateral").

36. Pursuant to the Credit Facility, Escalera granted to the Lender a security interest in and continuing lien ("Prepetition Liens") on almost all of Escalera's assets and property ("Prepetition Collateral"), including the Cash Collateral. Escalera believes the Prepetition Liens in the Prepetition Collateral, including the Cash Collateral, are legal, valid, binding, enforceable, non-avoidable and perfected.

37. Escalera is not aware of any party with an interest in Cash Collateral other than the Lender.

38. Consequently, prior to filing this Motion, Escalera sought and obtained consent to use of Cash Collateral from the Lender. Such consent is conditioned upon the Court's entry of an order in the form attached to the Cash Collateral Motion as **Exhibit 1** (the "proposed order").

39. I have prepared a budget showing estimated receipts and disbursements (the "Approved Budget") for Escalera for the next thirteen weeks, which is attached to the proposed order as **Exhibit A**. I believe the Approved Budget to be an accurate projection, subject of course to the inherent uncertainties in any projection of this sort. However, as a natural gas company with coal-bed methane production, Escalera's revenues are significantly less variable than many crude oil exploration and production companies, such as those producing from more traditional gas wells or shale reservoirs, since the depletion curves on Escalera's coal-bed methane properties tend to be constant over long periods (sometimes decades).

40. The Term Sheet attached to the proposed order as **Exhibit B** reflects the result of arms-length negotiations with the Lender. Escalera's management believes that the terms will permit

Escalera to favorably reorganize its balance sheet and exit its chapter 11 case relatively quickly as a going concern with an assured future for at least three years.

## DEBTOR'S EXPEDITED MOTION TO DETERMINE ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES AND RESTRAINING UTILITY COMPANIES FROM DISCONTINUING, ALTERING, OR REFUSING SERVICE.

41.   In connection with its business, Escalera receives utility service from multiple vendors in Wyoming, Colorado, Texas and other states (the "Utilities"). Escalera has not been required to post any deposits by its Utilities and is current with its utility providers. A complete list of the Utilities is set forth in the First Day Motion. Some of the listed utility providers are internet and telephone providers which, while perhaps not technically a "utility" under the Bankruptcy Code, provide critical communication and other related services for which payment and continuation of the service is critical.

42.   Continuity of Escalera's utility service is essential for continued operation of Escalera's business and to prevent irreparable damage to the value of Escalera's estate.

43.   Escalera anticipates having sufficient cash postpetition, as specified in the Approved Budget, to assure the Utilities of prompt and continued payment of all their invoices on an ongoing basis. Further, if required by any Utility, Escalera will pay a one-month deposit to each of the Utilities to provide adequate assurance to such Utilities.

## REQUEST FOR ORDER AUTHORIZING PAYMENT OF PREPETITION WAGES, SALARIES, EXPENSES AND BENEFITS

44.   Prior to the Petition Date, Escalera had approximately 22 employees, of which twelve are wage-earners and ten are salaried (collectively, the "Employees"). Escalera paid its salaried employees their normal salary through the Friday before the Petition Date. The salaried

employees are not owed any pre-petition wages at this time. Escalera paid its wage earners their wages through the Petition Date; however, the wage earners are paid one week in arrears and thus are still owed for seven (7) days of prepetition wages.

45. The Employees are also entitled to certain accrued, but unpaid vacation and sick leave.

46. Escalera funds on an on-going basis various sums for 401(k) plan match obligations, all of which are current. Escalera's and the Employees' share of all 401(k) plan contributions are made at the time of payroll. Escalera also provides a group health insurance plan for its Employees. On average, Escalera pays what amounts to 90% of the premium costs and the Employees pay the remaining 10%. All of the Employees' contributions are deducted from their salary or wages (the 401(k) plan and the group health insurance plan and hereinafter collectively referred to as the "Employee Benefit Obligations").

47. Escalera uses an external payroll service and does not process payroll or hold proceeds or funds for Employees. Escalera's payroll is outsourced to Discovery Outsourcing ("Discovery"). Every other week, Discovery automatically withdraws payroll from Escalera's operations account to cover the prior two weeks' pay period. Discovery pays Employees directly either through direct deposits or checks drawn on Discovery's own operations account. In each case, the direct deposits and checks are generally received by Employees on the Friday following Escalera's payroll remittance to Discovery. Escalera also issues employee expense reimbursements by check, generally paid directly from its operations account. Many of the field based Employees work in remote locations and may use personal vehicles for company purposes for which mileage and other reimbursements are commonly made.

48. Not all accrued employee benefits for services rendered prior to the Petition Date became due prior to the Petition Date, but will become due in the ordinary course in the immediate future. All of these amounts are generally small and under the amount of $12,475.00 per individual. To the extent any payment to an Employee pursuant to the authority that Escalera seeks would exceed $12,475.00, the payment will be limited to $12,475.00.

49. Escalera seeks authority, in the ordinary course of business, to: (i) honor its prepetition payroll and expense reimbursement obligations to the Employees; (ii) pay its 401(k) Obligations; (iii) honor accrued, but unused vacation time and sick days; and (iv) to maintain its group health insurance plan and to pay the employer share of the premiums.

50. If Escalera is not permitted to honor these obligations in the ordinary course of business, Employees will not receive full payment for services already performed. Such a result would seriously undermine the morale and loyalty of the Employees and, as a result, Escalera's reorganization efforts would be substantially jeopardized.

51. To maintain the continuity of Escalera's business and to preserve the morale of its continuing work force, it is essential that Escalera be permitted to pay benefits which have accrued but remain unpaid.

## REQUEST FOR ORDER AUTHORIZING PAYMENT OF PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS

*Overview*

52. Escalera is seeking authority from the Court to pay the Operating Critical Vendors and the unit operators for the amounts due for joint interest billings under unit working agreements as discussed below. The Operating Critical Vendors provide essential and critical services for well operations, and it is essential that Escalera maintain its share of production under the unit operating agreements.

53. Escalera has identified three (3) critical vendors who provide essential operational services in areas where substitute service providers are either not available due to geographical remoteness or simply do not have the level of skill and diligence to be replaced without causing a delay and disruption to Escalera's gas well operations. The vendors deemed critical are: Winchester Well Service, Inc. ("Winchester"); Dunn Trucking, Inc. ("Dunn"); and Warrior Welding and Backhoe Service, LLC ("Warrior"). Winchester, Dunn and Warrior are sometimes collectively referred to as the ("Operating Critical Vendors"). The amount owed the Operating Critical Vendors totals $122,623.77 in the aggregate as of the Petition Date, not including JIBs.

54. In addition, Escalera is a participant in approximately 21 Unit Agreements and their corresponding Unit Operating Agreements, which require Escalera to pay on a monthly basis its share of unit operating costs billed by the unit operator, commonly called "Joint Interest Billings," or "JIBs." In some circumstances, the costs among the holders of the working interests are "trued up" on an annual basis as well. If Escalera fails to pay its share of the costs in a timely manner, the other participating parties have, among other legal default remedies, the right to recoup the amount owed against the proceeds from the sale of the defaulting party's share of production. Any recoupment against Escalera's interests would result in a reduction in net revenue to Escalera and negatively impact relations with the joint operators.

55. The total pre-petition JIBs billed but unpaid ("Billed JIBs") total $1,890,095.05. In addition, there are likely prepetition JIB costs which have not yet been billed by the unit operators (the "Unbilled JIBs"), which Escalera estimates total $197,000. Both Billed and Unbilled JIBs need to be paid to maintain the viability of Escalera's business operations. Escalera requests authority to pay these in the ordinary course of business.

56.     Escalera also has a small number of leases still in their primary term which require cash lease payments to be made to hold those leases. These obligations are routinely billed to and paid by Escalera as part of its on-going operations. Escalera is not presently aware of any pre-petition cash lease obligations that have not been paid but, purely as a protective measure, Escalera seeks authority to make such cash lease payments, even if a pre-petition obligation.

57.     The Lender has consented to the payment of the JIBs and other critical vendor obligations as set forth in the Budget, Exhibit "B".

*Winchester Well Service*

58.     Winchester, located in Worland, Wyoming, provides a rig to support workover operations on Escalera's oil and gas wells in order to optimize and enhance production. These services include pulling and replacing tubing, rods and pumps, and performing remedial well-work to repair casing. Winchester has been providing services to Escalera for approximately nine (9) years, and it is very familiar with Escalera, its requirements and wells. Winchester is the only acceptable well service company in the area of most of Escalera's wells.

59.     Winchester's services are critical to Escalera's operations. Escalera requires uninterrupted access to repair and maintenance services. Given the number of wells in operation, there are always wells needing servicing and repair. Without Winchester's services, Escalera would not be able to maintain the wells in optimal working condition. Escalera would lose production, leading to loss of revenue.

60.     Replacing Winchester with another well service company would be extremely difficult. As previously stated, there are no other acceptable well service companies in the area. This issue, together with Winchester's familiarity with the unique problems and attributes of each of Escalera's wells, make Winchester critical to Escalera's operations.

61. As of the Petition Date, Winchester is owed $62,515.79 for services billed. In order to keep Winchester's services, Escalera feels it must pay Winchester in the next seven (7) days in order to prevent a cessation in these critical well services.

*Dunn Trucking, Inc.*

62. Dunn provides services for hauling produced water as well as crane and winch truck services to move equipment when necessary. Escalera hired Dunn to provide these services after a competitive bid process. While there are other trucking services in the area, Dunn has become familiar with Escalera's requirements and is the most reliable, which is important for smooth operations and saving operating costs in the longer run.

63. As of the Petition Date, Dunn is owed $5,557.50. It is a small company and needs to be brought current in order to meet its expenses.

*Warrior Welding & Backhoe Service, LLC*

64. Warrior provides roustabout services to repair pipelines and fittings. Warrior has provided Escalera with these services for over a year. Warrior has provided superior reliability and quality of service.

65. There are approximately two (2) other companies in the area who provide roustabout services. In the past, Escalera has utilized these companies' services, but they were deemed not as reliable and their quality of service was mediocre to poor. Escalera does not believe there is a viable and effective alternative to Warrior.

66. As of the Petition Date, Warrior is owed $54,550.48. As a smaller company, it needs to be brought current in order to continue to provide services to Escalera.

67. In summary, Escalera seeks authority herein to pay the prepetition claims of the Critical Operating Vendors and the Unit Operators as to the Billed JIBs and Unbilled JIBs (herein the "Prepetition Critical Obligations").

68. The payment of the Prepetition Critical Obligations is necessary to Escalera's effective reorganization. Escalera believes that payment of the Prepetition Critical Obligations is necessary to maintain uninterrupted operations and thereby maximize Escalera's going concern value, and is in the best interests of Escalera and its creditors.

69. I understand that these vendors may be able to assert mechanics', materialmen's or well liens against Escalera's properties and the proceeds of production under Wyoming law. While these claims may or may not be junior to the claims of the Lender, the Lender has consented to the payment of these claims in the amounts set forth in the Approved Budget.

70. In conclusion, I believe the granting of First Day Motion including the separate Motion for Authority to Use Cash Collateral, will be in the best interests of the estate and its creditors.

END OF AFFIDAVIT

Dated at Denver, Colorado, this 5th day of November, 2015

_____
Adam Fenster

Sworn to before me by Adam Fenster on this _____ day of November, 2015.

_____
Notary Public

My commission expires: _____

Dated at Denver, Colorado, this 5 day of November, 2015

_____
Adam Fenster

Sworn to before me by Adam Fenster on this 5th day of November, 2015.

_____
Notary Public

My commission expires: 1/24/19

*[Notary seal: Barbara Moss, Notary Public, State of Colorado, My Commission Expires 1/24/19]*

18