### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 15-15-22395-TBM |
| ESCALERA RESOURCES CO., a Maryland corporation, | ) | |
| | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

### DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION PROPOSED BY DEBTOR DATED JANUARY 26, 2016

Escalera Resources Co., debtor and debtor in possession in the above-captioned bankruptcy case ("Debtor"), submits this Disclosure Statement for Plan of Reorganization Proposed by Debtor dated January 26, 2016 (the "Disclosure Statement") pursuant to § 1125 of the Bankruptcy Code, 11 U.S.C. §101 *et seq.* (the "Bankruptcy Code"), to all known holders of claims against Debtor's Chapter 11 bankruptcy estate in order to disclose information deemed to be material, important, and necessary for creditors of Debtor to make an informed decision in exercising their right to vote for acceptance or rejection of the Plan of Reorganization Proposed by Debtor dated January 26, 2016(the "Plan"). The Plan has been filed with the United States Bankruptcy Court for the District of Colorado (the "Court"), and a copy of the Plan is attached as **Exhibit 1** hereto.[1]

**COURT APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY COURT APPROVAL OF THE PLAN. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN SHALL CONTROL.**

### I. DISCLOSURE STATEMENT APPROVAL, VOTING PROCEDURES AND PLAN CONFIRMATION

This Disclosure Statement is provided to all of Debtor's creditors, Equity Interest holders and other parties in interest entitled to it under the Bankruptcy Code. Debtor is the source of the information provided herein, except as may be otherwise noted. This Disclosure Statement is intended to provide adequate information to enable the typical creditor, Equity Interest holder, or other party in interest to make an informed decision to accept or reject the Plan. **YOU ARE ENCOURAGED TO READ THE PLAN, THIS DISCLOSURE STATEMENT, AND ALL EXHIBITS THERETO IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.** Prior to its distribution to all creditors, Interest holders and other parties in interest, the Court approved this Disclosure Statement by Order dated _____, 2016, as

---

[1] Capitalized terms not otherwise defined have meanings given in the Plan.

containing adequate information; however, Court approval of this Disclosure Statement does not imply Court approval of the Plan.

The Plan exhibits, being Exhibits A through F, will be filed with the Clerk of the Court at least ten (10) days prior to the last day upon which holders of Claims may vote to accept or reject the Plan, or such later date as may be approved by the Court on notice to parties in interest, as it may thereafter be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules, comprising of, without limitation, the following: (a) Management Incentive Program, (b) New Senior Secured Note, (c) PIK Note, (d) Rejected Executory Contracts and Expired Leases, (e) Amended and Restated Certificate of Incorporation and Bylaws for Reorganized Debtor, (f) the directors comprising the New Board; and (g) the identities and affiliations of the officers of Reorganized Debtor.

**A.      Plan Requirements.** The Bankruptcy Code imposes requirements for acceptance of the Plan by creditors, minimum value of distributions, and feasibility, among other things.  To confirm the Plan, the Court must find that all of these conditions and other conditions set forth in § 1129(a) of the Bankruptcy Code have been met, unless the "cram down" provisions of the Bankruptcy Code are applicable. Even if each Class of Claims accepts the Plan by the requisite majorities, the Court must undertake an independent evaluation of Plan feasibility and other statutory requirements before confirming the Plan.  The conditions for minimum value and feasibility are discussed below and elsewhere in this Disclosure Statement.

**B.      Voting on the Plan.**  Your vote on the Plan is important. The Plan can be implemented only if it is confirmed by the Court. The Plan can be confirmed only if, among other things, it is accepted by the holders of two thirds in amount and more than one-half in number of the holder(s) of Claims in at least one impaired Class who actually vote on the Plan. In the event the requisite acceptances are not obtained from the other impaired Classes, the Court may nevertheless confirm the Plan if the Court finds that it is fair and equitable to the Class or Classes rejecting it.

Holders of Claims or Equity Interests in Class 1 and Classes 4 through 8 are impaired. Holders of Allowed Claims in Class 1 and Classes 4 through 7 are entitled to vote. **IF YOU HAVE A DISPUTED, CONTINGENT OR UNLIQUIDATED CLAIM IN ONE OF THE THESE CLASSES, YOU MUST HAVE YOUR CLAIM ESTIMATED BY THE COURT IN ORDER TO VOTE**.

Even though holders of Allowed Claims or Equity Interests in Class 8, Equity Interests, are impaired, since they will receive nothing under the Plan, they are not entitled to vote and are deemed to reject the Plan.

**C.      Balloting and Confirmation of the Plan.**  The Court will hold a hearing on confirmation of the Plan on _____, 2016, and will then, among other things, determine the results of the vote. The date on which the Court approves the Plan is the "Confirmation Date," and the "Effective Date" is the date that is fifteen (15) days after the Confirmation Date (unless an appeal is taken and a stay of the confirmation order is obtained, or

Debtor, by notice filed with the Court, elect an earlier Effective Date). Objections to Confirmation are due on or before _____, 2016.

A ballot pursuant to which the holder of an Allowed Claim may vote on the Plan accompanies this Disclosure Statement. **Completed ballots should be mailed or otherwise delivered so as to be received no later than 5:00 p.m. Mountain Standard Time on _____, 2016, to:**

Alice A. White
Onsager | Guyerson | Fletcher | Johnson
1801 Broadway, Suite 900
Denver, CO 80202

If your ballot is damaged or lost, or if you have any questions concerning voting, you may contact Ms. White (email: awhite@ogfj-law.com) or by phone at (303) 512-1123.

Debtor will not count votes that do not contain the required signature. Debtor will not count votes that do not indicate acceptance or rejection as votes accepting the Plan.

Section 1126(e) of the Bankruptcy Code states that on request of a party in interest, and after notice and a hearing, the Court may designate any entity whose acceptance or rejection of the Plan is not in good faith, or is not solicited or procured in good faith or in accordance with the provisions of title 11 of the United States Code.

**D. Cram Down.** The Bankruptcy Code allows the Court to confirm a plan of reorganization or to "cram down" a plan of reorganization despite its rejection by a class of impaired claims under some circumstances. The Bankruptcy Code provides that if an impaired class rejects the Plan, then the Plan cannot be confirmed unless at least one class of claims that is impaired under the Plan has accepted it. In this regard, the Court must determine acceptance without including any vote by any insider, and further, the Court must conclude that the Plan "does not discriminate unfairly, and is fair and equitable" with respect to the claims of the impaired class. Debtor will invoke their rights to request the Court to confirm the Plan under such circumstances.

## II.    HISTORY OF THE DEBTOR

### A.    Description of Debtor and Debtor's Operations.

1.    **Overview**. Debtor is an independent energy company engaged in the exploration, development, production and sale of natural gas and crude oil, primarily in the Rocky Mountain basins of the western United States. Approximately 98% of Debtor's 2014 and 2015 production volume was natural gas produced primarily from the Atlantic Rim area of the eastern Washakie Basin (the "Atlantic Rim Area") and the Pinedale area of Southwestern Wyoming. The majority of the Debtor's current production is coalbed methane reserves located in the Atlantic Rim. Debtor also holds acreage with exploration potential in the Greater Green River Basin of Wyoming. Substantially all of Debtor's revenues are generated through the sale

of natural gas and oil production at market prices and the settlement of commodity hedges. As of July 1, 2015, Debtor had estimated proved reserves of 65.5 Bcf (billion cubic feet) of natural gas and 134.4 MBbl (1,000 barrels of oil) of oil, for a total of 66.3 Bcfe (billion cubic feet equivalent).[2] Of these estimated proved reserves, 56% were proved developed and 99% were natural gas.

Debtor's corporate offices are located at 1675 Broadway, Suite 2200, Denver, Colorado 80202. In addition to Debtor's leased office space in Denver, Debtor leases executive office space in Houston, Texas. On December 15, 2015, Debtor closed its regional and executive offices in Casper, Wyoming and Houston, Texas, respectively, and rejected the respective leases effective on that day.

**2.    Operations.**

*Wells and Controlled Acreage*

As of September 30, 2015, Debtor owned interests in over 700 producing wells. As of December 31, 2014, it leased 343,947 gross (112,219 net) acres, of which 268,820 gross (95,661 net) acres are undeveloped in what Debtor believes are natural gas prone basins primarily located in the Rocky Mountains.

As of September 30, 2015, Debtor's total estimated acreage holdings by basin were:

| Basin | Gross Acres | Net Acres |
|---|---|---|
| Washakie Basin | 146,641 | 28,870 |
| Wind River Basin | 18,847 | 3,966 |
| Powder River Basin | 18,252 | 12,812 |
| Utah Overthrust | 46,475 | 14,746 |
| Greater Green River Basin | 15,707 | 1,929 |
| Hanna Basin | 10,488 | 5,764 |
| **Total** | **256,410** | **68,088** |

Debtor's project development focus is in areas where it believes its core competencies can provide it with competitive advantages.

---

[2] The figure for total provided reserves below includes a significant amount of non-economic non-producing reserves.

*Employees and Employee Benefits*

As of November 5, 2015, the Petition Date, Debtor had 22 employees.  They are not subject to any collective bargaining agreement. In November 2015, Debtor reduced its workforce by four employees.

Debtor provides a group health insurance plan for its employees. On average, Debtor pays 90% of the premium costs and the employee 10%.  Debtor also funds on an on-going basis various sums for 401(k) plan match obligations, all of which are current.  Debtor's and the employees' share of all 401(k) plan contributions are made at the time wages and salaries are paid. Employees are also entitled to certain accrued but unpaid vacation.

*Eastern Washakie Midstream, LLC*

Debtor's subsidiary Eastern Washakie Midstream, LLC ("Eastern Washakie") owns a 13-mile pipeline and related gathering assets ("EWM Pipeline") which connected the Debtor's operated Catalina Unit with the pipeline system owned by Southern Star Central Gas Pipeline, Inc.[3] The EWM Pipeline provides Debtor with access to the interstate gas markets and the ability to move third party gas.

Prepetition, Debtor, with the assistance of Petrie (its financial advisor prior to filing Chapter 11, as discussed later in this document) investigated if there was any interest for the purchase of EMW Pipeline.   They contacted strategic companies in the area but there was no interest.  Thus, Debtor determined that it was not worthwhile to pursue a formal sale process for the pipeline.

*Marketing and Major Customers*

Oil and natural gas are marketed and sold primarily to purchasers that have access to nearby pipeline facilities. Typically, oil is sold at the wellhead at field-posted prices and natural gas is sold both (i) under contract at negotiated prices based upon factors normally considered in the industry (such as distance from well to pipeline, pressure and quality) and (ii) at spot prices. Debtor currently has no long-term delivery contracts in place.

The marketing of most of Debtor's products are performed by a third-party marketing company, Summit Energy, LLC.  Although a substantial portion of such production is purchased by one customer, Debtor does not believe the loss of this customer would likely have a material adverse effect on its business because there are other customers in the area that are accessible to it.

*Reserves*

On an annual basis, Debtor has historically engaged an independent petroleum engineering firm, Netherland, Sewell & Associates, Inc. ("NSAI"), to prepare its reserve

---

[3] Legal title to some or all of the easement for the EMW Pipeline is held by Debtor for the benefit of Eastern Washakie.

estimates.  NSAI most recently prepared its reserve estimates at December 31, 2014. A summary of NSAI's findings is below. NSAI evaluated properties representing 100% of Debtor's reserves for all periods presented below.[4]  All of the proved reserves are located within the continental United States.

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | | 2013 | | 2012 | |
| | Oil (Bbls) | Natural Gas (Mcf) | Oil (Bbls) | Natural Gas (Mcf) | Oil (Bbls) | Natural Gas (Mcf) |
| *Oil and gas reserve estimates:* | | | | | | |
| Developed | 215,411 | 48,451,767 | 207,999 | 58,588,355 | 207,881 | 71,146,164 |
| Undeveloped | 31,159 | 37,394,441 | 105,979 | 14,215,296 | 48,263 | 5,445,433 |
| Total proved reserves | 246,570 | 85,846,208 | 313,978 | 72,803,651 | 256,144 | 76,591,597 |
| Total proved reserves (expressed in Bcfe) | 87.3 | | 74.7 | | 78.1 | |

Excluding the Pinedale assets (which were sold on July 31, 2015), Debtor's internally assessed proved reserves as of June 30, 2015 were as follows:

| | Oil (Bbls) | Natural Gas (Mcf) |
|---|---|---|
| *Oil and gas reserve estimates:* | | |
| Developed | 134,390 | 37,644,920 |
| Undeveloped | - | 27,843,121 |
| Total proved reserves | 134,390 | 65,488,041 |
| Total proved reserves (expressed in Bcfe) | 66.3 | |

Reserve estimates are inherently imprecise and are subject to revisions based on production history, results of additional exploration and development, prices of oil and gas, and other factors.  Accordingly, reserve estimates may vary from the quantities of oil and natural gas that are ultimately recovered.  The Debtor expects the current value of estimated reserves to be significantly reduced due to the existing low pricing environment.

*Derivative Instruments*

As a hedge against negative market forces and commodity prices for natural gas and oil, Debtor previously entered into various derivative instruments - such as  forward contracts, costless collars and swaps - to mitigate the risk associated with downward fluctuations in the prices of natural gas and oil and the resulting impact on cash flow, net income, and earnings per

---

[4] The figure for total provided reserves below includes a significant amount of non-economic non-producing reserves.

share. The duration of the various derivative instruments depended on senior management's view of market conditions, available contract prices and Debtor's operating strategy. Debtor hedged at least 85% of its projected production through 2016 based on its most recent third-party prepared reserve report (December 31, 2014). At this time Debtor has liquidated all of its 2016 hedges.

   3. **Affiliates.** Although Debtor has six wholly-owned subsidiaries, and one of these subsidiaries, PetroSearch Energy Corporation, a Nevada corporation ("PetroSearch"), has nine wholly-owned subsidiaries, only two of these companies, PetroSearch and Eastern Washakie, are considered to be operating in any fashion. Attached hereto as **Exhibit 2** is a list of all the subsidiaries of Debtor and PetroSearch.

   Debtor is not part of a tax consolidation group. To the extent necessary when tax returns are filed, intercompany and affiliate transactions may be shown as receivables or payables.

   None of Debtor's affiliates filed Claims against Debtor.

  **B.** **Debtor's Prepetition Financial Structure.**

   1. **Debtor's Prepetition Capital Structure**. Debtor was incorporated in Wyoming in 1972 and reincorporated in Maryland in 2001. Debtor has approximately 14,300,000 shares of common stock (symbol "ESCR") and 1,610,000 shares of Series A Cumulative Preferred Stock (symbol "ESCRP") outstanding. As of the Petition Date, the Debtor's common stock was traded on the OTC Market's Pink Sheet marketplace, and all Series A Cumulative Preferred Stock was publicly traded on the NASDAQ Capital Market. Currently, all shares of are traded on the OTC Market's Pink Sheet marketplace.

   2. **Debtor's Prepetition Assets.**

   As of the Petition Date, Debtor's principal assets consisted of oil and gas producing interests, well equipment, cash and cash equivalents, accounts receivable, undeveloped acreage and rights under hedge contracts.

   3. **Debtor's Prepetition Debt.** The Court established January 20, 2016, as the last day for all persons and entities (excluding governmental units) having Claims against Debtor to file proofs of claim in Debtor's case, with May 19, 2016 as the bar date for governmental units. Attached hereto as **Exhibit 3** is a description of the aggregate numbers and amounts of all of the Claims (other than Administrative Claims) scheduled and/or filed in the bankruptcy case, separated into Classes.

**PURSUANT TO THE PLAN AND UNLESS OTHERWISE SPECIFICALLY ALLOWED IN THIS PLAN, DEBTOR OR REORGANIZED DEBTOR MAY OBJECT TO ANY CLAIM LISTED ON EXHIBIT 3, AS WELL AS ANY CLAIMS SUBSEQUENTLY FILED.**

   The text below provides more detail on the Priority Tax Claims, Secured Claims and Unsecured Claims.

*Priority Tax Claims*

Three are four (4) Priority Tax Claims all but one of which are payable to various departments of the State of Wyoming. These taxes include production taxes, conservation taxes and unpaid royalties and total $55,493.03. These Claims are unclassified but are included in the totals on Exhibit 3.

*Secured Claims*

a.    Senior Secured Claim. Debtor is a party to a Credit Agreement dated as of August 29, 2014 (as amended, restated or otherwise modified from time to time, the "Credit Facility") among Debtor as Borrower, and Société Générale and Mutual of Omaha Bank Société Générale (collectively the "Senior Secured Lenders"). Société Générale serves as the administrative agent under the Credit Facility. The Credit Facility is generally a revolving credit facility, under which the amount of credit available for borrowing is determined by a borrowing base that is in turn determined by the value of Debtor's oil and gas reserves on a periodic basis.

The Credit Facility is collateralized by substantially all of Debtor's oil and gas producing properties, and substantially all other assets, pursuant to the following: (i) Mortgage, Security Agreement, Financing Statement, Fixture Filing and Assignment of Production dated August 29, 2014 and recorded on September 16, 2014, at Book 1258, Page 284, in the land records of Carbon County, Wyoming; (ii) Mortgage, Security Agreement, Financing Statement, Fixture Filing and Assignment of Production dated July 21, 2015, and recorded July 30, 2015 at Book 1274 Page 283 in the land records of Carbon County, Wyoming; (iii) UCC Financing Statement filed On September 10, 2014, in the office of the Maryland Secretary of State at File No. 181509780; (iv) UCC Financing Statement filled on September 16, 2014, and recorded at Book 1258, Page 284 in Carbon County, Wyoming; (v) the Interim Order (A) Authorizing Postpetition Use of Cash Collateral; (B) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, and 507, Bankruptcy Rules 2002, 4001, and 9014; (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001; and (D) Granting Related Relief, entered on November 11, 2015; and (vi) the Final Order (A) Authorizing Postpetition Use of Cash Collateral; (B) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, and 507, Bankruptcy Rules 2002, 4001, and 9014; and (C) Granting Related Relief, entered on December 2, 2015, granting adequate protection liens in such property of Debtor as described in such order.

As of the Petition Date, Debtor was indebted to the Senior Secured Lenders in the aggregate amount of not less than: (i) $36,886,300.00 in aggregate principal amount; (ii) accrued and unpaid interest and fees of $393,658.68 as of the Petition Date; and (iii) additional amounts claimed as owed under the Credit Facility. These amounts substantially exceed the borrowing base as re-determined as of September 30, 2015.

The Senior Secured Claim is categorized as Class 1.

b.    Secured Tax Claims.   The Secured Tax Claims (Class 2, Subclasses 2A -2J), also listed by Debtor on Schedule D of the Bankruptcy Schedules, are Secured Claims of governmental units arising as a result of a statutory Lien in taxable property

of Debtor. These Claims are primarily claims for ad valorem taxes on production imposed by Wyoming counties, and total $2,682,115.32.

                c.     <u>JIB Claims</u>.  These are Secured Claims of operators of unitized fields in which Debtor is a participant (Class 3).  Debtor is a participant in approximately 21 Unit Agreements and their corresponding Unit Operating Agreements, which require Debtor to pay on a monthly basis its share of unit operating costs billed by the unit operator, commonly called "Joint Interest Billings," or "JIBs."  If Debtor fails to pay its share of the costs in a timely manner, the other participating parties have, among other legal default remedies, the right to recoup the amount owed against the proceeds from the sale of the defaulting party's share of production. Any recoupment against Debtor's interests would result in a reduction in net revenue to Debtor and negatively impact relations with the joint operators.

Due to this situation, Debtor requested Court approval to pay the unit operators, both the prepetition billed but unpaid JIBs and the prepetition unbilled JIBs.  By Court Order dated November 30, 2015, the Court approved the payment of approximately $1,942,343 of JIBs, with up to another $340,815.32 after Debtor's review.  Debtor has paid these amounts, or will pay them when received and approved.  The remainder of the JIBs has been, or is expected to be, recouped by the unit operators.  If the Debtor receives prepetition JIBs in excess of the approved $340,815.32, Debtor expects to file additional motions for approval to pay these prepetition JIBs.

There is an outstanding JIB from Warren Resources, Inc. ("Warren") in the amount of approximately $233,275.52 for a "true-up" amount from 2013.  Debtor has disputed this JIB, and at this time, the parties have not resolved this dispute.

                d.     <u>Secured M&M Claims</u>.  Class 4 Claims are Secured Claims of any mechanic, materialman or other like party providing good or services entitled to a Lien on Debtor's property under Title 29 of the Wyoming Statutes and meeting the following requirements: (i) the Lien is timely perfected under Title 29 of the Wyoming statutes; (ii) The commencement of any construction work or repair of the premises or property is considered to predate the perfection of the Senior Secured Claim pursuant to Section 29-1-402(c) of the Wyoming Statutes; and (iii) all work performed or materials furnished for which the holder is asserting the Claim is considered as having been done under the same contract pursuant to Section 29-1-403 of the Wyoming Statutes.

At this time, Debtor knows of one Claim in the amount of $54,550.03 which may be a Secured M&M Claim.

*Priority Non-Tax Claims*

To Debtor's knowledge, there are no Priority Non-Tax Claims (Class 5).

*Unsecured Claims*

The Unsecured Claims consist of Convenience Claims (Class 6) and General Unsecured Claims (Class 7).  Class 6 (Claims held by creditors totaling $1,000.00 or less in the aggregate)

total approximately $16,000, and Class 7 (General Unsecured Claims) total approximately $25.9 million at this time, including the SSL Deficiency Claim of $22.275 million.

Debtor believes that certain prepetition overriding royalties in the Spyglass Hill Unit may be due to approximately 50 claimants up to the amount of approximately $400,000. After Debtor finishes its review of this matter, it will file amendments to Schedule F if it determines that these are General Unsecured Claims rather than property held for the benefit of the royalty owners or some other characterization. Debtor has not included an estimate of these Claims in Class 7, General Unsecured Claims.

    **4.**     **Debtor's Prepetition Financial Performance.** Since Debtor is a public company, Debtor's prepetition financial performance can be reviewed on the website of the Securities and Exchange Commission, at the Company Filings section. The website is www.sec.gov/edgar/searchedgar/companysearch.html; the Ticker Symbol is ESCR, and the CIK number is 0000029834. The Debtor's 10-Q for September 30, 2015, is on file.

    **5.**     **Prepetition Litigation.** Prepetition, Debtor was involved in three (3) separate actions as a defendant:

    a.     *Alan Eugene Humphrey and Wyoming GTL, LLC v. Escalera Resources CO*, United States District Court for the District of Colorado, Civil Action No. 15-cv-00769-RM-NYW (the "Humphrey Litigation"). On April 27, 2015, plaintiffs filed an Amended Complaint and Jury Demand against Debtor. Plaintiffs allege the following (summarized for the purposes hereof): In 2014, the parties entered into a letter agreement for the development, ownership and operation of a proposed gas-to-liquids facility in Cheyenne, Wyoming (the "GTL Project"). The letter agreement contains certain binding provisions with which Debtor failed to comply, including Debtor's contribution of up to $2 million for the project. Further, Debtor used the letter agreement to improperly obtain financing. As causes of action, plaintiffs assert, among other things, fraud in the inducement, securities fraud, and breach of contract. Plaintiffs also allege two claims for fraud in connection with plaintiffs' purchase of preferred stock. Debtor anticipates that the claims relating to securities will be subordinated under § 510(b) of the Bankruptcy Code.

Debtor filed an answer and counterclaim on May 5, 2015, denying plaintiffs' allegations and asserting a counterclaim against Humphrey for reimbursement of Debtor's expenses under the letter agreement of approximately $1.4 million. A final pretrial conference is set for April 7, 2016.

    b.     *William A. Sidwell, III v. Escalera Resources Co.*, In the District Court for Harris County, Texas, Cause No. 2015-04698. On January 29, 2015, plaintiff filed his Amended Original Petition against Debtor. Plaintiff alleged the following (summarized for the purposes hereof): Debtor hired plaintiff in 2014 as the Vice President of Corporate Strategy, and he was also tasked with handling other matters for Debtor. Subsequently, Debtor terminated plaintiff's employment without cause, and Debtor breached the contract by failing to pay him severance. Plaintiff seeks monetary damages in excess of $200,000, but no more than $1,000,000.

On April 1, 2015, Debtor filed its First Amended Answer and Affirmative and Other Defenses and Counterclaims against Plaintiff/Counter-Defendant, generally denying all of plaintiff's allegations and asserting various affirmative defenses. In Debtor's counterclaims, Debtor, among other things, stated that plaintiff made defamatory statements to representatives of the Humphrey companies in connection with the GTL Project, to Debtor's employees and directors, and to other parties falsely denigrating the competency, honesty and expertise of Debtor's senior management. Debtor asserted the following causes of action against plaintiff: business disparagement and willful and malicious conduct. The Court has set a trial date of April 18, 2016, but the case remains stayed.

c.    *Gregory Whiting v. Escalera Resources Co.*, In the District Court of Harris County, Texas, Cause No. 2015-04669. On January 28, 2015, plaintiff filed his Original Petition against Debtor. In the complaint, plaintiff alleged the following (summarized for the purposes hereof): Debtor had hired plaintiff to analyze and evaluate potential acquisitions and the financing of same. A severance contract between the parties was executed. Subsequently, Whiting terminated his employment for "Good Reason," entitling him to severance, since Debtor had hired another management employee to take over a majority of plaintiff's duties and responsibilities, and further that Debtor had asked plaintiff to resign. Debtor refused to pay plaintiff severance. Plaintiff seeks injunctive relief and monetary damages in excess of $500,000, but no more than $1,000,000.

On April 1, 2015, Debtor filed its First Amended Answer and Affirmative and Other Defenses and Counterclaims against Plaintiff/Counter-Defendant, generally denying all of plaintiff's allegations and asserting various affirmative defenses and counterclaims. In Debtor's counterclaims, Debtor, among other things, stated that plaintiff made defamatory statements to representatives of the Humphrey companies in connection with the GTL Project, to Debtor's employees and directors, and to other parties falsely denigrating the competency, honesty and expertise of Debtor's senior management, and attempted to use his position with Debtor to secure an ownership interest in the GTL Project and more lucrative employment with the Humphrey companies. Debtor asserted the following causes of action against plaintiff: business disparagement, breach of fiduciary duty and willful and malicious conduct. A trial is scheduled to begin May 2, 2016, but the case remains stayed.

4.    **Avoidance Actions.**

a.    Avoidance Actions - Generally.

Actions under Sections 542 through 553, inclusive, ("Avoidance Actions") include actions to avoid certain preferential or fraudulent transfers. Avoidable preferential transfers under § 547 are payments or transfers of property made (i) to or for the benefit of a creditor, (ii) on account of an antecedent debt owed by a debtor before the transfer was made, (iii) made while the debtor was insolvent, (iv) within ninety days of the filing a bankruptcy petition (one year before bankruptcy if the transfer was made to an insider of the debtor) and (v) which enable such creditor to receive more than such creditor would receive if, among other things, the case were a case under Chapter 7 of the Bankruptcy Code. Under § 547, these payments are recoverable, subject to certain defenses that include the contemporaneous exchange of new value, subsequent

advances of new value and payment in the ordinary course of business. Additionally, transfers or payments received by the initial transferee that are subsequently passed on to a subsequent transferee are recoverable under certain circumstances.

Sections 544 and 548 authorize a trustee or debtor in possession to avoid transfers deemed fraudulent under applicable state law (§ 544(b)) and under federal law (§ 548). Specifically, § 548 provides that a debtor or trustee may avoid a transfer of an interest in property of a debtor or avoid obligations incurred by a debtor if the debtor, within one year of the petition date, voluntarily or involuntarily

(A) made such transfer or incurred such obligations with the actual intent to hinder, delay or defraud any existing or future creditors; or

(B)(i) received less than the reasonably equivalent value in exchange for such transfer or obligation and (ii)(a) the debtor was insolvent on the date the transfer was made or became insolvent as a result of such transfer, (b) was engaged in a business or transaction, or about to engage in a business or transaction, for which any property remaining with the debtor was unreasonably small capital, or (c) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

b.    Analysis of Possible Chapter 5 Actions.

In its Statement of Financial Affairs (the "SOFA"), Debtor listed approximately $4,079,907 in transfers to creditors made within ninety days of the Petition Date (excluding employees' wages and salary) and approximately $1,022,115 in transfers to insiders made within one year of the Petition Date (collectively, the "Preferential Transfers"). These transfers are the maximum potential Preferential Transfers before the costs and expenses of recovery are deducted. Recovery would require Debtor to bring adversary proceedings against the transferees for the avoidance and recovery of such transfers. Transfers that aggregate less than $6,225 are not recoverable.

Debtor's preliminary analysis of the potential value of the Preferential Transfers indicates that few if any of the transfers made within 90 days prior to the Petition Date - listed on Debtor's Statement of Financial Affairs ("SOFA") in response to Question 3b - may be recoverable because most transfers are subject to valid defenses, such as payment in the ordinary course, subsequent new value, and qualification under § 503(b)(9) of the Bankruptcy Code. Payments of JIBs are not recoverable because the unit operators have rights of recoupment, and many have liens as well. Other vendors held potential mechanic's or well liens, and others have provided subsequent new value. Some payments were C.O.D., which do not qualify as payment of antecedent debt.

The approximately $1,022,115 of transfers made to insiders (listed on Debtor's SOFA in response to Question 3c), were primarily to pay employee wages, benefits, payroll taxes, director fees and expense reimbursements in the ordinary course. The remaining amounts pertain to the deemed value of stock and stock options granted in the ordinary course which, except for the amount of $3,603.50, never vested. Since all Equity Interests are being cancelled and extinguished by the Plan, even the vested grants have no value. Accordingly, Debtor believes that none of these payments are recoverable.

The right to investigate, pursue and, if necessary, litigate Avoidance Actions will belong to the Reorganized Debtor.

**REGARDLESS OF DEBTOR'S ANALYSIS, ANY OF THE RECIPIENTS OF TRANSFERS LISTED ON DEBTOR'S STATEMENTS OF FINANCIAL AFFAIRS AND ANY CURRENT OR FORMER INVESTORS OR OTHER PARTIES WHO RECEIVED PAYMENTS DIRECTLY OR INDIRECTLY FROM DEBTOR, MAY BE SUBJECT TO AVOIDANCE LITIGATION (UNLESS DEBTOR HAS RELEASED ANY OF ITS CLAIMS UNDER CHAPTER 5 OF THE BANKRUPTCY CODE PURSUANT TO A COURT APPROVED SETTLEMENT).**

6. **Events Precipitating Bankruptcy.** Beginning in the second half of 2014, natural gas and oil commodity prices decreased substantially compared to prices during the first half of 2014, and pricing continued to decline or remain low through the first three quarters of 2015. As a result of these lower prices, Debtor's cash flow from operations has decreased. The lower prices resulted in a reduction in Debtors' borrowing base with the Senior Secured Lenders, which resulted in the obligation to pay down a greater amount of the debt owed to the Senior Secured Lenders.

Given the decreases in Debtor's operating cash flows, Debtor focused on the following near-term business strategies: (i) attempting to identify potential merger candidates which might offer improved opportunities to obtain capital to develop its natural gas and oil properties and to acquire natural gas properties; (ii) maintaining production while efficiently managing and in some cases reducing its operating and general and administrative costs; (iii) evaluating asset divestiture opportunities to allow Debtor to reduce its overall indebtedness; and (iv) pursuing the acquisition of certain oil and gas properties that would result in overall lower operating costs in comparison with the resulting added revenue.

Debtor also explored raising additional capital in order to pursue its objective of acquiring and developing natural gas properties; however, given its capital structure (Debtor's current capital structure inhibits raising capital due primarily to certain terms and provisions of its Series A preferred stock) and the recent declines in natural gas and oil commodity prices, raising additional capital was very unlikely and in fact did not occur.

On May 19, 2015, the Senior Secured Lenders declared an event of default, and, as provided in the Credit Facility, the loans began accruing interest at 2.00% above the otherwise applicable rates effective as of May 19, 2015.[5] Debtor and the Senior Secured Lenders executed a Forbearance Agreement on July 21, 2015, in which Debtor and the guarantors acknowledged the existence of events of default under the Credit Facility. The Forbearance Agreement provided for the increase in the percentage of Debtor's reserves that were pledged to the Senior Secured

---

[3] The borrowings under the Credit Facility bear non-default interest at a daily rate based on the interest rate election of either the Base Rate or the LIBOR Rate. Under the Base Rate option, interest was calculated at an annual rate equal to the highest of (a) the base rate for Dollar loans for such day, the Federal Funds rate for such day, or the LIBOR for such day plus (b) a margin ranging between 0.75% and 1.75% (annualized) depending on the level of funds borrowed. Under the LIBOR Rate option, interest was calculated at an annual rate equal to LIBOR, plus a margin ranging between 1.75% and 2.75% (annualized) depending on the level of funds borrowed. The average interest rate on the facility at December 31, 2014, was 3.1%.

Lenders from 80% to 85%, addressed certain lien perfection issues, and imposed certain milestones for actions by Debtor.

In May 2015, Debtor engaged Petrie Partners, LLC ("Petrie") as its investment banker to serve as financial advisor, as might be needed, for matters Debtor was addressing, including the negotiations for a prospective acquisition, asset sales, and identifying potential merger candidates. Petrie assisted Debtor's entry into a purchase and sales agreement in June 2015 for certain assets held by Warren. These assets are adjacent to Debtor's Catalina Unit and would allow for operational efficiencies when operated together.

On July 31, 2015, Debtor completed the sale of its tight gas reserves and production on the Pinedale Anticline in the Green River Basin of Wyoming to Vanguard Operating, LLC for a total price of $12,000,000. The net proceeds of approximately $10,500,000 from this sale were used to reduce the secured debt owed to the Senior Secured Lender.

In connection with the prospective acquisition of the Warren assets, Debtor engaged Roth Capital as an additional advisor in July 2015 to assist Debtor in raising debt capital to close the acquisition. This acquisition contemplated a purchase price of $47 million based on Debtor's valuation at the time. Since prices for natural gas continued to decline during 2015, the value of this acquisition continued to decline and so did the amounts that Debtor would be able to borrow to fund the acquisition or recapitalize. Warren and Debtor continued to negotiate concerning a revised purchase price, but the acquisition is no longer under contract.

Given the continued decline in gas prices, Debtor decided to file this Chapter 11 case after exploring all reasonable alternatives.

Debtor's objective is to maintain Debtor as a going concern, since Debtor believes that a liquidation of the assets would not be in the best interest of Debtor's creditors. During the Chapter 11 case, Debtor intends to focus on:

- identifying alternative ways to enhance the value of its natural gas reserves;
- investing in and enhancing its existing production wells and field facilities on operated and non-operated properties in the Atlantic Rim Area;
- selectively pursuing acquisitions of abundant, low cost natural gas assets that are currently undervalued or underutilized; and
- pursuing high quality exploration and strategic development projects with potential for providing long-term drilling inventories that generate above average returns.

## III.    EVENTS SINCE THE PETITION DATE

**A.    Operations.** Debtor's operations have continued uninterrupted since the Petition Date. In November, 2015, Debtor reduced its workforce by four employees, in part due to the closure of its Casper, Wyoming and Houston, Texas offices.

    **B.**　　**Financial Performance**. Shortly before the Petition date, Debtor liquidated its 2016 hedges and received approximately $8,047,000 net, thus providing liquidity for operations. At the outset of the bankruptcy case, Debtor requested and received permission to use cash collateral, in which the Senior Secured Lenders had an interest, which permitted Debtor to continue its business without interruption. In connection with its request, Debtor submitted a weekly operating budget through January 29 2016, which was approved by the Court (see subparagraph 2C below).　　After the expiration date of that budget, Debtor submitted and is currently operating under a 13-week budget which expires the week of April 22, 2016.

    Attached as **Exhibit 4** are the balance sheet and profit and loss statements from Debtor's monthly operating report for the month of _____[to be appended upon approval of the disclosure statement].

    **C.**　　**Chapter 11 Events.**

    **1.**　　**Initial Proceedings.**　　Within the first month of the bankruptcy case, various critical or key actions were taken, some on an expedited basis, to ensure that Debtor's operations could continue without interruption.  On November 5, 2015, Debtor filed its Motion seeking Expedited Entry of First Day Orders, which were granted by the Court as set forth below:

- *Order Authorizing Payment of Prepetition Wages, Salaries, Expenses and Benefits, entered November 9, 2015.*  The Court authorized Debtor to, among other things, (i) honor its prepetition payroll obligations and pay its employer 401(k) match obligations; (ii) honor accrued, but unused paid time off; (iii) pay all employee business expenses that accrued prepetition; and (iv) maintain its group health insurance plan and pay the employer share of the premiums;

- *Orders Determining Adequate Assurance of Payment of Future Utility Services and Restraining Utility Companies from Discontinuing, Altering, or Refusing Service, Interim Order entered November 10, 2015, and Final Order entered February __, 2016*  These Orders ensured that utility companies would continue to provide services to Debtor since they have assurance of payment In addition, Debtor was authorized to pay up to $15,000 in the aggregate for invoices that covered both pre and post-petition communications services;

- *Order Authorizing Debtor to Pay Critical Vendors, entered November 30, 2015 as a Minute Order.*  The Court authorized Debtor to pay the prepetition debt of Winchester Well Service and various joint interest billings (see Article II.B.3.); and

- *Order Establishing Interim Notice, Case Management and Administrative Procedures Pursuant to 11 U.S.C. § 105, Rules 2002 and 9007 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 2081-2, Interim Order entered November 9, 2015.*  The Court authorized Debtor to limit notice

the bankruptcy case and established certain methods of service under the Bankruptcy Rules.

      **2.**     <u>**Use of Cash Collateral.**</u>  In order to continue operations and allow for a successful reorganization, Debtor requires the use of funds on hand and funds to be received. Debtor believes those funds are cash collateral within the meaning of § 363(a) subject to a senior lien in favor of the Senior Secured Lenders. The cash collateral is comprised of funds held in various bank accounts and its ongoing revenues, along with receivables owed to Debtor (collectively, the "Cash Collateral").

      At the outset of this bankruptcy case, Debtor requested permission to use Cash Collateral in which the Senior Secured Lenders had an interest.  Prior to the Petition Date, Debtor and the Senior Secured Lenders agreed on the terms of Debtor's use thereof.  On November 5, 2015, Debtor filed its Expedited Motion for Authority to Use Cash Collateral.  After a hearing conducted on November 9, 2015, the Court entered an order dated November 13, 2015, authorizing Debtor to use cash collateral on an interim basis and also set a final hearing for November 30, 2015.  Shortly after the final hearing, the Court entered its order permitting Debtor's use of cash collateral on a final basis.

      Debtor's use of Cash Collateral is subject to and governed by the terms of a budget showing estimated receipts and disbursements (the "Approved Budget"), which is attached to the order; provided, however, that: (i) Debtor shall be permitted to exceed the Approved Budget by an amount up to fifteen percent (15%) measured weekly; (ii) unused budget amounts for any week may be carried forward; and (iii) Debtor and the Senior Secured Lenders may agree to exceptional unanticipated expenditures that will not be counted against the permitted variance. The Approved Budget was for a 13-week period ending January 29, 2016.  The final order contains a procedure for extension of the period covered by the Approved Budget, and Debtor is currently operating under an extension through April 22, 2016.

      As adequate protection for the use of Cash Collateral, Debtor granted the Senior Secured Lenders replacement liens on all tangible and intangible property of Debtor now existing or hereafter acquired in an amount equal to any post-petition diminution in the value of its Prepetition Collateral (the "Adequate Protection Liens"), all as set forth with more particularity in the final order.  The Adequate Protection Liens will be subject to any valid, perfected and unavoidable liens existing as of the Petition Date that are senior to the Lender's prepetition liens, and any valid and senior liens that may arise or be perfected post-petition under § 546(b).  The Adequate Protection Liens will otherwise prime all other liens, including any liens preserved for the benefit of Debtor's estate under § 551.

      The Adequate Protection Liens will also be subject to "Carve Outs" as more particularly described in the proposed order, but which include amounts for payment of: (i) all statutory fees required to be paid by Debtor to the Clerk of the Court and the UST Fees; (ii) all accrued and unpaid fees, disbursements, costs, and expenses incurred by professionals or professional firms retained by Debtor or its estate pursuant to Sections 327, 328, or 363 and the Committee (hereinafter defined) to the extent set forth in the Approved Budget, incurred before the termination of Cash Collateral use, and allowed or approved by the Court; (iii) professional fees

incurred following the termination of Cash Collateral use and allowed by this Court in an aggregate amount not exceeding $100,000; and (iv) fees and expenses of up to $15,000 incurred by a trustee under Section 726(b); provided, however, there are certain exceptions to the foregoing set forth in the final order.

To the extent that the adequate protection described above proves to be insufficient, the Lender, subject to the Carve-Out, was granted first priority superpriority administrative expense claims under Section 507(b) with priority in payment over any other administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, those sections enumerated in the final order.

There are other provisions contained in the final order. Parties in interest may consult the final order for a complete view of the relief granted.

**3.** **Employment of Bankruptcy Counsel and other Professionals**. On November 5, 2005, Debtor filed its motion to employ and compensate Onsager | Guyerson | Fletcher | Johnson ("OGFJ"), as bankruptcy counsel for Debtor.  On November 10, 2015, the Court approved the application to employ and compensate such firm.  Debtor also filed motion to approve a retainer held by OGFJ in the amount of $70,000, and a motion to approve interim compensation procedures.  These motions were approved on December 15, 2015 and December 23, 2015, respectively.

Three other professionals were approved by the Court: (i) on January 19, 2016, Hein & Associates, LLP, as accountants for Debtor; (ii) on January 19, 2016, Lindquist & Vennum LLP, as special counsel for Debtor in connection with the Humphrey Litigation;  and (iii) on January 28, 2016, Jones & Keller, P.C.,  as special counsel for Debtor for general corporate and securities matters.

**4.** **Appointment of Committee**.   The United States Trustee appointed an Official Unsecured Creditors Committee (the "Committee") on November 13, 2015.   The Committee hired Singer & Levick, P.C. and Kutner Brinen Garber, P.C. as its counsel, which was approved by the Court on November 23, 2015. A motion to approve interim compensation procedures for Committee counsel was approved on December 23, 2015.

**5.** **Relief from Stay Motion.**   As described in Article II.B.5., prepetition Debtor was a defendant in the Humphrey Litigation.  On November 16, 2015, the plaintiffs in the litigation filed a motion for relief of the automatic stay in order to proceed with the litigation in the U.S. District Court for the District of Colorado. Debtor opposed the motion because it believed that the case should be litigated before the Court.  On December 10, 2015, the Court granted relief from the automatic stay without prejudice to Debtor moving in the District Court to refer the case to the Court at a later date.

**6.** **Requests for Payment of Administrative Expenses**.   To date, three (3) motions for payment of administrative expenses have been filed, as follows:

a.      DNOW L.P. filed a motion on January 19, 2016, alleging that it supplied goods to Debtor valued at $92,671.55 within twenty (20) days of the Petition Date, which amount should be allowed under Section 502(b)(9).  The objection deadline is February 10, 2016.

b.      PacificCorp d/b/a Rocky Mountain Power, filed a motion on January 20, 2016, alleging that it supplied electricity to Debtor valued at $87,853.94 within twenty (20) days of the Petition Date, which amount should be allowed under Section 502(b)(9). The objection deadline is February 10, 2016.

c.      Beaumont Crossroads, Ltd and Griffin Partners 675 Bering L.P. filed a motion on January 20, 2016, seeking allowance and payment of $14,981.57 as an administrative expense for postpetition rent from November 6, 2015 until December 15, 2015, pursuant to Section 365(d)(3).  The objection deadline is February 11, 2016.

Debtor has filed a response to PacifiCorp's motion asserting, among other things, that electricity is not a "good" as such term is used in Section 365(d)(3), and thus the motion should be denied. Debtor is in the process of reviewing the other two motions.

7.      **Other Events.**   In addition to the events described above, the following events have occurred since the Petition Date:

a.      Debtor requested and obtained a Court approved deadline for filing prepetition proofs of claim, which request was granted by the Court on December 8, 2015.  The deadline to file proofs of claim is January 20, 2016;

b.      Debtor has maintained proper insurance in place, remained current on payroll, payroll taxes, withholdings, and all other postpetition obligations;

c.      On November 17, 2015, Debtor filed amended motions to reject two of its office leases effective as of December 15, 2015, one located in Houston, Texas and the other located in Casper, Wyoming.  Debtor determined that these offices are not necessary to its business operations and constitute an expense that can be eliminated without any negative consequences for Debtor.  These rejection motions were approved on December 15, 2015;

d.      On November 17, 2015, Debtor filed its amended motion to reject an executory contract with Petrie Partners, LLC, Debtor's prepetition investment advisor and investment banker, since its services are neither needed nor beneficial to Debtor postpetition. Debtor has requested the rejection be effective as of November 17, 2015.  This rejection motion was approved on December 15, 2015 and

e.      On December 14, 2015, Debtor filed its motion to reject executory contracts or unexpired leases with the following entities: (i) Dahill Office Technologies, LLC for cloud services; (ii) Dahill Technology Services for managed services support; (iii) Shoretel Inc. for use of its telephone system; (iv) Capital Business Systems, Inc. for uses of an office copier, printer, scanner and fax machine; and (v) Xerox Financial Services, LLC for use of certain office

equipment. These services and equipment were neither needed nor beneficial to Debtor postpetition. These rejection motions were approved on January 20, 2016.

## IV.     PLAN OF REORGANIZATION

The following is a simplified description of the Plan. **REFERENCE SHOULD BE MADE TO THE PLAN FOR A FULL ANALYSIS OF ITS CONTENTS**.

**A.     Concept of the Plan.**  The primary purpose of the Plan is to provide all creditors with at least partial payments or consideration on or for their Claims.  The Senior Secured Lenders have agreed to have the Senior Secured Claim Allowed in the amount of $15 million, with a $22.275 million Deficiency Claim.  The Senior Secured Claim, the Allowed Secured Tax Claims, and the Allowed Priority Tax Claims shall receive installment payments until paid in full.  Allowed JIB Claims, to the extent not paid as critical vendors prior to Confirmation, will be paid in full on the Effective Date. To the extent there are any Secured M&M Claims, Debtor has several treatment options, including installment payments.

The Unsecured Claims are divided into two (2) Classes: the Convenience Claims (Class 6) consists of Allowed Claims of $1,000 or less, and the General Unsecured Claims (Class 7) consists of all Allowed Claims over $1,000.  The holders of Convenience Claims will be paid 25% of their Allowed Claims on or before the Initial Distribution Date.  The holders of General Unsecured Claims will have three (3) options to choose from:  (i) the Cash Fund Option; (iii) the PIK Note Option, and (iii) the New Common Stock Option.  The Senior Secured Lenders may only elect the PIK Option.  Holders these Claims may elect to split their Allowed Claims between two (2) of these options.

Equity Interests shall receive nothing under the Plan, and their interests will be cancelled and extinguished as of the Effective Date.  On the Effective Date, Reorganized Debtor will issue New Common Stock, of which up to 49% shall be available to holders of General Unsecured Claims in exchange for their Allowed Claims. Fifty-one percent (51%) of the New Common Stock will be distributed to management pursuant to a Management Incentive Program.

Debtor believes that its Plan is in the best interests of the creditors.  See LIQUIDATION ANALYSIS, Article XII, and PLAN FEASIBILITY AND RISK FACTORS, Article XIII.

**B.     Treatment of Unclassified Claims.**

**1.     Administrative Claims.**  Administrative Claims are not designated as a Class pursuant to § 1123(a)(1) and are not entitled to vote, pursuant to the Bankruptcy Code. Unless otherwise agreed, these Claims (other than Allowed Operating Administrative Claims), shall receive payment in full (unless previously paid in full pursuant to Court orders), from Reorganized Debtor, as applicable, in Cash on the later of (a) the Effective Date, or (b) within twenty (20) business days after the date these Claims become Allowed Claims.  Allowed Operating Administrative Claims will be paid fully and in Cash in the ordinary course of business by Reorganized Debtor (including any payment terms applicable to such expenses), upon presentment or otherwise in accordance with the particular terms relating thereto.  All

Administrative Claims (other than Operating Administrative Claims) shall be filed within 60 days of the Effective Date or shall be forever barred.

Professional fees will continue to accrue through the Effective Date of the Plan. The Court will ultimately review and determine the allowance of all fees paid or to be paid to Debtor's attorneys and the other professionals described above.  All fees of professionals approved by the Court will be paid by Debtor. The estimated Administrative Claims of Debtor's and Committee professionals not yet paid as of the Effective Date  range between $250,000 and $400,000.

Fees of the United States Trustee payable under 28 U.S.C. Section 1930 will be paid on confirmation in accordance with § 1129(a)(12) of the Bankruptcy Code.  No Quarterly UST Fees are yet due, but Debtor anticipates timely paying all such fees.  Debtor estimates that the total aggregate amount due to the United States Trustee will be approximately $13,000 as of the Confirmation Date. The obligation to pay Quarterly UST Fees will continue until the Chapter 11 case is dismissed, converted or closed.

2. **Priority Tax Claims.** In accordance with Section 1123(a)(1), Priority Tax Claims are not designated as a Class and are not entitled to vote.  Unless otherwise agreed, Allowed Priority Tax Claims will be treated as follows:

(i)	payment in full in equal monthly installments due on the first day of each month, commencing on the first day of the month following the Effective Date, for a period not to exceed five (5) years after the Effective Date, in full; and

(ii)	Reorganized Debtor may prepay any of these Claims in whole or in part at any time if such payment is approved by the Senior Secured Lenders and all independent directors on the New Board.

Proof of all Priority Tax Claims not scheduled in the Bankruptcy Schedules or scheduled therein as disputed or contingent shall be filed pursuant to Bankruptcy Rule 3003 within sixty (60) days of the Effective Date or shall be forever barred, and such Priority Tax Claims shall be deemed disallowed.

Article II.B.3. and Exhibit 3 describe the existing Priority Tax Claims, which at this time total $55,493.03.

B.	**Classified Claims and Equity Interests - Overview.** The classification of Claims and Equity Interests pursuant to this Plan follows.  **THE FOLLOWING SUMMARY AND THE OTHER DESCRIPTIONS IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PROVISIONS OF THE PLAN.   IT IS URGED THAT EACH HOLDER OF A CLAIM OR INTEREST CAREFULLY REVIEW THE TERMS OF THE PLAN.**

Each holder of an Allowed Claim in Class 1, and Classes 4 through 7 shall be entitled to vote to accept or reject the Plan.  Classes 2 and 3 are unimpaired, and they are not entitled to vote

since they are presumed to have accepted the Plan.  Class 8 is impaired, but will receive nothing under the Plan.  Therefore, it is not entitled to vote since it is presumed to have rejected the Plan.

| Class | Name | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Senior Secured Claim | Impaired | Yes |
| Class 2 | Secured Tax Claims – See Exhibit 3 | | |
| Class 2A | Campbell Parcel 0724 Claim | Unimpaired | No |
| Class 2B | Campbell Parcel 8996 Claim | Unimpaired | No |
| Class 2C | Carbon Parcel 0974(2013) Claim | Unimpaired | No |
| Class 2D | Carbon Parcel 0974(2014) Claim | Unimpaired | No |
| Class 2E | Carbon Parcel 0795 Claim | Unimpaired | No |
| Class 2F | Fremont Parcel 1911 Claim | Unimpaired | No |
| Class 2G | Fremont Parcel 1732 Claim | Unimpaired | No |
| Class 2H | Natrona Parcel 8570 Claim | Unimpaired | No |
| Class 2I | Sweetwater Parcel 2753 Claim | Unimpaired | No |
| Class 2J | Miscellaneous Secured Tax Claims | Unimpaired | No |
| Class 3 | JIB Claims | Unimpaired | No |
| Class 4 | Secured M&M Claims | Impaired | Yes |
| Class 5 | Priority Non-Tax Claims | Impaired | Yes |
| Class 6 | Convenience Claims | Impaired | Yes |
| Class 7 | General Unsecured Claims | Impaired | Yes |
| Class 8 | Equity Interests and Section 510(b) Claims | Impaired | No |

## V.    TREATMENT OF CLAIMS UNIMPAIRED BY THE PLAN

A.    *Subclasses 2A through Class 2J*.  These Subclasses consist of Secured Tax Claims which are unimpaired.  Allowed Claims in these Classes shall be treated as follows:

(i)    each holder of an Allowed Secured Tax Claim shall retain its Lien on the property securing the Claim;

(ii)    each holder of an Allowed Secured Tax Claim be paid in equal cash payments on the first day of each month, commencing on the first day of the month following the Effective Date, during a period not to exceed five (5) years after the Petition Date, in full plus interest on the outstanding balance from the Effective Date calculated at the plus interest on the outstanding balance from the Effective Date calculated at the interest rate resulting from an application of T*ill v. SCS Credit Corp.*, 541 U.S. 465 (2004), or such other rate as the Court determines is appropriate;

(iii)    notwithstanding the foregoing payment provision, and in order to comply with Section 1129(a)(9)(C)(iii), in the event a payment to General Unsecured Creditors causes the return to holders of General Unsecured Claims to be greater than return to holders of Allowed Secured Tax Claims, Debtor shall pay to holders of Allowed Secured Tax Claims,

within ten (10) days of such event, an amount of Cash sufficient to cause return to holders of Allowed Secured Tax Claims to equal the return to holders of General Unsecured Claims (or the deemed Cash value, if such holders elect the PIK Note Option and/or the New Common Stock Option); and

> (iv)    Reorganized Debtor may prepay in whole or in part any Allowed Secured Tax Claim at any time in its discretion.

Since Classes 2A through 2J are unimpaired, the holders of Claims in such Classes are not entitled to vote to accept or reject the Plan because they are deemed to accept the Plan pursuant to Section 1126(f).

Claims in Class 2 currently total approximately $2,682,115.32 before interest accruals.

B.    *Class 3*.  This Class consists of JIB Claims, which are unimpaired. JIB Claims that have not been satisfied prior to the Effective Date shall be treated as follows: each holder of an Allowed JIB Claim shall be paid in full in cash in the ordinary course of business following the Effective Date.  To the extent an Allowed JIB Claim was due prior to the Effective Date and was not paid in the ordinary course of business and remains unpaid as of the Effective Date, such claim shall be paid on the later of the Effective Date or when such JIB Claim is Allowed.

Since Class 3 is unimpaired, the holders of Claims in such Class are not entitled to vote to accept or reject the Plan, since they are deemed to accept the Plan pursuant to Section 1126(f).

See Article II.B.3. for a fuller description of and discussion concerning these Claims.

## VI. TREATMENT OF CLAIMS IMPAIRED BY THE PLAN

A.    **Treatment of Class 1.**  Class 1, the Senior Secured Claim, is impaired.  This Claim shall be treated as follows:

> (i)    it shall be Allowed in the amount of $15,000,000;

> (ii)    the Senior Secured Lenders shall retain their Lien on the Senior Secured Collateral to secure the payment of the Claim;

> (iii)    the Claim will be paid in monthly cash installments of interest only at LIBOR plus 300 basis points from the Effective Date at the rate set forth in the New Senior Secured Note, and payable in full thirty-six months (36) months from the Effective Date, as more fully described in the New Senior Secured Note;

> (iv)    upon payment in full of the Senior Secured Claim, the Senior Secured Lenders' Lien upon the Senior Secured Collateral arising under the Senior Secured Loan Documents shall be discharged, the Senior Secured Lenders will release such lien on the Senior Secured Collateral; and

(v)     prior to the hearing confirming the Plan, the Senior Secured Lenders and Debtor shall enter into the New Senior Secured Note to be effective as of the Effective Date, and shall modify the other Senior Secured Loan Documents consistent with the terms herewith. The terms of the New Senior Secured Note and any ancillary documents thereto will be subject to approval in writing by the Senior Secured Lenders, in their sole discretion.

Since Class 1 is impaired, the holder of the Claim in this Class is entitled to vote to accept or reject the Plan.

**B.     Treatment of Class 4.**  Class 4, the Secured M&M Claims, is impaired. To the extent not satisfied prior to the Effective Date, these Claims shall be treated as follows:

(i)     at the sole option of Reorganized Debtor (unless otherwise determined by a Final Order of the Court), each holder of an Allowed Secured M&M Claim in this Class shall receive:

(A)     the property subject to the holder's Lien;

(B)     payment in full in equal monthly installments due on the first day of each month, commencing on the first day of the month following the Effective Date, for a period not to exceed five (5) years after the Petition Date, in full with interest at the rate of 5% per annum from the Effective Date; or

(C)     the indubitable equivalent of such Claim; and

(ii)     Reorganized Debtor may prepay any Allowed Secured M&M Claim in whole or in part at any time in its sole discretion.

Since Class 4 is impaired, holders of Allowed Secured M&M Claims are entitled to vote to accept or reject the Plan.

Claims in this Class total $54,550.48.  See Article II.B.3. for further information.

**C.     Treatment of Class 5**.  Class 5, the Priority Non-Tax Claims, is impaired. Holders of Allowed Priority Non-Tax Claims shall be treated as follows:

(i)     payment in full in equal monthly installments due on the first day of each month, commencing on the first day of the month following the Effective Date, for a period not to exceed five (5) years after the Petition Date, in full; and

(ii)     Reorganized Debtor may prepay these Claims in whole or in part at any time in its sole discretion.

Since Class 5 is impaired, the holder of the Claims in this Class is entitled to vote to accept or reject the Plan.

Debtor is currently unaware of any Claims in this Class.

**D.     Treatment of Class 6**.  Class 6, Convenience Claims, is impaired.  The holders of Allowed Claims in this Class will be paid 25% of their Claims in Cash on or before the Initial Distribution Date in full satisfaction of their Claims.  No holder of an Allowed Unsecured Claim may "opt-in" to Class 6 by voluntarily reducing its claim, absent written consent by Debtor and the Senior Secured Lenders in their sole discretion.  Since Class 6 is impaired, the holders of Allowed Convenience Claims are entitled to vote to accept or reject the Plan.

Total Claims in this Class are approximately $16,000.  If all such Claims are Allowed, total Distributions in this Class would be approximately $4,000.

**E.     Treatment of Class 7**.  Class 7, General Unsecured Claims, is impaired.  These Claims shall be treated as follows:

(i)     each holder of an Allowed General Unsecured Claim may elect up to two (2) of the following three (3) options for the treatment of its Allowed Claim:

(A)     New Common Stock Option: a holder of an Allowed General Unsecured Claim electing to share in the New Common Stock Option shall receive its pro rata share of forty-nine thousand (49,000) shares of New Common Stock, with the pro rata share determined by using the aggregate amount of all Allowed General Unsecured Claims (excluding any General Unsecured Claim of the Senior Secured Lenders) as the denominator and the Allowed General Unsecured Claim amount of the electing holder (or one-half such amount if the holder elects two options) as the numerator). No fractional shares will be issued, and Reorganized Debtor will round down any amount under .5 and up any amount .5 or higher.

If all Class 7 creditors elected this option, they would hold 49% of the New Common Stock. However, any New Common Stock not to be distributed under this option shall not be issued, so that if less than all the Class 7 holders do not elect the New Common Stock Option, Class 7 holders will own less than 49% of the outstanding stock.

(B)     Cash Option: a holder of an Allowed General Unsecured Claim electing the Cash Option shall receive its pro rata share of the Cash Fund on the earlier of the Initial Distribution Date or within thirty (30) days after the Claim becomes an Allowed Claim, with the pro rata share determined by using the aggregate amount of all Allowed General Unsecured Claims (excluding any claim of the Senior Secured Lenders) as the denominator and the Allowed General Unsecured Claim amount allocated to this option by the electing holder as the numerator; or

(C)     PIK Note Option: a holder of an Allowed General Unsecured Claim electing the PIK Note Option shall receive its pro rata share of the PIK Note available to the holders of Allowed Claims in this Class, with the pro rata share determined by using the aggregate amount of all Allowed General Unsecured Claims electing the PIK Note Option plus the Allowed General Unsecured Claim of the Senior Secured Lenders as the denominator and the Allowed General Unsecured Claim amount allocated to this option by  the electing holder as the

numerator.  The PIK Note shall be substantially in the form of Exhibit C to the Plan, and shall include, among other things, the following key terms:

           1.     A principal amount of $22,275,000 plus the aggregate amount of all Allowed General Unsecured Claims electing the PIK Note Option;

           2.     Interest at LIBOR plus 600 basis points, payable in kind until either maturation, or a sale of Debtor or substantially all assets of Debtor; and

           3.     Maturation upon the 3rd anniversary of the Effective Date;

       (ii)    A holder may elect one or two of the New Common Stock Option, the Cash Option or the PIK Note Option, and if two options are elected, the Allowed General Unsecured Claim amount will be equally divided between the two options;

       (iii)    the Senior Secured Lenders may only elect the PIK Note Option for their General Unsecured Claim; and

       (iv)    the election of one or more of the options must be indicated on the ballot to accept or reject the Plan; in the event a holder fails to make an election, or fails to vote, it shall be deemed to have elected the Cash Option.

The terms of the PIK Note and any ancillary documents thereto will be subject to approval in writing by the Senior Secured Lenders, in their sole discretion. Holders of Allowed General Unsecured Claims that elect the PIK Note Option (other than the Senior Secured Lenders) shall be "silent" lienholders, with, among other restrictions, no right, power, or authority to initiate, control, or block a sale of the collateral securing the PIK Note.

Since Class 7 is impaired, holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

Claims in this Class total approximately $25.9 million, with $22.275 million of this amount being the General Unsecured Claim of the Senior Secured Lender. The final amount of Allowed General Unsecured Claims may be higher or lower depending on proofs of Claim filed and the resolution of disputed Claims.  See the chart below for the projected percentage payable based on the foregoing figures under various scenarios:

| Election | Percentage payable |
|---|---|
| All creditors elect Cash Option (SG may not elect Cash Option) | 2.3% |
| ½ of creditors elect Cash Option (SG may not elect Cash Option) | [4.6%] |
| All creditors elect PIK Note Option (SG must elect PIK Note Option). | The recovery under the PIK Note Option is too speculative to estimate. Creditors should consult the Risk Factors, below, for more information. |

| All creditors elect the New Common Stock Option (SG may not elect the New Common Stock Option). | Recovery under the New Common Stock Option is too speculative to estimate. Creditors should consult the Risk Factors, below, for more information. |
|---|---|

**F.     Treatment of Class 8**.  Class 8, Equity Interests and claims arising from the purchase or sale of Equity Interests that are subject to subordination under 11 U.S.C. § 510(b) ("Section 510(b) Claims"), is impaired. Known Section 501(b) Claims include, but are not limited to the Claims of Alan Eugene Humphrey and Wyoming GTL, LLC, relating to the purchase of securities. Holders of Equity Interests and Section 501(b) Claims shall receive nothing under the Plan, and on the Effective Date, all such Equity Interests and Section 510(b) Claims will be cancelled and extinguished.  This Class is impaired but the holders of Equity Interests and Section 510(b) Claims in this Class are not entitled to vote to accept or reject the Plan since they are deemed to reject the Plan pursuant to § 1126(g).

## VII.     MEANS OF IMPLEMENTATION OF PLAN

**A.     Vesting of Assets.**  On the Effective Date, pursuant to Section 1141(b) and (c), all assets of Debtor, including all Avoidance Actions, shall vest in Reorganized Debtor free and clear of all Claims, charges and other interests of creditors, Equity Interests and of all Liens securing any Claims and Equity Interests, except as may be otherwise provided herein.

**B.     Cancellation of Existing Equity Interests.**  On the Effective Date, all of the existing and outstanding Equity Interests of Debtor shall be extinguished and cancelled.

**C.     Issuance of New Equity.**  On the Effective Date, Reorganized Debtor shall authorize and issue 100,000 shares of New Common Stock.  Fifty-one thousand (51,000) of the New Common Stock shall be retained by Reorganized Debtor for distribution pursuant to the Management Incentive Program. So much of the other forty-nine thousand (49,000) shares of New Common Stock as is necessary shall be available for issuance to distribute to the holders of Allowed General Unsecured Claims who have elected the New Common Stock Option, but only so much as is necessary shall be issued. As of the Effective Date, the New Common Stock shall be neither listed on a stock exchange nor otherwise available for public trading.

**D.     Certificate and Bylaws.** The Certificate of Incorporation and Bylaws of Reorganized Debtor shall be amended: (i) to provide for the inclusion of a provision prohibiting the issuance of nonvoting equity securities, and (ii) as necessary to satisfy the provisions of this Plan, substantially in the form and substance of the Amended and Restated Certificate of Incorporation and Bylaws attached as Exhibit E to the Plan. The Amended and Restated Certificate of Incorporation and Bylaws shall be subject to approval in writing of the Senior Secured Lenders, in their sole discretion. Such Amended and Restated Certificate of Incorporation and Bylaws shall govern Reorganized Debtor after the Effective Date.

**E.     Appointment of Officers and Directors.**  As of the Effective Date, the term of the current members of the board of directors of Debtor shall expire without further action by any person.  The New Board shall consist of five (5) members.  A majority of the New Board

directors shall be independent. The members of the New Board and their affiliations are set forth in Exhibit F to the Plan. For so long as either the New Senior Secured Note or the PIK Note are outstanding, the independent members of the New Board shall be acceptable to the Senior Secured Lenders in their sole discretion. The identities and affiliations of the officers of Reorganized Debtor are also set forth in Exhibit F to the Plan. Exhibit F shall also disclose the compensation for the officers and members of the New Board.

      **F.    Management Incentive Program.** The Management Incentive Program shall be subject to the written approval of the Senior Secured Lenders in their sole discretion.

      **G.    Source of Cash Plan Distributions.** The funds necessary for Reorganized Debtor to make Cash distributions shall be obtained from the operations of Debtor and Reorganized Debtor and cash on hand.

      **H.    Litigation and Adversary Proceedings.** Reorganized Debtor shall have the right to commence adversary proceedings to enforce any claim or interest belonging to Debtor or Reorganized Debtor, including any Avoidance Actions. Any recoveries therefrom, after payment of legal fees and expenses associated with such actions, shall be added to Reorganized Debtor's operating funds.

      **I.    Post-Confirmation Financing.** To the extent necessary to provide operating or other funds, Reorganized Debtor, on or after the Effective Date, may obtain financing from parties other than the Senior Secured Lenders; provided, however, that unless otherwise agreed by the Senior Secured Lenders, (a) such financing shall be in accordance with the terms of the New Senior Secured Note and the PIK Note, and the related loan documents for each, and (b) such new debt may not be secured by a Lien senior to, or *pari passu* with, that of the Senior Secured Lenders under the New Senior Secured Note or that of the holders of the PIK Note.

      **J.    Recapitalization.** Reorganized Debtor, as agent on behalf of the holders of Claims entitled to receive distributions under the Plan, agrees to report to the extent applicable, for federal income tax purposes, the transaction described in paragraphs C of this Article as a recapitalization under Section 368(a)(1)(E) of the Internal Revenue Code, and Reorganized Debtor shall not adopt any tax filing position that is inconsistent with the position required under this paragraph.

## VIII.    EXECUTORY CONTRACTS AND LEASES.

      Upon the Effective Date, all unexpired leases and executory contracts which were entered into prior to the Petition Date will be deemed assumed by Reorganized Debtor except (a) those described on Exhibit E to the Plan, which are deemed rejected, (b) those subject to an order of the Court authorizing rejection, or (c) those that are the subject of a pending rejection motion as of the Confirmation Date. Holders of Claims arising as a result of rejection under this Article will have until thirty (30) days from the Effective Date or such earlier date as may have been established by Court Order within which to file proofs of Claim for rejection damages, or any such Claim will be forever barred. Rejection shall be deemed to have occurred on the earlier of:

(i) the date the leased property was returned to the lessor thereof or abandoned or (ii) the Confirmation Date.

## IX.    ALLOWANCE OF CLAIMS AND DISTRIBUTIONS

### A.    Allowance of Claims.

**1.    Disputed Claims.**    Objections to Claims shall be made only by Reorganized Debtor, as applicable.  Reorganized Debtor may, at any time up to the six (6) month anniversary of the Effective Date, file objections to any Claim that in its opinion should be rejected in whole or in part.  The period within which to file such objections may be extended with Court approval.  The objection procedure will apply, without limitation, to Claims arising from the rejection of executory contracts and unexpired leases.  Upon the filing of such an objection, such Claim will be considered a Disputed Claim.

**2.    Reserve for Disputed Claims**. Reorganized Debtor shall make an adequate reserve for all Disputed Claims.  The reserve amounts shall equal the amounts that would otherwise be paid on such Claims if they were Allowed in full. **IF YOU BELIEVE THAT A RESERVE EQUAL TO THE FACE AMOUNT OF YOUR CLAIM IS INSUFFICIENT, YOU MUST HAVE THE UNLIQUIDATED PORTION OF YOUR CLAIM ESTIMATED BY THE COURT.**

**3.    Allowance of Disputed Claims and Payment of Distribution**.  Upon the allowance of a Disputed Claim, by either settlement or by Final Order, Reorganized Debtor shall promptly distribute from the amounts reserved in the above paragraph to the holder of such Allowed Claim the distributions to which such holder would have been entitled had the Allowed Claim been an Allowed Claim as of the Effective Date of the Plan, without interest.  Reorganized Debtor shall make future distributions on such Claim consistent with the timing and terms of distribution to other members of the same Class.  No holder of a Disputed Claim shall be entitled to recover any distributions made to other holders of Allowed Claims regardless of any delay in obtaining an order allowing or estimating a Disputed Claim.

**4.    Estimation of Disputed Claims**.  Any Disputed Claim may be estimated by the Court at any time, for purposes of voting on the Plan.

### B.    Distributions.

**1.    Effective Date Payments.** On the Effective Date, Reorganized Debtor will pay the existing Allowed Administrative Claims (other than Operating Administrative Claims) and the unpaid Allowed JIB Claims.

**2.    Initial Payment Date Payments.** On the Initial Distribution Date, Reorganized Debtor will pay all Allowed Convenience Claims (Class 6) and all Allowed General Unsecured Claims that are subject to the Cash Fund Option (Class 7).

**3.    Periodic Payments.**

(a)      Payment to Class 1 shall be made in accordance with the terms of the New Senior Secured Note;

(b)      Payments to Classes 2A through 2J, 4, and 5 shall be made on or shall commence on the first day of the month following the Effective Date;

(c)      Payments to Class 3 shall be made as and when due in the ordinary course of business per the terms of the relevant agreement, except that to the extent a payment to a holder of Class 3 Claim was due prior to the Effective Date and remains unpaid as of the Effective Date, then such payment shall be made on later of the Effective Date or when the Class 3 Claim becomes Allowed;

(d)      New Common Stock shall be distributed as set forth in Article 5.E. and Article 7.C of the Plan; and

(e)      Payments under the PIK Note will be made as set forth in Article 5.E. of the Plan.

**C.      UST Fees.**  All Quarterly UST Fees shall be made when due, which payment obligation shall continue until Reorganized Debtor's Chapter 11 case is closed.  Reorganized Debtor shall also comply with all reporting requirements of the Office of the U.S. Trustee.

**D.      Delivery of Distributions.**  Distributions shall be made by Reorganized Debtor at the addresses set forth in the following documents: (i) the proof of claim filed by a holder of an allowed Claim (or at the last known addresses of such holder if no proof of Claim is filed); (ii) a written notice of address change delivered to Debtor or Reorganized Debtor after the date of any related proof of claim; or (iii) at the addresses reflected in Debtor's Bankruptcy Schedules if no proof of Claim has been filed and Debtor and/or Reorganized Debtor have not received a written notice of change of address.  Reorganized Debtor may require any holder of an Allowed Claim entitled to a Distribution to furnish an Employee Identification Number or Federal Tax Identification Number as assigned by the Internal Revenue Service, and Reorganized Debtor may condition any Distribution to such Claim holder upon receipt of such identification number.

Any money or property that is payable under this Plan to a holder of an Allowed Claim will be sent by first class United States Mail, postage prepaid, to the address of the holder of the Allowed Claim.  If any such money or property is returned to or by the United States Postal Service undelivered and is not claimed by the holder of the Allowed Claim within ninety (90) days from the date the distribution was made, it will become Cash available for distribution free and clear of any Claim by such holder and Reorganized Debtor's obligation to make that payment of money or property will be deemed satisfied in full. No further distributions shall be made on such Allowed Claim unless and until Reorganized Debtor is notified of a current address.  Further, if any check mailed to a holder of an Allowed Claim is not cashed, deposited or otherwise negotiated within ninety (90) days of its mailing, the check will be void, the funds on deposit to cover that check will become Cash available for distribution free and clear of any Claim of such holder, and Reorganized Debtor's obligation to make the payment represented by

that check will be deemed satisfied in full. No further distributions shall be made or reserves held on such Allowed Claim unless and until Reorganized Debtor is notified of a current address.

## X. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**A.    Introduction.** The following discussion summarizes certain expected federal income tax consequences of the implementation of the Plan. No opinion of counsel has been obtained and no ruling has been requested or obtained from the Internal Revenue Service with respect to any of the tax aspects of the Plan, and the discussion set forth herein is not binding upon the Internal Revenue Service. CREDITORS AND HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES TO THEM UNDER FEDERAL AND APPLICABLE STATE AND LOCAL TAX LAWS, OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN.

IRS CIRCULAR 230 DISCLOSURE:   TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE U.S. INTERNAL REVENUE SERVICE, WE INFORM YOU THAT ANY TAX ADVICE CONTAINED IN THIS COMMUNICATION (INCLUDING ANY ATTACHMENTS) WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF (1) AVOIDING TAX-RELATED PENALTIES UNDER THE U.S. INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR (2) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TAX-RELATED MATTERS ADDRESSED HEREIN.

The statements contained in this portion of the Disclosure Statement are based on existing provisions of the Code, Treasury Regulations promulgated thereunder, existing court decisions, published Revenue Rulings, Revenue Procedures and other technical releases from the Internal Revenue Service (the "IRS"), and legislative history. Any changes in existing law may be retroactive, may affect transactions commenced or completed prior to the effective date of the changes, and may significantly modify this discussion.

Legislation may be introduced in future sessions of Congress that could eliminate or alter some of the anticipated tax results of the Plan. No attempt has been made to evaluate in any detail the impact, which may be substantial, of any proposed legislation of the Plan.

The following is intended to be only a summary of certain tax considerations under current law that may be relevant to Reorganized Debtor's creditors and Equity Interest holders. It is impractical to set forth in this Disclosure Statement all aspects of federal, state, and local tax law that may have tax consequences to Debtor, its creditors and Equity Interest Holders.

Most of the tax aspects discussed herein are complex and uncertain. Moreover, the discussion below is necessarily general, and the full tax impact of the Plan will vary depending upon each creditor's individual circumstances. Therefore, all the creditors should satisfy themselves as to the federal, state, and local tax consequences of the plan by obtaining advice solely from their own advisors.

CREDITORS SHOULD NOT CONSIDER THE DISCUSSION THAT FOLLOWS TO BE A SUBSTITUTE FOR CAREFUL, INDIVIDUAL TAX PLANNING AND ARE

EXPRESSLY CAUTIONED THAT THE INCOME TAX CONSEQUENCES ARE COMPLEX AND UNCERTAIN AND MAY VARY CONSIDERABLY DEPENDING UPON EACH PARTY'S CIRCUMSTANCES.

IN ADDITION, THE TAX CONSEQUENCES DESCRIBED HEREIN ARE UNDER THE LAWS OF THE UNITED STATES OF AMERICA.  NO ATTEMPT HAS BEEN MADE BY THE PLAN PROPONENTS TO DESCRIBE OR IDENTIFY ANY TAX CONSEQUENCES UNDER THE LAWS OF ANY OTHER COUNTRY, INCLUDING CANADA.

**B.     Tax Consequences to Creditors.**     Creditors may be required to recognize income or may be entitled to a deduction as the result of the implementation of the Plan. The exact tax treatment will depend on each creditor's method of accounting and the nature of each Claim in the hands of the creditor.

To the extent a creditor has elected the Cash Option, the New Common Stock Option or the PIK Note Option, a creditor will generally recognize gain or loss equal to the difference between the amount of Cash or property received and the creditor's tax basis in the Claim held. Such gain or loss may be a capital gain or loss depending upon the creditor's particular tax situation and the nature of the creditor's Claim. Gain recognized by a creditor with respect to a Claim for which a bad debt deduction has been claimed generally will be treated as ordinary income to the extent of any such prior deduction. Gain or loss on a form of security, e.g. warrants, will generally be a capital gain or loss depending on the holder's basis.  The gain or loss will be short term or long term depending on the holder's holding period.

Corporations are taxed as an entity, meaning that the corporation pays taxes on its own account based on its income, deductions and credits. If Reorganized Debtor makes a distribution, the holders of the New Common Stock will have income that may be qualified dividends (i.e., subject to reduced tax rates), if distributions are made when Reorganized Debtor has current or accumulated earnings and profit.  If a holder of New Common Stock holds its stock in Reorganized Debtor as a capital asset, such holder will have capital gains if the holder sells such stock for more than its basis in the stock, or capital losses if it sells the stock for less than its basis in the stock.

Notwithstanding anything to the contrary above or in this Disclosure Statement, Debtor cannot opine regarding the tax consequence to any particular creditor or interest holder, and each creditor and interest holder should not rely on this summary in determining how to vote on the Plan.

**C.     Tax Consequences to Debtor.**  Debtor does not believe it will incur "discharge of indebtedness" income.  However, its net operating loss carry-forwards may be reduced as a result of discharge of debt under the Plan.  Further, because the reorganization of its capital structure results in a "change of control," the ability to carry forward its operating losses for tax purposes may be restricted unless it qualifies for one or more exceptions.

**D.     Reservation of Rights.**  This tax section is subject to change based on subsequent changes to other provisions of the Plan.  Debtor and their advisors reserve the right to further

modify, revise or supplement this Article and the other tax related sections of the Plan up to ten days prior to the date by which objections to Confirmation of the Plan must be filed and served.

## XI.   SECURITIES LAW CONSEQUENCES OF THE PLAN

The planned issuance of securities in connection with the Plan raises legal issues under the Bankruptcy Code and securities laws.  Under § 1145(a) of the Bankruptcy Code, the issuance of securities to be distributed under the Plan and the subsequent resale of such securities by entities that are not "underwriters" (as defined in § 1145(b) of the Bankruptcy Code) are not subject to the registration requirements of federal and state securities laws.

**ANY RECIPIENT OF PLAN SECURITIES MUST CONSULT WITH ITS OWN ADVISORS FOR THE FEDERAL, STATE OR LOCAL SECURITIES CONSEQUENCES TO IT UNDER THE PLAN.  NEITHER DEBTOR NOR THEIR PROFESSIONALS ARE PURPORTING IN ANY MANNER TO GIVE SECURITIES LAW RELATED ADVICE TO ANY RECIPIENT OF ANY SECURITIES ISSUED OR RETAINED PURSUANT TO THE PLAN.**

**EACH RECIPIENT OF PLAN SECURITIES SHOULD SATISFY ITSELF THROUGH CONSULTATION WITH ITS OWN LEGAL ADVISORS AS TO WHETHER RESALES OR OTHER TRANSACTIONS IN PLAN SECURITIES ARE LAWFUL UNDER THE FEDERAL AND STATE SECURITIES LAWS.  NEITHER DEBTOR NOR CURRENT MANAGEMENT HAS RECEIVED ADVICE OR APPROVALS FROM THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION WITH RESPECT TO ANY MATTER DISCUSSED HEREIN.   THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

## XII.   LIQUIDATION ANALYSIS

**A.     Introduction.**   To confirm the Plan, the Court must determine (with certain exceptions) that the Plan provides to each member of each impaired class of Allowed Claims a recovery at least equal to the distribution that such member would receive if each Debtor were liquidated under Chapter 7 of the Bankruptcy Code.  As described below, Debtor has concluded that under the Plan each holder of a Claim will receive or retain property of a value that is equal to or greater than the amount that such holder would receive or retain if the estate of Debtor were liquidated under Chapter 7.

**B.     Liquidation Analysis.** Exhibit 5 sets forth Debtor's liquidation analysis.  The footnotes are an essential part of the Liquidation Analysis; please review the analysis in conjunction these footnotes.

## XIII.   PLAN FEASIBILITY AND RISK FACTORS

**A.  Plan Feasibility.**  The Court must find that the Plan is feasible.  The feasibility requirement also contemplates that Reorganized Debtor establish the wherewithal to make the required Plan distributions to creditors.  The sources of funds for Reorganized Debtor's distributions under the Plan will come from (i) Cash accumulated or acquired prior to the Effective Date; and (ii) Reorganized Debtor's operations following the Effective Date.

Debtor anticipates that it will have the Cash necessary to make (or reserve, as necessary) the initial distributions under the Plan from Cash accumulated prior to the Effective Date.

With regard to subsequent periodic payments on Classes 1, 2 and 7 (PIK Note Option), Debtor anticipates having sufficient Cash to make the required monthly and/or quarterly distributions from operations following the Effective Date.  Attached hereto as Exhibit 6 is Reorganized Debtor's operating projections for (3) years commencing June 1, 2016 (assuming the Plan is confirmed on or about May 1, 2016), and ending May 31, 2019 (the "Projections").

The Projections are based on Debtor's historical performance and in particular its actual performance in 2015 adjusted for known and estimated cost savings from the following:

- Revamped operations, including cost efficiencies provided by closing two of its offices and reducing the rent on the third, and reducing its workforce;

- Elimination of the costs involved with maintaining a public company, including listing and certain types of accounting fees, since the Plan intends that Debtor go private;

- Reduced litigation costs, since most prepetition litigation is stayed and Debtor anticipates that the Claims being asserted can be resolved cost-effectively given the projected recoveries for holders of General Unsecured Claims in the Plan; and

- Elimination of the expenses of Debtor's Chapter 11 reorganization after confirmation and substantial consummation of the Plan;

Further, Debtor may increase revenue by, among other things, investing in and enhancing its existing production wells and field facilities on operated and non-operated properties in the Atlantic Rim Area.

Thus, while the Projections are inherently uncertain, Debtor is cautiously optimistic that it can meet its Projections.

**B.  Risk Factors.**   The risk factors associated with the Plan are described below:

Debtor's Plan is based upon assumptions which it believes is reasonable based on current expectations and projections about future events and industry conditions and trends affecting its business. However, whether actual results and developments will conform to Debtor's expectations and predictions is subject to a number of risks and uncertainties that, among other things, could cause actual results to differ materially from those contained in the Projections and the Assumptions related thereto, including the following:

- no increase in the price of oil and gas;
- further declines, volatility of and weakness in natural gas or oil prices;
- Debtor's ability to maintain adequate liquidity in view of current natural gas prices;
- Debtor's ability to obtain replacement financing or to extend existing terms;
- Debtor's ability to comply with the covenants and restrictions of any credit facility or its ability to obtain waivers from a lender on a credit facility for the covenants we are not in compliance with, or those we may not be in compliance with in the future;
- Debtor's ability to obtain, or a decline in, oil or gas production;
- Debtor's ability to increase its natural gas and oil reserves;
- Debtor's future capital requirements and availability of capital resources to fund capital expenditures;
- the actions of third party co-owners of interests in properties in which Debtor also own an interest, and in particular those which it does not operate or control;
- the shortage or high cost of equipment, qualified personnel and other oil field services;
- general economic conditions, tax rates or policies, interest rates and inflation rates;
- incorrect estimates of required capital expenditures;
- the amount and timing of capital deployment in new investment opportunities;
- changes in or compliance with laws and regulations, particularly those relating to drilling, derivatives, and safety and protection of the environment such as initiatives related to drilling and well completion techniques including hydraulic fracturing;
- the volumes of production from our natural gas and oil development properties, which may be dependent upon issuance by federal and state governments, or agencies thereof, of drilling, environmental and other permits;
- Debtor's ability to market and find reliable and economic transportation for its gas;
- Debtor's ability to successfully identify, execute, integrate and profitably operate any future acquisitions;
- industry and market changes, including the impact of consolidations and changes in competition;
- Debtor's ability to manage the risk associated with operating in one major geographic area;
- weather, changes in climate conditions and other natural phenomena;
- Debtor's ability and the ability of its partners to continue to develop the Atlantic Rim project;
- the credit worthiness of third parties with which Debtor enters into hedging and business agreements;
- the changing political and regulatory environment in which Debtor operates;
- numerous uncertainties inherent in estimating quantities of proved natural gas and oil reserves and actual future production rates and associated costs; and

- the outcome of any future litigation or similar disputes and the impact on any such outcome or related settlements.

Debtor may also make material acquisitions or divestitures or enter into financing or other transactions. None of these events can be predicted with certainty, and the possibility of such events occurring is not taken into consideration in the Projections.

New factors that could cause actual results to differ materially from those described in the Assumptions to the Projections emerge from time to time, and it is not possible for Debtor to predict all such factors, or the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Projections.

Debtor believes that its success depends on the services of certain of its present senior management.  If Reorganized Debtor loses the services of key executives, then its business could be materially adversely affected.  There can be no assurance that, if replacement of these key executives became necessary, Debtor would be able to employ suitable replacements or that replacements could be hired on terms that are acceptable to Debtor.

The effect, if any, that Debtor's Chapter 11 case may have upon any continued operations of Reorganized Debtor cannot be accurately predicted or quantified.  Although Debtor's reorganization and emergence from bankruptcy will eliminate some uncertainty about its future operations, some entities, at least initially, may be uncomfortable doing business with companies that recently emerged from a Chapter 11 process.  The Chapter 11 case could have harmed Debtor's relationships with its clients and employees, resulting in a materially adverse impact on Reorganized Debtor's operations.  However, to date, Debtor has been able to successfully manage issues with its clients and employees during the Chapter 11 case.

The fundamental premise of the Plan is the successful implementation of Debtor's business plan as reflected in the Projections. The Projections are inherently uncertain and are dependent upon the successful implementation of the business plan and the reliability of the other assumptions contained therein. The Projections reflect numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of Reorganized Debtor, industry performance, general business and economic conditions and other matters, most of which are beyond the control of Reorganized Debtor and some of which may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement, including unanticipated changes in applicable regulations or accounting procedures, may affect the actual financial condition, results of operations and Cash flows of Reorganized Debtor in the future.

## XIV.  SOLICITATION OF ACCEPTANCE OF PLAN

Debtor hereby solicits acceptance of its Plan and urges its creditors to vote to accept the Plan.

Dated: February 8, 2016.

ESCALERA RESOURCES CO.


By:  s/ Adam Fenster
        Chief Financial Officer


**ONSAGER | GUYERSON | FLETCHER | JOHNSON**

By: *s/ Christian C. Onsager*
        Christian C. Onsager, #6889
        Michael J. Guyerson, #11279
        Andrew D. Johnson, #36879
        Alice A. White, #14537
    1801 Broadway, Ste. 900
    Denver, Colorado 80202
    Telephone: (303) 512-1123
    Facsimile: (303) 512-1129
    Email: consager@ogfj-law.com
    Email: mguyerson@ogfj-law.com
    Email: ajohnson@ogfj-law.com
    Email: awhite@ogfj-law.com

## LIST OF EXHIBITS

Exhibit 1        Plan of Reorganization

Exhibit 2        Subsidiaries

Exhibit 3        Claims

Exhibit 4        Financials

Exhibit 5        Liquidation Analysis

Exhibit 6        Projections

## EXHIBIT 1
## Plan of Reorganization

[To be appended upon approval of the Disclosure Statement]

## EXHIBIT 2
### Subsidiaries

Atlantic Rim Development Company, LLC
Eastern Washakie Midstream LLC
Escalera GTL, LLC
Escalera International Co. LLC
PetroSearch Energy Corporation
Wyoming Intercept, LLC

**EXHIBIT 3**
**Summary of Claims**

| Name | Class | Amount |
|------|-------|--------|
| Priority Tax Claims | N/A | $ 55,493.03 |
| Senior Secured Claim | 1 | $ 15,000,000.00 |
| Secured Tax Claims | 2 | $ 2,682,115.32 |
| JIB Claims (1) | 3 | $ 2,374,035.42 |
| Secured M&M Claims | 4 | $ 54,550.48 |
| Priority Non-Tax Claims | 5 | $ - |
| Convenience Claims | 6 | $ 16,183.10 |
| General Unsecured Claims | 7 | $ 25,873,632.06 |

(1) Debtor believes all these claims have been paid.

## **EXHIBIT 4**
### **Financials**

[To be attached]

**EXHIBIT 5**
**Liquidation Analysis**

[To be provided]

**<u>EXHIBIT 6</u>**
**<u>Projections</u>**

[To be provided]