**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re: | |
| | Bankruptcy Case No. 15-22395 TBM |
| Escalera Resources Co., | Chapter 11 |
| | |
| Debtor. | |

---

**OPINION AND ORDER ON APPLICATION FOR ALLOWANCE OF
ADMINISTRATIVE EXPENSE CLAIM (ELECTRICAL ENERGY)
UNDER 11 U.S.C. § 503(b)(9)**

---

I.     Introduction.

Electrical energy.  Since Thales of Miletus (circa 585 B.C.) made his initial observations on the generation of static electricity by rubbing a piece of *ilektron* against fur, intellectuals have puzzled over the physics of the phenomenon.  Great scientists like Alessandro Volta, André-Marie Ampère, James Prescott Joule, Michael Faraday, George Ohm, James Watt, Thomas Edison, and Nikola Tesla provided the foundation for development of the modern electric industry including the manufacture, transmission, distribution, and measurement of electrical energy.  And, now, electrical energy is virtually indispensable for modern living and work.

This case presents an interesting question touching on the nature of electrical energy and connecting it with bankruptcy.  Chapter 11 debtor, Escalera Resources Co. (the "Debtor"), produces coal bed methane gas from its wells in Wyoming.  Its operations rely on substantial quantities of electrical energy.  PacifiCorp d/b/a Rocky Mountain Power ("PacifiCorp") is a public utility.  It supplied the Debtor with metered electrical energy both before and after the Debtor sought protection under the Bankruptcy Code.[1]

In 2005, as part of comprehensive changes to the Bankruptcy Code, Congress enhanced certain creditors' rights by enacting Section 503(b)(9).  That new provision created an administrative expense priority for "the value of any goods received by the debtor within 20 days before the date of commencement of a case."  So, creditors that supplied goods right before a bankruptcy jump to the front of the line for distributions.  Right or wrong from a policy perspective, that is what Congress decided.  Now, the Court must decide whether the electrical energy supplied by PacifiCorp in the days leading up to the Debtor's bankruptcy constitutes "goods" entitled to priority status under the Bankruptcy Code.  The exercise requires some basic

---

[1]     All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*  Unless otherwise indicated, all references to "Section" are to Sections of the Bankruptcy Code.

understanding of the nature of electrical energy; but this is not a science test. The main focus of the inquiry is on the plain meaning of the term "goods."

## II. Procedural Background.

The Debtor filed for protection under Chapter 11 of the Bankruptcy Code on November 5, 2015 (the "Petition Date"). (Docket No. 1.) The Debtor operates as a "debtor in possession" under Section 1107. The Court has not confirmed a plan of reorganization. PacifiCorp filed Proof of Claim No. 46-1 (the "Claim") for $240,479.43 on the basis of "electricity sold by electric utility." PacifiCorp asserted that an $87,853.94 portion of the Claim was entitled to administrative expense priority under Section 503(b)(9) as "[t]he value of the electricity sold to the Debtor and received by the Debtor in its ordinary course of business during the 20 day period prior to the Petition Date."

Subsequently, PacifiCorp filed a "Motion for Order Allowing Administrative Expense Pursuant to 11 U.S.C. § 503(b)(9)." (Docket No. 206, the "Application.") Consistent with its Claim, PacifiCorp requested that the Court enter an Order allowing an $87,853.94 portion of the Claim as an administrative expense priority under Section 503(b)(9). The Debtor opposed the Application by filing its "Response to PacifiCorp's Motion for Order Allowing Administrative Expense Pursuant to 11 U.S.C. § 503(b)(9)." (Docket No. 232, the "Response.") The Debtor did not challenge the amount of the Claim but contended that none of the Claim should receive administrative expense priority treatment. The Debtor argued that electricity is not a "good" under the Uniform Commercial Code (the "UCC") and Section 503(b)(9). Creditor, Société Générale, joined in the Response and adopted the Debtor's arguments.[2] (Docket No. 237, the "Joinder.") The Debtor and PacifiCorp requested an evidentiary hearing.

Prior to trial, the parties submitted a "Stipulation of Agreed Facts for Evidentiary Hearing." (Docket No. 309, the "Stipulated Facts.") The Court conducted a one-day evidentiary hearing on the Application and Response. (Docket Nos. 313 and 335.) Prior to the presentation of evidence, PacifiCorp reduced the amount asserted as an administrative expense priority from $87,853.94 to $84,253.95 (as adjusted, the "Administrative Expense Claim"). (Docket No. 335, "Transcript of Evidentiary Hearing on PacifiCorp's Motion for Order Allowing Administrative Expenses, Debtor's Response Thereto and Joinder," May 10, 2016, at 6-7 [hereinafter, "Tr. at ___"].) At trial, the Court heard testimony from three witnesses: Dr. Shawn Kolitch, Stacy Splittstoesser, and Ben Geertsen. Further, the Court admitted Exhibits 1-8 proffered by PacifiCorp and Exhibits A-C presented by the Debtor. The Court acknowledges the professional and skilled legal work by counsel for both parties in presenting their evidence and arguments. The Application and Response are ripe for final decision.

## III. Jurisdiction and Venue.

The Court has jurisdiction over this matter under 28 U.S.C. § 1334. The issues raised in the Application and Response are core proceedings under 28 U.S.C. §§ 157(b)(2)(A) (matters

---

[2] As Société Générale did not materially participate in the dispute after filing the Joinder, this Opinion and Order makes no further reference to Société Générale.

concerning administration of the estate), (B) (allowance or disallowance of claims against the estate), and (O) (other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Court has jurisdiction to enter final judgment with respect to the Application and Response.

IV.    Findings of Fact.

A.    The Parties.

The Debtor is a publicly-traded, independent energy company engaged in the exploration, development, production, and sale of natural gas and crude oil in the Rocky Mountain basins of the western United States. *In re Escalera Resources Co.*, 2015 WL 7351396, at *1 (Bankr. D. Colo. Nov. 9, 2015). Its core operations are natural gas (coal bed methane) wells in Wyoming. *Id.* PacifiCorp is a public utility company that sells electricity to the Debtor. (Stipulated Fact No. 1.)

B.    The Administrative Expense Claim.

At trial, PacifiCorp presented (and the Court admitted into evidence):

(1)    a prepetition billing summary for each of the Debtor's three accounts with PacifiCorp (the "Billing Summary");

(2)    a list of service locations and meter numbers (the "Meter List");

(3)    invoices for the 20-day period prior to the Petition Date (the "Invoices");

(4)    excerpts of Wyoming tariff rules and regulations (the "Wyoming Tariff Information"); and

(5)    a Section 503(b)(9) Claim Summary (the "Administrative Expense Summary").

(Ex. 4-8.) Witnesses Stacy Splittstoesser (the Wyoming Regulatory Affairs Manager of PacifiCorp) and Ben Geertsen (a Senior Credit Analyst of PacifiCorp) authenticated the exhibits and provided details concerning the nature and amount of the Administrative Expense Claim. The Court finds both Stacy Splittstoesser and Ben Geerten to be credible and competent.

1.    The Accounts.

The Debtor had three accounts with PacifiCorp. (Stipulated Fact No. 3.) However, PacifiCorp supplied the bulk of electrical energy to the Debtor under a single account: XXX9206-001-5 (the "Principal Account"). For example, the Principal Account is the basis of $240,125.27 (or more than 99%) of the total $240,479.93 amount of the Claim. (Ex. 4; Stipulated Fact No. 6.) Similarly, during the 20-day period prior to the Petition Date, the

3

Principal Account constituted $83,946.96 (or more than 99%) of the total $84,253.95 amount of the Administrative Expense Claim.  (Ex. 8.)

    2.    <u>The Meters</u>.

PacifiCorp supplied electrical energy to the Debtor measured by five meters.  (Ex. 5 and 7; Tr. at 87.)  More than 99% of the electrical energy flowed through Meter Nos. 35739021 and 35739016, both of which were associated with the Principal Account.  PacifiCorp supplied the remaining amount of electrical energy through three other meters.  All of the electrical energy was metered and delivered to the Debtor in Wyoming in connection with the Debtor's coal bed methane natural gas operations.  (Tr. at 72.)

    3.    <u>The Invoices, Amount of Electrical Energy Supplied, and Amount of Administrative Expense Claim</u>.

PacifiCorp issued Invoices for each of the three accounts covering each of the five meters for the 20-day period prior to the Petition Date.  The Invoices identify the main charges as for "ELECTRIC SERVICE."  (Ex. 6 at 2-3, 5-6 and 9.)  The "Electric Service" sections of the Invoices are followed by a table and further explanation of the charges.  *Id.*  For example, the first Invoice (which contains the same format as the other Invoices and covers the Primary Account as well as the highest-use meter) states the following:

| METER NUMBER | SERVICE PERIOD From       To | ELAPSED DAYS | METER READINGS Previous   Current | METER MULTIPLIER | AMOUNT USED THIS MONTH |
|---|---|---|---|---|---|
| 35739021 | Oct 19, 2015 Nov 5, 2015 | 17 | 76158     76299 | 3,500.0 | 500.500 kwh |
| 35739021 | Demand Nov 5, 2015 | | 0.54 | 3,500.0 | 1,890 onkw |
| 35739021 | Demand Nov 5, 2015 | | 0.476 | 3,500.0 | 1,658 offkw |
| 35739021 | Demand Nov 5, 2015 | | 0 | 3,500.0 | 0 kvar |

(*Id.*)  Thus, meter readings form the basis for the charges detailed in the Invoices.  "The purpose of the meter is to identify and measure the usage of electricity . . . ."  (Tr. at 87.)  Over 99% of the amount of the Administrative Expense Claim is based upon electrical energy supplied by PacifiCorp to the Debtor as identified by actual daily meter readings of the two main meters, Meter Nos. 35739016 and 35739021.  (Ex. 8 at 2; Tr. at 88-89.)  With respect to the remaining amount of the Administrative Expense Claim (less than 1%), PacifiCorp calculated such amount by prorating monthly meter readings.  (*Id.*)

After quantifying the amount of electrical energy supplied, the balance of each of the Invoices details the associated financial charges.  Again, the first Invoice is typical:

| CLOSING CHARGES | Units | Cost Per Unit | Charge |
|---|---|---|---|
| Basic Chg, 3P, Prl Delivery for 17 days | 5,695 kw | 2.4300000 | $  8,624.02 |
| Demand Use Details | 1,890 onkw | | |
| On Peak Demand Charge Prl for 17 days | | 15.9400000 | $ 17,071.74 |
| Net Power Cost Demand Prl for 17 days | | 2.1300000 | $  2,281.23 |

4

| Energy Use Details | 500,500 kwh | | |
|---|---|---|---|
| Energy Charge Primary for 17 days | | 0.0078400 | $  3,923.92 |
| Net Power Cost Energy Prl for 17 days | | 0.0235700 | $ 11,846.84 |
| Renewable Rev Adj Demand Prl for 16 days | 1,890 onkw | -0.0500000 | $     -53.55 |
| Renewable Rev Adj Energy Prl for 16 days | 500,500 kwh | 0.0000100 | $       -5.01 |
| Customer Efficiency Services | | 0.0040000 | $    174.76 |
| 58.43% Sales Tax Exempt | | 0.0600000 | $  1,094.05 |
| Total New Charges | | | $ 44,958.00 |

(*Id.*)  Thus, the Invoices establish that the great majority of the charges levied against the Debtor were for actual electrical energy supplied on a "kw" or kilowatt basis.  However, there were some minor amounts included on the Invoices for "Customer Efficiency Services" and taxes.

In the Administrative Expense Summary, PacifiCorp provided further detail for its Administrative Expense Claim.  (Ex. 8.)  Notably, the Administrative Expense Summary confirms that PacifiCorp limited the Administrative Expense Claim only to the supplied electrical energy.  (*Id.* at 2.)  Put another way, PacifiCorp is not claiming a Section 503(b)(9) administrative expense priority for "Customer Efficiency Services," taxes, or city franchise fees listed on the Invoices.  (*Id.*)  Instead, only the value of electrical energy actually supplied to the Debtor during the 20-day period before the Petition Date is included.  (*Id.* and Tr. at 79 and 90.)  Ben Geersten testified that the amount of the Administrative Expense Claim fairly and accurately represents the value of the electrical energy provided to the Debtor during the 20 days prior to the Petition Date.  (Tr. at 91.)  The Court concurs and finds that the value of the electrical energy provided to the Debtor during the relevant time is $84,253.95.

C.    Wyoming Tariff Information.

Since PacifiCorp is a public utility, its rates are regulated by the Wyoming Public Service Commission.  (Tr. at 70; Stipulated Fact No. 2.)  The Wyoming Tariff Information identifies the "Applicable Wyoming Rate Schedules."  (Ex. 7.)  Schedule 46 is titled "Large General Service Time of Use – 1,000 KW and Over" and states that it applies to:

> . . . non-residential Customers for all electric service required on the Customer's premises.  Service under this Schedule is limited to electric service loads which have exceeded 999 kw in more than one month of a consecutive 18-month period.

(*Id.* at 2.)  Consistent with the Invoices, Schedule 46 permits "Monthly Billing" for "Basic Charge," "Demand Charge," Energy Charge," and "Minimum Charge."  (*Id.* at 2-3.)  All of the authorized Schedule 46 charges are based on the number of kilowatt hours supplied.  (*Id.*)  Further, Schedule 46 refers to "Continuing Service at each service location."  The other applicable Schedules, Schedules 25 (Small General Service) and 26 (General Service), contain similar terminology.  The Debtor added Tariff Schedules used by PacifiCorp for many other types of accounts such as for residential, agricultural, and street lighting customers.  (Ex. A.)  Virtually all of the other Tariff Schedules contain the word "service" in their titles and text.

5

D.    The Nature of Electrical Energy.

PacifiCorp presented Dr. Shawn Kolitch as an expert witness "in the field of physics." (Tr. at 14.)  His testimony focused on the characteristics of electrical energy.  Dr. Kolitch is well qualified.  (Ex. 1 and Tr. 14.)  He received a Bachelor of Sciences in applied mathematics and a Master of Sciences in applied physics from Columbia University.  Thereafter, he earned a Doctorate in physics from the University of California, Santa Barbara.  Dr. Kolitch taught physics, including the principles of electricity and magnetism, as a physics lecturer and assistant professor of physics at three universities.  He published several articles and made numerous presentations on physics topics.  After a career focused on the sciences, Dr. Kolitch elected to pursue a new field:  law.  He earned a Juris Doctorate and is in private practice in Oregon.  In his current work, Dr. Kolitch marries his science and legal training by focusing on intellectual property in the emerging technology and high-technology industries.  The Court approved Dr. Kolitch's designation under F.R.E. 702 as an expert witness in the field of physics.  Dr. Kolitch testified on complex issues in a straightforward and understandable manner.  The Court finds that Dr. Kolitch's testimony was highly credible and very helpful to the Court in assessing the nature of electrical energy.[3]  The Court notes that while Debtor's counsel conducted a very facile and detailed cross-examination of Dr. Kolitch, the Debtor did not offer any additional or contrary expert concerning physics or the nature of electrical energy.

Dr. Kolitch, testified that "the electricity provided by a utility company to a customer . . . is more properly described as 'electrical energy'" rather than just "electricity."  (Ex. 2 at 1 and 3.)  That is because:

> Electricity is a sort of catchall term that's used to describe the constellation of physical properties and effects whereas electrical energy has a more specific meaning.  It means the energy carried by charged particles as they move and . . . what we're talking about [in this case] is the transfer of electrical energy from the source [PacifiCorp] to the customer [the Debtor] . . . .

(Tr. at 16.)  Put another way, "electrical energy is the energy per electron multiplied by the total number of electrons carrying the charge."  (Tr. at 16.)  And, "[a]n electron is a fundamental particle of nature."  (Tr. at 15.)

The Court finds that Dr. Kolitch's use of the phrase "electrical energy," rather than the more amorphous word "electricity," is proper and best reflects the nature of the transaction

---

[3]       However, Dr. Kolitch's testimony went further than just explaining the nature of electrical energy from the perspective of physics.  He testified regarding the ultimate issue in this controversy and opined that "electrical energy should be considered a 'good' under U.C.C. § 2-105(a)."  (Ex. 2 at 30; *see also* Tr. at 25 (opining that electrical energy "fit[s] within the definition of goods."))  Because the Court accepted Dr. Kolitch as an expert witness only in the "field of physics," such testimony was not proper and invaded the province of the Court.  Thus, while the Court appreciates his testimony about the nature of electrical energy, the Court gives no weight to Dr. Kolitch's legal conclusions regarding bankruptcy and commercial law.

between PacifiCorp and the Debtor.  The phrase "electrical energy" is particularly appropriate in this case because "the transfer of electrical energy is precisely what occurs (and what the customer pays for) when a utility company supplies electricity to a customer."  (Ex. 2 at 3.)  Accordingly, the Court adopts "electrical energy" as the proper terminology.[4]

The production of utility-scale electrical energy relies on a discovery made by the English scientist Michael Faraday in 1831, commonly known as "Faraday's Principle."  (Ex. 2 at 4.)  Faraday discovered that "rotating a loop of wire between the poles of a magnet causes charged particles within the wire to move around the loop, a phenomenon now commonly known as the flow of 'electric current.'"  (*Id.*)  Even now, almost two hundred years after Faraday's original discovery, electric utility companies generate electrical current and electrical energy primarily by causing large coils of wire to rotate between the poles of a magnet.  (Tr. at 17-18.)  Rotation is accomplished most commonly by using coal, natural gas, diesel fuel, or nuclear energy to heat water and transform it into steam.  (Ex. 2 at 7.)  The resulting steam is used to spin a turbine that then produces electrical energy.  (*Id.*)

At trial, Dr. Kolitch demonstrated Faraday's Principle by using a hand-crank electric generator to generate electrical energy that was transmitted by copper wire and consumed by a series of light bulbs.  (Tr. at 18-22.)  The demonstration showed that:

> Electrical energy produced by a generator can travel through conductive wires and be put to a useful purpose at its destination.  To accomplish this, i.e., to be transferred from the generator to the energy-consuming device, the electrical energy evidentially must move — and therefore be *movable* — from the generator to the energy-consuming device.

(Ex. 2 at 9.)

Power plants produce alternating electric current that is supplied to customers.  (Ex. 2 at 6-7.)  "The most basic characteristic of AC power is that it represents sub-microscopic charged particles (electrons) moving *back-and-forth* in a wire, many times per second.  This back-and-

---

[4]    Using the phrase "electrical energy" instead of the word "electricity" also is consistent with federal statutes governing the regulation of electric utility companies.  For example, the Federal Power Act, 16 U.S.C. § 824d(a), states:  "All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy . . . shall be just and reasonable . . . ."  *See also* 16 U.S.C. § 824(a) ("the business of transmitting and selling electric energy . . . to the public is affected with a public interest . . . ."); 16 U.S.C. § 796 (Federal Power Act defines "electric utility" as "a person or Federal or State agency . . . that sells electric energy."); 16 U.S.C. § 2602(4) (references "electric energy"); 42 U.S.C. § 16451(5) (references "electric energy"); and 42 U.S.C. § 16211(b) (authorizing appropriations for programs to improve "electric energy" systems).  The Bankruptcy Code follows the same pattern and also utilizes the term "electric energy."  11 U.S.C. § 363(h)(4) (authorizing sale of certain interests in property "only if such property is not used in the production, transmission, or distribution for sale, of electric energy . . . .").

7

forth movement is what 'alternating' in 'alternating current' means." (Ex. 2 at 13. *See also* Tr. at 17.) According to Dr. Kolitch:

> The fundamental nature of AC power is that it represents a current of electrically charged particles (electrons) moving back and forth in a conductor. If the current stops, there is no electrical energy that can be identified or transferred to the customer. It is the very current itself, which by definition consists of moving electrical charges, which carries the electrical energy and which allows both the identification and transfer of the energy. Therefore, in my opinion it is a matter of logical necessity, based upon the fundamental nature of AC power, that the electrical energy identified at the customer's meter is moving — and therefore movable — when it is identified.

(Ex. 2 at 10.)

Public utilities typically supply electrical energy to their customers through the electric grid and highly conductive copper transmission wires. An electromechanical meter measures the electric energy sold to an end-user. Put another way, a meter "identifies and measures the electrical energy passing through it." (Ex. 2 at 10.) How does the standard meter work?

> Essentially what happens is the energy passes through the meter and generates what are called eddy currents in an aluminum disk which is caused to rotate at a rate which is proportional to the amount of energy passing through the disk and so the number of rotations of that disk is used as a measurement of the amount of electrical energy passing through the disk.

(Tr. at 22.) The electrical energy transferred to a customer "typically [is] measured in kilowatts (kW). Over a set period, such as a monthly billing cycle, the total electrical energy transferred to the customer is the average power multiplied by the time, usually expressed in kilo-watt-hours (kWh)." (Ex. 2 at 19; *see also* Tr. at 23.)

Dr. Kolitch was quite emphatic that the supply of electrical energy to a customer, and its measurement, is based on movement:

> The fundamental nature of that measurement (kilowatt hours) requires that electrons in the wires be moving as they pass through the meter to cause these rotations of the disk. Without the motions of the electrons back and forth in the wires, the disk would not move and there would be no energy transferred and no measurement made, so it absolutely requires the motion of electrical current to measure anything.

(Tr. at 23-24.; *see also* Ex. 2 at 30.)

8

Ultimately, Dr. Kolitch opined that: (1) "electrical energy passing from a utility company to a customer is identifiable"; and (2) "electrical energy transferred to the customer is by its fundamental nature moving — and therefore movable — at all times, including when it passes through the customer's electricity meter."  (Ex. 2 at 30.)  The Court finds Dr. Kolitch's foregoing opinions compelling, well-supported, and valid.  Accordingly, the Court accepts Dr. Kolitch's conclusions concerning the characteristics of electrical energy (which stem from his expertise in the field of physics); however, the Court (not Dr. Kolitch) must decide whether electrical energy constitutes "goods" within the meaning of Section 503(b)(9).

V.   <u>Legal Analysis</u>.

A.   <u>The Legal Question</u>.

The Application requests the allowance of the Administrative Expense Claim as a priority in the amount of $84,253.95.  Section 503(b)(9) provides priority treatment for:

> . . . the value of any goods received by the debtor within 20 days
> before the date of commencement of a case under this title in
> which the goods have been sold to the debtor in the ordinary
> course of such debtor's business.

As set forth in the Court's Findings of Fact, PacifiCorp established that it supplied $84,253.95 worth of electrical energy to the Debtor within 20 days before the Petition Date.  The Debtor did not contest the ordinary course nature of the transaction.  Thus, the only remaining question is whether the electrical energy received by the Debtor qualifies as "goods" within the ambit of Section 503(b)(9).

B.   <u>General Guidelines for Statutory Interpretation</u>.

The Court employs a fair reading method that dictates the primacy of the statutory text. Stated differently, the inquiry must center on the "language of the statute itself." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (quoting *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).  Here, the main issue is the meaning of one word:  "goods."  However, neither Section 503(b)(9), nor the Bankruptcy Code, defines the term "goods."  Thus, the Court must engage in a classic statutory interpretation exercise.  Since the Bankruptcy Code "standardizes an expansive (and sometimes unruly) area of law," it is the Court's "obligation to interpret the Code clearly and predictably using well established principles of statutory construction. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2073 (2012).

The starting place is the "plain" or "ordinary" meaning of the text.  *Clark v. Rameker*, 134 S. Ct. 2242, 2246 (2014); *Hamilton v. Lanning*, 560 U.S. 505, 513 (2010).  As the U.S. Supreme Court explained, "[w]hen terms used in a statute are undefined, we give them their ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995).  And, statutory interpretation should focus on the meaning of the statutory text at the time of enactment. *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2165 n.2 (2015) (interpreting the word "services"

9

as of 1934 when the term was first used in the statute).  Put another way, "[t]o gain a proper understanding of the statute at issue, we must put in into its historical context." *Aulston v. U.S.*, 915 F.2d 584, 585 (10th Cir. 1990).  Fortunately, in this case, no real historical foray is required because Section 503(b)(9) was enacted by Congress only a decade ago as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005).

While the Court looks to the modern "ordinary meaning" of the term "goods," context also is important.  The term "goods" appears as part of a single sentence subsection in a statute governing the "allowance of administrative expenses" as part of the bankruptcy process. 11 U.S.C. § 503 identifies those categories of claims or expenses that are afforded more favorable treatment than other unsecured claims.  *See* 11 U.S.C. §§ 507 (listing priorities), 726 (detailing the distribution of property of the estate); and 1129 (requiring payment of priority administrative expenses as part of Chapter 11 plan confirmation).  In 2005, Congress *expanded* the category of administrative expense claims to include the value of "goods" received by the Debtor shortly before the bankruptcy filing.  So, the measure obviously was designed to provide additional redress for creditors — not debtors.

Beyond this expansion of creditors' rights, what did Congress intend in enacting Section 503(b)(9)?  The Court believes that is the wrong question.  The Court should not decide "what the legislature meant . . . [but] only what the statute means."  Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 HARV. L. REV. 417, 419 (1899).  More recently the U.S. Supreme Court explained: "in interpreting a statute a court should always turn first to one, cardinal canon, before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).  Thus, "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"  *Id.* (quoting *Rubin v. U.S.,* 449 U.S. 424, 430 (1981)).

For these reasons, the Court is quite reticent to engage in an analysis and discussion of legislative history as part of its statutory interpretation work.  In fact, the exercise of trying to divine intent from legislative statements (whether from floor speeches, debates, or committee reports) is a sort of fiction.  *See* Antonin Scalia and Bryan A. Garner, READING LAW:  THE INTERPRETATION OF LEGAL TEXTS 394 (Thompson/West 2012) [hereinafter, "READING LAW"] ("The use of the term *legislative intent* encourages this search for the nonexistent.")  But, in this case, even if the Court wanted to seek fiction, it would be even more impossible because there is no legislative history explaining Section 503(b)(9) and Congress' intention in using the expansive word "goods."  *See* H.R. Rep. 109-31(I) (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88 (House Report notes only that "Section 1227(b) amends Bankruptcy Code section 503(b) to provide that the value of any goods received by a debtor not later than within 20 days prior to the commencement of a bankruptcy case in which the goods have been sold to the debtor in the ordinary course of the debtor's business is an allowed administrative expense").  The Debtor acknowledges the lack of legislative history.  *See* Response at 2 ("BAPCPA's sparse legislative history is of little help . . . there is no legislative history as to why § 503(b)(9) was needed . . . .").

So, we turn back to the meaning of the language Congress actually used:  "goods."

C.    In the Absence of a Statutory Definition of "Goods" in the Bankruptcy Code, Other Sources Provide Guidance.

Interpretation of the word "goods" used in Section 503(b)(9) of the Bankruptcy Code, which after all is a federal statute, is a matter of federal law — not state law. *Kamen v. Kemper Fin. Serv., Inc.*, 500 U.S. 90, 97 (1991); *In re Pilgrim's Pride Corp.*, 421 B.R. 231, 236 (Bankr. N.D. Tex. 2009). Unfortunately, there is no binding federal precedent for this Court since neither the U.S. Supreme Court nor the U.S. Court of Appeals for the Tenth Circuit have addressed the meaning of the word "goods" under Section 503(b)(9).[5]

Thus, the Court must look elsewhere for plain meaning. Dictionaries can help determine the ordinary meaning of words. *Baker Botts*, 135 S. Ct. at 2165 (utilizing dictionaries from time period when statute was passed to confirm plain meaning of the word "services" in Bankruptcy Code). And, analogous statutory and common law may be an important aide. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-23 (1992) (using the common law meaning of "employee" to construe the term in ERISA statute); *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 738-41 (1989) (utilizing conventional common law understanding of word to ascertain meaning of federal statute). Of course, the context of the Bankruptcy Code must be taken into account as key. But, unless the statutory text and context of the Bankruptcy Code somehow lead to an entirely contrary understanding of the word "goods," the ordinary meaning of the term "goods" should prevail whether the question arises in bankruptcy or not. Indeed, every bankruptcy court decision construing Section 503(b)(9) has looked outside of bankruptcy for a definitional analog and all have seized on the UCC, a state law statutory scheme, as the main source for defining "goods" under the Bankruptcy Code.

The Court concludes that there are many useful guideposts for ascertaining "plain meaning" in this case including dictionaries, the UCC, federal antitrust law, federal labor law, federal energy regulatory law, state tort law, tax law, and international treaties — in addition to persuasive but non-binding precedent from other federal and state courts. Virtually all of such sources point in the same direction.

D.    Electric Energy Is a "Good" Under Dictionary Definitions.

Plain meaning may be ascertained by examining typical usage of words. Although not dispositive, reference to dictionaries published near the time of statutory enactment often is helpful, at least as a starting place. *Clark*, 134 S. Ct. at 2246 (utilizing dictionaries to interpret the words "funds" and "retirement" in Bankruptcy Code); *Ransom*, 562 U.S. at 69 (using dictionaries to interpret the word "applicable" in Bankruptcy Code). One of the more prominent and popular United States dictionaries defines "goods" as "commodities; wares" or "portable personal property." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 756 (Houghton Mifflin Harcourt 4th ed. 2000). The main British counterpart is quite similar.

---

[5]    For that matter, neither the United States Bankruptcy Appellate Panel for the Tenth Circuit, the United States District Court for the District of Colorado, nor any other divisions of this Court has adjudicated the issue.

"Goods" are "[t]hings that are produced for sale; commodities and manufactured items to be bought and sold; merchandise, wares" or "[p]ersonal property, possessions; *esp.* movable property." OXFORD ENGLISH DICTIONARY (ONLINE), available at www.oed.com.  Offering a slightly more refined legal definition, BLACK'S LAW DICTIONARY defines "goods" as "[t]angible or movable personal property other than money . . . .  The sale of goods is governed by Article 2 of the UCC" or "[t]hings that have value, whether tangible or not."  Bryan A. Garner, BLACK'S LAW DICTIONARY at 714 (Thompson Reuters 8th ed. 1999).

None of the many dictionaries consulted by the Court contains detailed lists of "goods."  Thus, and perhaps not surprisingly, such dictionaries make no specific references to electricity or electrical energy as being either included in, or excluded from, the definition of "goods."  Instead, the main etymological lesson from examination of dictionary definitions is that the term "goods" is very broad.  Indeed, the "[t]hings that have value, whether tangible or not" definition of "goods" seems to be about the most encompassing definition of an object in the English language.  And, "personal property" is not far off.

That Congress chose to use an extremely broad word, "goods," does not suggest that the judiciary should somehow impose its own limits or exclusions where Congress did not do so.  Instead, under the "general-terms canon" of statutory interpretation, "the presumed point of using general words is to produce general coverage — not to leave room for courts to recognize ad hoc exceptions . . . .  [I]n the end, general words are general words, and they must be given general effect." READING LAW at 101.  Utilization of general words "demonstrates breadth." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985)).

The Debtor invites the Court to consider "common parlance" and proposes as a "goods" definition: "tangible items that can 'be packaged and handled.'"  Response at 2.  But, the Debtor provides no authoritative linguistic source for the definition.  Instead, the "packaged and handled" phrase appears to have come from *Pilgrim's Pride,* where a bankruptcy court seemingly created the phrase out of whole cloth.  421 B.R. at 239.

The Court concludes that the broad dictionary definitions of "goods" seem far more representative of the typical usage of "goods" than the *Pilgrim's Pride* formulation.  Under such definitions, "goods" means "things that have value, whether tangible or not," "things that are produced for sale," "commodities," and "personal property."

Electrical energy most definitely is a "thing."  Dr. Kolitch explained that "electrical energy is the energy per electron multiplied by the total number of electrons carrying the charge." (Tr. at 16.)  Furthermore, electrical energy obviously has value.  In this case, the value of the electrical energy supplied during the relevant time period was $84,253.95.  PacifiCorp produced the electrical energy for sale and did sell it to the Debtor (albeit the Debtor failed to pay for the electrical energy).  Further, the electrical energy had value in that it was critical to operate the Debtor's coal bed methane wells and other infrastructure.  And, electrical energy is a "commodity." *See Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 800 (6th Cir. 2012); *City of Kirkwood v. Union Elec. Co.*, 671 F.2d 1173, 1181-82 (8th Cir. 1982).  Futures contracts for

electrical energy are regulated by the Commodity Futures Trading Commission (the "CFTC"). *DiPlacido v. Commodity Futures Trading Comm'n*, 364 Fed. Appx. 657 (2d Cir. 2009).

To the extent that tangibility is a requisite for "goods" under some (but not all) dictionary definitions, electrical energy is tangible. It exists. It can be seen under certain conditions (*i.e.,* an arc of electric current). It can be heard humming through overhead transmission wires. Moreover, as even a small child knows, electrical energy can be touched or felt, albeit with risk of electrical shock and serious personal injury. In short, electrical energy is perceptible to the senses. And, it can be quantified. So, it is tangible. As set forth in more detail below, the tangibility of electrical energy is confirmed by numerous legal sources. In addition to the sensory perception aspect, the evidence from Dr. Kolitch and Ben Geersten confirms that electrical energy can be measured by use of an electromechanical power meter. (Ex. 2 at 10.) The meter "identifies and measures the electrical energy passing through it." *Id.* The unit of measurement is a kilowatt. (Ex. 2 at 19; *see also* Tr. at 23.)

Therefore, putting it all together on a common sense basis, there really can be no doubt electrical energy falls within the ambit of "goods" under typical usage definitions. In fact, the question is not even close. Nevertheless, a more comprehensive and discerning approach (including an analysis of legal usage) seems warranted as a check on the common meaning because the term "goods" appears in many legal texts and may constitute a "legal term of art." So, the Court turns to legal definitions and usage.

E.   Electrical Energy Constitutes "Goods" under the UCC.

    1.   The UCC Definition of "Goods" Provides Guidance But Is Not Dispositive.

In the absence of a definition of "goods" in the Bankruptcy Code, all bankruptcy courts construing Section 503(b)(9) have turned to the UCC. *See In re NE Opco, Inc.,* 501 B.R. 233, 237 (Bankr. D. Del. 2013); *In re Erving Indus., Inc.,* 432 B.R. 354, 365 (Bankr. D. Mass. 2010); *GFI Wis., Inc. v. Reedsburg Util. Comm'n*, 440 B.R. 791, 797 (W.D. Wis. 2010) ("Every bankruptcy court to consider the issue . . . has applied the Uniform Commercial Code definition of goods."). Notably, both the Debtor and PacifiCorp advocate for the Court to adopt the UCC approach. Application at 2-3; Response at 3-4. There is some attraction to this method since the UCC does contain an express definition of the term "goods" and both parties seem to accept it.

However, since interpretation of the word "goods" used in Section 503(b)(9) is a matter of federal law — not state law — the UCC does not automatically determine the rule of decision. *See Am. Sur. Co. of N.Y. v. Sampsell*, 327 U.S. 269, 272 (1946) ("federal bankruptcy law, not state law, governs the distribution of a bankrupt's assets to his creditors"). But, the UCC is a very important analog. Why? First, the UCC does contain a definition of "goods" that was in place prior to the enactment of Section 503(b)(9). Second, the priority claim dispute between PacifiCorp and the Debtor is, in essence, a commercial dispute between corporations relating to a transaction (*i.e.,* the purchase and sale of electrical energy). The UCC generally governs commercial "transactions in goods." COLO. REV. STAT. § 4-2-102(1); WYO. STAT. ANN. § 34.1-

2-102(1).[6]  Third, the UCC purports to be a uniform law in the United States and has been adopted (in one form or another) in 49 States.  Fourth, the UCC definition of "goods" is widely accepted and used.  *Erving Indus.*, 432 B.R. at 365.  So, the Court adopts the UCC definition of "goods" as the principal legal definition to be used for purposes of Section 503(b)(9).

      2.    The UCC Definition of "Goods."

The UCC defines "goods" as:

> (1)  "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8 of this title), and things in action.  "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (section 4-2-107).

> (2)  Goods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are "future" goods. A purported present sale of future goods or of any interest therein operates as a contract to sell.

COLO. REV. STAT. § 4-2-105.  The definition of "goods" contained in the Wyoming version of the UCC is substantively identical to the Colorado version.  WYO. STAT. ANN. § 34.1-2-105(a) and (b).  The Court refers to these similar definitions more generically as "UCC Section 2-105."  Further simplified, under the UCC Section 2-105 definition, "goods" must be: (1) things existing and identifiable; (2) movable at the time of identification; and (3) capable of being sold.

      3.    Outside of Bankruptcy, the Majority of UCC Cases Have Determined that Electrical Energy Constitutes "Goods" Generally, or at Least After the Electrical Energy is Metered and Delivered.

Many state courts and federal courts (sitting in diversity) have applied UCC Section 2-105 to determine whether electrical energy is "goods."  Such determinations are important for purposes of choice of substantive law because the UCC only applies to a "transaction in goods."  If the sale of electrical energy is a "transaction in goods," then the provisions of the UCC apply; if not, the transaction is governed by state common law rather than the UCC.

---

[6]    Neither the state law of Colorado (where the Debtor filed for bankruptcy protection) nor Wyoming (where the electrical energy was delivered by PacifiCorp), both of which have adopted their own versions of the UCC, applies directly.  There is no need for the Court to engage in a choice of law analysis as between Colorado and Wyoming law since the Court is only required to construe federal law.

Notwithstanding the statutory uniformity of UCC Section 2-105, at first blush, the non-bankruptcy case law construing the term "goods" in the context of electrical energy does not seem particularly uniform.  The majority view is that electrical energy is "goods" for purposes of UCC Section 2-105.  Case law from California, Indiana,[7] Michigan,[8] Ohio,[9] Pennsylvania,[10] Texas,[11] and Utah[12] buttresses the pro-"goods" line.  One of the more comprehensive treatments

[7]     *Helvey v. Wabash Cty. REMC*, 278 N.E. 2d 608, 610 (Ind. App. 1972) (holding electricity is a good under the UCC as "[i]t is necessary for goods to be (1) a thing; (2) existing; and (3) movable, with (2) and (3) existing simultaneously. We are of the opinion that electricity qualifies in each respect.  [Plaintiff] says it is not movable and in this respect we do not agree, if for no other reason than the monthly reminder from the electric company of how much current has passed through the meter. Logic would indicate that whatever can be measured in order to establish the price to be paid would be indicative of fulfilling both the existing and movable requirements of goods.").  *See also Hedges v. Pub. Serv. Co. of Ind., Inc.*, 396 N.E. 2d 933, 936 (Ind. App. 1979) (electricity in high-voltage transmission wire which had not been metered and delivered is not "goods" under Indiana UCC in personal injury action; but metered electrical energy is "goods" under Indiana UCC); *In re Wabash Valley Power Ass'n, Inc.*, 1991 WL 11004220, at *66 (Bankr. S.D. Ind. 1991) (the supply contracts "involved the sale of goods (i.e. electricity)" and are governed by the Indiana UCC).

[8]     *Detroit Edison Co. v. Dep't of Treasury*, 844 N.W.2d 198, 207 (Mich. App. 2013) (electricity becomes a "finished good" when it "reaches its customers' meters"), *aff'd in part and rev'd in part on other grounds,* 869 N.W.2d 810, 823 (Mich. 2015) ("electricity is not a 'finished good' until it is set at a useable voltage").  *But see Williams v. Detroit Edison Co.*, 234 N.W.2d 702, 705 (Mich. App. 1975) (electricity in overhead transmission wire, which was not metered and delivered, not considered "goods" under Michigan UCC for purposes of wrongful death action); *Citizens Ins. Co. of Am. v. Consumers Energy Co.*, 2005 WL 1227038, at *1 (Mich. App. May 24, 2005) (electricity is a service, not "goods," under Michigan UCC in context of property damage case involving overhead transmission wires where electric energy had not been metered and delivered).

[9]     *Cincinnati Gas & Elec. Co. v. Goebel*, 502 N.E.2d 713, 715 (Hamilton County Mun. Ct. Ohio 1986) (metered amounts of electricity already passed into customer's home are goods under Ohio UCC).

[10]    *Bellotti v. Duquesne Light Co.*, 1987 WL 258084, at *1 (Ct. Com. Pl. Pa. Apr. 16, 1987) (electricity is a "good" under Pennsylvania UCC after it enters residence).  *But see Schriner v. Pa. Power & Light Co.*, 501 A.2d 1128 (Pa. Super. Ct. 1985) (while in the distribution system in overhead wire before metering and delivery, electricity was a service, not a product, under Pennsylvania UCC).

[11]    *Grant v. Sw. Elec. Power Co.,* 20 S.W.3d 764, 771 (Tex. App. 2000) ("The Texas Supreme Court has ruled that: 'Electricity is a commodity, which, like other goods, can be manufactured, transported and sold.' As the Houston Court of Appeals stated, 'While the distribution of the electricity through a system of towers, poles, and wires may well be considered a service, the electricity itself is a consumable product.' As such, the sale of electricity comes under the umbrella of the Uniform Commercial Code."), *aff'd in part and rev'd in part on other grounds* 73 S.W.3d 211 (Tex. 2002) (not addressing "goods" issue).

[12]    *Enron Power Mktg., Inc. v. Nevada Power Co. (In re Enron Corp.)*, 2004 WL 2290486, at *2 (S.D.N.Y. Oct. 12, 2004) (applying Utah UCC law to contract for sale of electricity).

15

of the subject (under California UCC law) is *Puget Sound Gas & Elec. Co. v. Pac. Gas & Elec. Co. (In re Pac. Gas & Elec. Co.),* 271 B.R. 626, 639-40 (N.D. Cal. 2002).  That case involved an alleged breach of contract for failure to supply electrical energy.  The *Puget Sound* court succinctly explained:

> The court here finds that the U.C.C. does apply.  Many of the cases tackling this question stem from the products liability realm, but California courts have consistently found that electricity is a product or good.  Courts in other states have similarly found that electricity is a good for purposes of the U.C.C.  Simply put, electricity in this instance is a thing movable at the time of identification to the contract for sale.  That is clearly demonstrated by the fact that the Agreement calls for the shipment of specific quantities of electricity.  The electricity is moved through the power lines and the amounts are metered and therefore identifiable.  The court will apply the U.C.C.

More recently, in a different *Pacific Gas* case, the U.S. Court of Appeals for the Federal Circuit stated:  "The parties appear to agree that the provision of electricity involves the sale of goods which would invoke the UCC . . . .  Indeed, we would lack jurisdiction . . . if the contracts [for sale of electricity] were interpreted as involving the provision of services rather than goods."  *Pac. Gas & Elec. Co. v. U.S.*, 838 F.3d 1341, 1351 (Fed. Cir. 2016).  The appellate court then proceeded to decide the merits since the electrical energy sale contracts involved the sale of goods.

Despite the apparent logic of the majority approach, some courts have disagreed and determined that electrical energy is not "goods" under the UCC.  In the Court's view, the suggested disarray in the UCC Section 2-105 case law (outside of bankruptcy) is overstated and can be explained by a careful and more nuanced analysis.  Virtually all of the cases characterized as supporting the minority UCC approach can be distinguished because they involved personal injury caused by contact with high voltage wires prior to metering and delivery of electrical energy.[13]  One prominent treatise calls this "the common refusal to treat as goods the sale of electricity that has not yet passed through a customer's meter."  Patricia F. Fonseca and John R. Fonseca, 1 WILLISTON ON SALES at 158, n.6 (Thompson West 5th Ed. 2005).  However, that is not the scenario presented in this case.  Instead, PacifiCorp delivered the electrical energy through the meters to the Debtor.

After carefully parsing the state personal injury cases involving high voltage wire contact (not metered and delivered electrical energy), there seems to be only one real outlier:  New York.

---

[13]      *See Singer Co. v. Baltimore Gas & Elec. Co.*, 558 A.2d 419 (Md. App. 1989) (electricity not "goods" under Maryland UCC when located in high-voltage transmission wires and not passed through meter); *G&K Dairy v. Princeton Elec. Plant Bd.*, 781 F. Supp. 485, 490 (W.D. Ky. 1991) (stray voltage of electricity causing injury to animal before passed through meter was not "goods" under Kentucky UCC).

New York courts first addressed whether electrical energy constitutes "goods" under the UCC in *Farina v. Niagara Mohawk Power Corp.,* 438 N.Y.S.2d. 645, 647 (N.Y. App. Div. 1981). *Farina* was a personal injury case stemming from contact with an overhead electric wire prior to metering and delivery. Although the main focus was on a tort claim, the intermediate appellate court also discussed a UCC claim. First, *Farina* determined that the UCC was inapplicable because there was no sale. *Id.* Then, in what appears to be almost an after-thought, the *Farina* court mentioned: "goods." The entire UCC "goods" discussion consisted of only a single sentence: "[W]e are unable to conclude that it was intended that electricity be included within the definition of "goods" (Uniform Commercial Code, § 2–105)." *Id.* And, again, the case was of the personal injury before metering variety.[14] This inauspicious and analysis-free dicta appears to be the sole basis why subsequent New York courts have determined that electricity is not a good under the UCC.

The *Farina* dicta jumped to federal court in *U.S. v. Consol. Edison Co. of N.Y.*, 590 F. Supp. 266, 269 (S.D.N.Y. 1984). That case concerned a breach of contract (to recover overcharges) against a public utility. Again, the UCC "goods" discussion comprised one sentence: "In New York, electricity is not considered "goods" and the U.C.C. therefore is not directly applicable to contracts involving the provision of electricity." *Id.* at 269. The court dropped a footnote citing *Farina* as the exclusive support for the proposition. From that humble beginning, the *Farina* dicta somehow metastasized into a precedential holding referenced in many subsequent New York cases as controlling. *See Encogen Four Partners, L.P. v. Niagara Mohawk Power Corp.*, 914 F. Supp. 57, 61 (S.D.N.Y. 1996) (determining that New York UCC did not apply to electricity sale contracts; adopting *Consol. Edison* without analysis).

The bottom line is that the great majority of state courts consider electrical energy to be "goods" under the UCC. In the special context of personal injury cases involving overhead power wires (before metering and delivery of electrical energy), some States exclude application of the UCC holding that stray electrical current in overhead power lines is not "goods." However, such state courts frequently have distinguished such results and clarified that electrical energy metered and delivered to a customer constitutes "goods" under the UCC.[15] New York simply is an outlier. In fact, other than in New York, the Court has been unable to locate any

---

[14]     The *Farina* court did note in discussing a tort claim that "until actually delivered, the electricity has not been placed in the stream of commerce" and "electricity [in overhead power wires] is not in a marketable state." *Farina*, 438 N.Y.S.2d at 646. These references appear to limit the holding of the case to electrical energy in overhead power lines and not metered and delivered electrical energy.

[15]     Although this Court acknowledges that many state courts have distinguished between electrical energy in transmission lines and electrical energy that has passed through a meter for purposes of characterizing such electrical energy as "goods," this Court finds the distinction without much logical merit. In this Court's view, the fundamental nature and characteristics of electrical energy do not necessarily change by location in the transmission system. But, this Court need not decide whether such distinctions are proper for state law because this case presents only the situation of electrical energy actually delivered, metered and used by the Debtor. Again, the state courts (other than New York) rather uniformly conclude that electrical energy that has passed through a meter constitutes "goods" under the UCC.

other state court precedent suggesting that electrical energy actually metered and delivered to a customer is anything other than "goods" under UCC Section 2-105.  In any event, the Debtor has not cited any such cases for the Court's consideration.

      4.    <u>Bankruptcy Courts Are Divided on Whether Electrical Energy Constitutes "Goods" under UCC Section 2-105</u>.

All bankruptcy courts construing Section 503(b)(9) in the context of electrical energy have adopted the UCC Section 2-105 definition of "goods."  But, despite this uniformity in initial analytic approach, such bankruptcy courts have reached starkly contradictory results concerning whether electrical energy is "goods."

      a.    <u>Bankruptcy Decisions Holding that Electrical Energy is "Goods" under UCC Section 2-105 Are Most Persuasive</u>.

*Erving Industries* is the key early decision determining that electricity is "goods" under UCC Section 2-105 and Section 503(b)(9).  In that case, a power company presented a large priority claim for electrical energy supplied to the debtor during the 20 days before bankruptcy. The debtor conceded the value and timing elements.  Thus, as in this case, in *Erving Industries* the main issue was whether electrical energy qualified as "goods."  Noting the absence of a Bankruptcy Code definition of "goods," the *Erving Industries* bankruptcy court adopted the UCC Section 2-105 definition.  The court reasoned that electricity is tangible since "[e]lectricity . . . is *the thing* the customer seeks to purchase" and "customers rely on the specific physical properties of electricity to fulfill their needs . . . ."  *Erving Indus.*, 432 B.R. at 368 (emphasis in original). In the terms of UCC Section 2-105 analysis, the bankruptcy court concluded:

> Electricity easily meets the movability requirement . . . .  After it is generated, the electric current *moves* through a huge network of transmission and distribution systems before ultimately reaching the customer's location.  Like movability, the identifiability of electricity is subject to little debate . . . .  Courts have generally held that electricity is identifiable because it can be measured at the point it passes through the meter.

*Erving Indus.*, 432 B.R. at 369-70.  As a result, the *Erving Industries* bankruptcy court allowed a Section 503(b)(9) administrative expense priority for electrical energy.

Relying heavily on *Erving Industries*, a different bankruptcy court reached the same conclusion in *In re Grede Foundries, Inc.*, 435 B.R. 593 (Bankr. W.D. Wis. 2010), *aff'd sub nom. GFI Wis.*, 440 B.R. at 799.  The case involved the typical scenario of a public utility providing electrical energy to its customer.  *Grede Foundries* looked to UCC Section 2-105.  *Id.* at 595.  The debtor conceded that the electrical energy was movable but argued that "the movement is so fast as to be nonexistent."  *Id*. at 596.  Allowing a Section 503(b)(9) administrative expense priority, the bankruptcy court ruled that "[n]either the Bankruptcy Code nor the UCC require that particles move at any particular speed before they can be deemed 'moveable.'"  *Id*.  On appeal, the district court affirmed.  *GFI Wis.*, 440 B.R. 791.

The district court, acting as an appellate court, decided that "it is reasonable" to use UCC Section 2-105 to define "goods" in Section 503(b)(9). *Id*. at 798. *GFI Wisconsin* also referenced many non-bankruptcy UCC decisions. The court promoted a common sense approach:

> [D]etermining whether a particular thing qualifies as a good and deserves administrative priority should be a straightforward assessment, taking into consideration the nature and common understanding of the thing, but also considering its similarities to goods that fall indisputedly under the UCC and would receive administrative priority under § 503(b)(9) . . . . I agree with those courts concluding that electricity is movable, tangible and consumable, that it has physical properties, that it is bought and sold in the marketplace and thus, that it qualifies as a good for purposes of the UCC and the Bankruptcy Code.

*Id*. at 800.

More recently, several other bankruptcy courts adopted the reasoning and rationale of *Erving Industries*, *Gedde Foundries*, and *GFI Wisconsin*. *See In re Wometco de P.R. Inc.*, 2016 WL 155393, at *2 (Bankr. D.P.R. Jan. 12, 2016) (court "concludes that because electricity is movable at the time of identification to the contract, the purchased electricity constitutes a *good* under 11 U.S.C. § 503(b)(9)"); *In re S. Mont. Elec. Generation and Transmission Coop., Inc.*, 2013 WL 85162, at *5 (Bankr. D. Mont., Jan. 8, 2013) ("electricity is movable, tangible and consumable" and is "goods" under Section 503(b)(9)). Ultimately, the Court finds this line of cases persuasive.

> b.   Bankruptcy Decisions Holding that Electrical Energy is Not "Goods" under UCC Section 2-105 Are Not Persuasive.

A roughly equal number of other bankruptcy cases reach the opposite electrical energy result under UCC Section 2-105 and Section 503(b)(9): *Pilgrim's Pride*, 421 B.R. at 240; *NE Opco*, 501 B.R. at 256; *In re Samaritan All., LLC*, 2008 WL 2520107, at *4 (Bankr. E.D. Ky. June 28, 2008); *Hudson Energy Serv., LLC v. Great Atl. & Pac. Tea Co., Inc.* (*In re Great Atl. & Pac. Tea Co., Inc.*), 538 B.R. 666, 673-74 (S.D.N.Y. 2015).[16] *Pilgrim's Pride* was the first

---

[16]    A fifth decision, *In re PMC Mktg. Corp.*, 501 B.R. 17, 24 (Bankr. D.P.R. 2013), *rev'd* 517 B.R. 386 (1st Cir. BAP 2014), is characterized as supporting the electricity-is-not-goods argument. At the trial level, the bankruptcy court initially determined that electrical energy supplied by a government-owned corporation was a service rather than "goods." But, this holding was reversed and remanded because the appellate court determined that the bankruptcy court had applied an incorrect legal standard that focused on the relationship between the parties rather than the term "goods." In any event, the same bankruptcy judge who initially declined to approve administrative expense priority for an electrical energy claim in *PMC Marketing*, later decided that electrical energy qualifies as "goods" under Section 503(b)(9). *Wometco de P.R.*, 2016 WL 155393, at *2. Thus, the initial *PMC Marketing* decision has no remaining

published decision on the topic.  In that case, the bankruptcy court reasoned that "the appropriate definition of goods for the purpose of Code § 503(b)(9) is that found in the 'model' UCC [Section 2-105]."  *Pilgrim's Pride*, 421 B.R. at 237.  Then, the court apparently used its own understanding of the physical characteristics of electrical energy — with no actual evidence — to drive the result.  The *Pilgrim's Pride* court determined:

> [T]he UCC requires that goods be movable at the time of identification.  This is simply not true of electricity.  Once electricity has been "identified" by measurement at the meter, it has already been consumed by the end user . . . .  The mere fact that electricity is sold in metered quantities does not bring it within UCC § 2-105 or Code § 503(b)(9).

*Id*. at 239.  After reaching this conclusion, the bankruptcy court attempted to bolster its decision by looking at the "plain meaning" of the UCC and the Bankruptcy Code.  To do so, the bankruptcy court attempted to divine the intent of the drafters of the UCC — not Congress.  Thus, with no actual support, the *Pilgrim's Pride* decision hypothesizes that:  "UCC § 2-105 does not suggest that *the provision's drafters* had intended that 'goods' would include things which cannot be packaged and handled" and "the *UCC's authors* did not intend things like electricity . . . to be within the scope of section 2-105."  *Id*. (emphasis added).  Finally, the bankruptcy court also cited numerous other decisions (from New York, Massachusetts, Michigan and Ohio) for the proposition that "electricity does not fall within the UCC's definition of 'goods.'"  *Id*. at 240.  Ultimately, the *Pilgrim's Pride* court denied the creditor's application for Section 503(b)(9) priority for the supplied electrical energy.

Some years after *Pilgrim's Pride*, a different bankruptcy court reached the same result: *NE Opco*, 501 B.R. at 259-60.  As in *Pilgrim's Pride*, the *NE Opco* court did not receive any evidence concerning the nature of electrical energy.  Instead, the *NE Opco* decision seems to rely on the bankruptcy judge's understanding of electrical energy coupled with reference to a physics article.  *Id*. at 251 n.68.  The *NE Opco* court endorsed use of UCC Section 2-105 for the bankruptcy priority issue and cited a series of non-bankruptcy cases supposedly standing for the proposition that "electricity is not a good."  *Id.* at 248 n.61.  Then, after a long recitation of the holdings in *Pilgrim's Pride, Erving Industries*, and *GFI Wisconsin*,[17] the *NE Opco* court announced a new UCC Section 2-105 requirement: the passage of time between identification and consumption of goods.  The *NE Opco* court put it this way:

> [I]n order for electricity to be a good, there must be a period between when electricity is identifiable and consumed.  But, in order to do justice to the term as it has developed over 1,000 years,

---

precedential value.  It was reversed and remanded and then effectively superseded by a subsequent decision from the same court and same bankruptcy judge.

[17]    The *NE Opco* court also discussed the *PMC Marketing* case at some length.  *NE Opco*, 501 B.R. at 246-48 and 255-56.  As set forth above, after *NE Opco*, the *PMC Marketing* decision was effectively superseded.

> *the period between identification and consumption must be
> meaningful*.  This is not the case with electricity.

*NE Opco*, 501 B.R. at 250.  Then, after establishing a new rule, the *NE Opco* bankruptcy judge calculated (based upon the speed of light) that electrical energy travels "1 mile in 8.024 microseconds."  *Id*. at 251 n.69.  According to the *NE Opco* court, the remarkably fast movement of electrical energy disqualifies it as "goods" under the "plain meaning" of the UCC Section 2-105 and Section 503(b)(9).  *Id*. at 251 and 256.  Having reached his conclusion on that basis, the bankruptcy judge addressed a number of other arguments, none of which changed the result.

The unpublished *Samaritan Alliance* decision, 2008 WL 2520107, adds little to the debate.  In that case, a utility sought a priority for electrical energy supplied to the debtor pre-bankruptcy.  The court did not have any evidence concerning the nature and characteristics of electrical energy.  After summarizing the parties' arguments and citations, the bankruptcy court's analysis boiled down to a conclusory sentence:  "the court concludes that while courts are divided on the general question of whether or not electricity is 'goods,' the Court agrees with the Debtor that section 503(b)(9) is not applicable here and that the electricity provided is more properly characterized as a 'service.'"  *Id*. at *4.

The final case in the electricity-is-not-goods line is *Great Atlantic*, 538 B.R. 666.  In that case, the bankruptcy court conducted a hearing during which it received evidence concerning the nature of electrical energy.  The bankruptcy court entered a bench ruling denying administrative expense priority treatment for electrical energy.  The bankruptcy court relied on *NE Opco* and held that "the time between identification and consumption of a good must be 'meaningful.'"  *Id*. at 669.  On appeal, the *Great Atlantic* district court determined that the bankruptcy court's factual findings were not erroneous.  Further, the district court clarified that "identification [of electrical energy] occurs after consumption, not — as *NE Opco* presumed — when the electricity passes through the meter."  *Id*. at 673.  As a result, the district court affirmed.

Respectfully, the Court determines that the *Pilgrim's Pride*, *NE Opco*, *Samaritan Alliance,* and *Great Atlantic* decisions are not persuasive under UCC Section 2-105 and Section 503(b)(9).  Why?

First, three of the four decisions (*Pilgrim's Pride*, *NE Opco*, and *Samaritan Alliance*) are bereft of any evidentiary foundation concerning the characteristics of electrical energy.  Instead, the bankruptcy courts proceeded on their own devices.  The lack of competent evidence renders the resulting judicial conclusions suspect.  Contrawise, in this case, the Court received and credited expert physics testimony that is contrary to conclusions reached without the benefit of any evidence.

Second, the court in the lead case, *Pilgrim's Pride,* based its result (at least in part) on supposedly discovering the intent of the UCC's "authors" and "drafters."  *Pilgrim's Pride*, 421 B.R. at 239.  This seems like a search for legislative history gone amuck.  Instead of trying to divine the intentions of Congress (a difficult task in its own right and perhaps a "fiction"), the *Pilgrim's Pride* court took it a step further looking for the intentions of unelected authors.  Who are the UCC's drafters?  The *Pilgrim's Pride* decision does not say.  But, a prominent treatise

explains that "[t]he original Uniform Commercial Code was the product of almost a generation of effort on the part of legal scholars in active practice and in the academic community." Richard W. Duesenberg et al., 3 SALES & BULK TRANSFERS UNDER THE UNIFORM COMMERCIAL CODE § 1.01 (Lexis Nexis 2016). This generation of now-unknown legal scholars and practitioners developed the first model UCC in 1952. Because the UCC Official Commentary does not shed light on whether UCC Section 2-105 was designed to include electrical energy, the *Pilgrim's Pride* bankruptcy judge did not look there for intent. Instead, the decision notes the UCC text and merely seems to guess at what the intent of the unidentified and unelected "drafters," might have been — all without any citation to actual "drafter" sources. This type of guesswork is not compelling and contrary to principles of statutory interpretation.

Third, in the two key cases, *Pilgrim's Pride*  and *NE Opco* (which are the main basis of *Great Atlantic*), the courts do not adequately acknowledge that the great majority of UCC decisions (over decades) have determined that metered and delivered electrical energy is "goods." Instead, they seem to mix-and-match products liability overhead transmission cases plus minority law from New York. But, the problem is even worse than that. The *Pilgrim's Pride* and *NE Opco* courts mistakenly cite some decisions for holdings that are the opposite of the decisions' actual rulings. For example, both the *Pilgrim's Pride* and *NE Opco* decisions cite the Ohio case of *Cincinnati Gas & Elec.*, 502 N.E.2d 713, in support of the proposition that "courts have held that electricity does not fall within the UCC's definition of 'goods.'" *Pilgrim's Pride*, 421 B.R. at 240; *see NE Opco*, 501 B.R. at 248 n.61 (same). However, the *Cincinnati Gas & Elec.* municipal court simply did not make such a ruling. In *Cincinnati Gas & Elec.*, an electric utility sued its customer for breach of contract in connection with the supply of electrical energy and sought to apply the UCC. This is the actual holding:

> We distinguish electricity in its raw state from metered amounts passing through utility-owned conduits and into the homes of consumers. The latter-described form of electricity is "goods" as defined in the Uniform Commercial Code.

*Id*. at 715. So, as applied to the context of this case — where PacifiCorp provided electrical energy to the Debtor which was metered, delivered and used — *Cincinnati Gas & Elec.* strongly supports a determination that such electrical energy is "goods" under the UCC Section 2-105 definition. Similarly, the courts in *Pilgrim's Pride* and *NE Opco* both cite Michigan case law, *Williams*, 234 N.W.2d 702, for the proposition that electrical energy is not "goods." *Pilgrim's Pride*, 421 B.R. at 240; *NE Opco*, 501 B.R. at 248 n.61. Although that is the holding of *Williams* (an overhead electric transmission wire products liability case), both the *Pilgrim's Pride* and *NE Opco* decisions fail to acknowledge a subsequent Michigan appellate case (albeit not decided under the UCC) that clarified that electrical energy becomes a "finished good" when it "reaches its customers' meters." *Detroit Edison*, 844 N.W.2d at 207. Finally, the *Pilgrim's Pride* and *NE Opco* courts also rely on New York precedent without any critical analysis. *Pilgrim's Pride*, 421 B.R. at 240; *NE Opco*, 501 B.R. at 248 n.61. But, as explained previously, the New York view is a true outlier built on the faulty foundation of a dicta statement in the *Farina* overhead electric transmission products liability case. In the end, the Court simply discounts the analysis of precedent presented by *Pilgrim's Pride* and *NE Opco*.

Fourth, the *NE Opco* court announced a new rule for "goods" that the period between identification and consumption must be "meaningful." *NE Opco*, 501 B.R. at 250. The bankruptcy court essentially opined that because electrical energy moves at "8.024 microseconds" per mile, there could be no "meaningful" interval between identification and consumption. But, the novel time interval concept is nowhere to be found in UCC Section 2-105. And, would 10, or 100, or 1,000 seconds be meaningful? The Court believes that under a UCC analysis the focus should be on the nature of electrical energy (including whether it is movable at the time of identification) rather than an arbitrary time interval.

5.   Electrical Energy Constitutes "Goods" Under UCC Section 2-105.

Having carefully reviewed the text of UCC Section 2-105 and UCC case law (both in and outside of bankruptcy), the Court reaches its own conclusion about whether electrical energy satisfies the UCC definition of "goods." Under UCC Section 2-105, "goods" are: (1) things existing and identifiable; (2) movable at the time of identification; and (3) capable of being sold. There are no other requirements.

As the name suggests, the UCC is designed to promote uniformity in state law in the area of commercial matters (including sales). So, it is quite salient to reiterate again at the outset that the majority of state and federal courts (sitting in diversity) have determined that electrical energy constitutes "goods" under UCC Section 2-105, especially when the electrical energy is metered and delivered to a customer. In fact, outside of the bankruptcy context, the Court has not been able to locate any decisions (except in New York) that conclude that metered and delivered electrical energy is anything other than "goods" under UCC Section 2-105. So, the Debtor's argument (*i.e.*, that metered electrical energy is not "goods") is very much a departure from the norm and long-standing national precedent.

Turning to the UCC Section 2-105 definition of goods, the Debtor concedes that electrical energy is a thing that exists, can be identified, and is capable of being sold. However, the Debtor denies that electrical energy is "moveable at the time of identification." Response at 3-4. Citing *Pilgrim's Pride* and *NE Opco*, the Debtor contends that "electricity is only identifiable once it is measured at the meter, after which 'it has already been consumed by the end user.'" *Id.*

On a factual basis, the expert testimony of Dr. Kolitch strongly rebuts the Debtor's argument. A trained physicist, he explained and opined:

• "[I]t is a matter of logical necessity, based upon the fundamental nature of AC power, that the electrical energy identified at the customer's meter is moving — and therefore movable — when it is identified." (Ex. 2 at 10.)

• The electromechanical power meter "identifies and measures the electrical energy passing through it." (Ex. 2 at 10.)

• "The fundamental nature of that measurement (kilowatt hours) requires that electrons in the wires be moving as they pass through the meter to cause these

23

rotations of the disk.  Without the motions of the electrons back and forth in the wires, the disk would not move and there would be no energy transferred and no measurement made, so it absolutely requires the motion of electrical current to measure anything."  (Tr. at 23-24)

• Electrical energy "must be moving at the time of its identification."  (Tr. at 25.)

• "The simplified version is that [electrical energy] is carried by transmission lines from the power plant to the customer, passes through an electric meter where it's quantified and then flows through conductors to the customer's electrical energy consuming devices."  (Tr. at 20.)

• "[T]he measure [of electrical energy in a meter] is occurring as the energy is passing through the meter."  (Tr. at 57.)

• "[E]lectrical energy transferred to the customer is by its fundamental nature moving — and therefore movable — at all times, including when it passes through the customer's electricity meter."  (Ex. 2 at 30.)

The Debtor's counsel conducted a highly skilled (and even entertaining) cross-examination of Dr. Kolitch; but, Dr. Kolitch did not retreat from his credible testimony and opinions.  The Debtor's best evidence was that electrical energy is fast.  On cross-examination, Dr. Kolitch acknowledged that electrical energy moves "very quickly," almost at the "speed of light" and transits 200 feet of copper wire in "around 226 nanoseconds."  (Tr. at 36-38.)  There is no doubt that the electrical energy supplied by PacifiCorp passed the 5 electromechanical meters and was consumed or used by the Debtor in its natural gas operations very quickly — in hundreds or possibly thousands of nanoseconds.  Citing *NE Opco,* the Debtor argues "[t]here is no meaningful delay between identification and consumption of electricity, and the 'infinitesimal gap' between the two 'is too short to establish that electricity is moveable at the time of identification' so as to be a good within the meaning of the UCC."  Response at 3; *NE Opco*, 501 B.R. at 256.

The Debtor's argument is not without some allure, but the Court rejects it on a variety of grounds.  First, the testimony from Dr. Kolitch was that "the electrical energy identified at the customer's meter is moving — and therefore movable — when it is identified."  That is all that is necessary under the only portion of the UCC definition of "goods" that the Debtor contests.  Second, the "no meaningful delay between identification and consumption of electricity" rule announced in *NE Opco* comes from thin air.  UCC Section 2-105 does not refer to the necessity of a short time interval.  And, how long is "meaningful"?  Other commodities that generally are considered "goods" (such as water and natural gas) are supplied through pipes and metered.  Such products move quickly, albeit not nearly as quickly as electrical energy.  Surely the *NE Opco* approach cannot mean that water and natural gas somehow are transformed into non-"goods" because they move fairly quickly.  So, it seems that the *NE Opco* court developed a unique rule applicable only to electrical energy.  In the Court's view, the *NE Opco* focus on interval is unsupported and unwarranted.  Third, the Court acknowledges again that the strong majority of UCC case law supports the classification of electrical energy that has been metered

24

and delivered to a customer as "goods."  Given that the UCC is designed to provide uniformity in commercial law, the Court is reticent to adopt a minority view that destroys the uniformity of the UCC.  Fourth, stepping aside from the physics, a common-sense interpretation of UCC Section 2-105 dictates that electrical energy meets the criteria.  It is a thing that exists, can be identified, and is capable of being sold.  By the daily activity of turning on the light switch, we know that electrical energy moves.  Moreover, it is measured as it passes through a meter.  A meter records movement of electrical energy but is not read every nanosecond.  Instead, the public utility reads the meter periodically and this calculation then finds its way to the dreaded electric bill.  Nothing else is required to satisfy the UCC Section 2-105 definition of "goods."

Thus, electrical energy is "goods" under UCC Section 2-105 which the Court has adopted as the applicable legal definition of the term.  But, as we shall see in a moment, the UCC is not the only legal source that helps clarify the plain meaning of the term "goods" and whether electrical energy constitutes "goods." Federal antitrust law, federal labor law, federal energy regulatory law, state tort law, tax law, and international treaties (including the international equivalent of the UCC) all confirm that electrical energy is "goods."

F.    Electrical Energy Constitutes "Goods" under Federal Antitrust Law.

Sections 2 and 3 of the Robinson-Patman Antidiscrimination Act (the "Robinson-Patman Act"), 15 U.S.C. §§ 13 and 14, use the terms "commodities" and "goods."  Since numerous federal courts have construed such terms in the context of electricity-oriented claims, Robinson-Patman Act cases also provide insightful guidance (albeit not binding precedent) concerning the commonly accepted legal meaning of the term "goods."

Section 2(a) of the Robinson-Patman Act prohibits "any person engaged in commerce" from discriminating "in price between different purchasers of *commodities* of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly . . . ." 15 U.S.C. § 13(a) (emphasis added).  Although Section 2(a) of the Robinson-Patman act uses the term "commodities" rather than "goods," the words are synonymous.  *Town of Concord, Mass. v. Boston Edison Co.,* 676 F. Supp. 396, 397 (D. Mass. 1988) ("The term 'commodity' is commonly used to refer to goods, merchandise, wares, supplies and other items bought and sold in the marketplace."); *see also* Brian Garner, BLACK'S LAW DICTIONARY 331 (Thompson Reuters 10th ed. 2014) (defining "commodity" as "An article of trade or commerce.  The term embraces tangible goods, such as products or merchandise, as distinguished from services.")

Section 3 of the Robinson-Patman Act, 15 U.S.C. § 14, makes it unlawful for any "person engaged in commerce . . . to lease or make a sale or contract for sale of *goods*, wares, merchandise, machinery, supplies, or other *commodities*" on an agreement that "the lessee or purchaser thereof shall not use or deal in the *goods*, wares, merchandise, machinery, supplies, or other *commodities* of a competitor . . . ."  *Id.*  Thus, the statute makes plain that "goods" means a type of "commodity."  In addition, the word "commodities" generally is construed similarly in both Sections 2 and 3 of the Robinson-Patman Act.  *City of Gainesville v. Fla. Power & Light Co.*, 488 F. Supp. 1258, 1280 (S.D. Fla. 1980).

25

At least two federal appellate courts have examined whether the sale of electrical energy is considered a "commodity" under Section 2 of the Robinson-Patman Act. The leading appellate case is *City of Kirkwood,* 671 F.2d 1173. *City of Kirkwood* involved a municipality's claim that an electrical energy supplier engaged in a discriminatory and anti-competitive "price squeeze." *Id*. at 1175. The U.S. Court of Appeals for the Eighth Circuit determined that the alleged misconduct stated a Robinson-Patman claim:

> Though the Robinson-Patman Act does not cover sales of real property, intangibles, or services, electricity does not fall into any of these categories. *Electric power can be felt, if not touched. It is produced, sold, stored in small quantities, transmitted, and distributed in discrete quantities. We hold that electricity is a commodity* for purposes of the Robinson-Patman Act.

*Id*. at 1181-82 (emphasis added). Much more recently, the U.S. Court of Appeals for the Sixth Circuit came to the same conclusion. In *Williams*, 681 F.3d 788, the plaintiff argued that an electric utility engaged in price discrimination in the sale of electrical energy. The appellate court cited *City of Kirkwood* with approval and "reaffirm[ed] that electricity is a commodity" under the Robinson-Patman Act. *Id*. at 800.

Consistent with appellate precedent, the clear majority[18] of federal trial-level decisions across the country also supports the characterization of electrical energy as a commodity under the Robinson-Patman Act. *Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 953 F. Supp. 617, 663 (E.D. Pa. 1997) (concluding that electricity is a commodity under the Clayton Act and Robinson-Patman Act); *Rankin Cty. Cablevision v. Pearl River Valley Water Supply Dist.*, 692 F. Supp. 691, 693 (S.D. Miss. 1988) ("Most of the courts which have considered the issue have concluded that electricity is a commodity subject to the Act."); *Town of Concord,* 676 F. Supp. 396 (D. Mass. 1988); *Borough of Ellwood City, Pa. v. Pa. Power Co.,* 570 F. Supp. 553, 561 (W.D. Pa. 1983) (determining that electricity is "commodity" under antitrust laws); *City of Gainesville*, 488 F. Supp. at 1283 ("Court concludes that electricity is a commodity within the terms of the Clayton and Robinson-Patman Acts."). In *Town of Concord*, the court explained why electric energy is a commodity:

---

[18]     The minority position is represented by *City of Newark v. Delmarva Power & Light Co.,* 467 F. Supp. 763, 772-74 (D. Del. 1979) which held that electricity is not a "commodity" under the Robinson-Patman Act. *City of Newark* appears to key off the court's perception that the terms "goods" and "commodities" "are not commonly applied to electric power." *Id.* at 774. But, most other courts adjudicating antitrust cases have determined that electrical energy is a commodity. And, electricity futures contracts also fall, at least in part, within the regulatory purview of the CFTC. *See* 7 U.S.C. § 1a(9) (defining term "commodity"); *see also* Terrance Healey et al., *Energy Commodities: The Netherworld Between FERC and CFTC Jurisdiction*, 33 No. 3 Futures & Derivatives L. Rep. 1 (March 2013) (explaining jurisdiction of the CFTC in energy contracts, including energy futures contracts). The CFTC frequently pursues enforcement actions and the imposition of penalties for improper commodities futures contracts, including electricity futures contracts. *See DiPlacido,* 364 Fed. Appx. 657 (determining that CFTC acted within its discretion in imposing sanctions related to electricity futures contract).

26

> [E]lectricity is not significantly different from other items deemed
> commodities subject to the price discrimination prohibitions of the
> antitrust laws.  Like the more traditional commodities, electrical
> energy is a thing bought and sold in the market place.  It may be
> measured, stored and even stolen.  More importantly, electricity is
> manufactured from other forms of energy and then distributed
> from the manufacturer to intermediaries . . . or to the ultimate
> consumers at retail.  Like other commodities, electricity is useful to
> purchasers solely because of its physical properties and not
> because it represents any underlying contractual right or other
> intangible.
> . . . .
> Although the average consumer of electricity might believe she is
> paying for a service rather than purchasing a product from [the
> electric utility], this fact is not controlling in the determination of
> whether electricity is a commodity within the Act.  [The electric
> utility] manufactures electricity and sells it to consumers at retail
> and at wholesale.  The primary purpose of a consumer who deals
> with [the electric utility] is to obtain this product, electricity . . . .
> *The manufacture and sale of electricity is no more a service than
> the manufacture and sale of widgets.*

*Town of Concord,* 676 F. Supp. at 398 (emphasis added and internal citation omitted).  Notably, the Robinson-Patman Act electrical energy jurisprudence does not refer to the UCC definition of "goods."  Instead, the antitrust cases take a more common sense and plain-meaning approach.

G.      Electrical Energy Constitutes "Goods" under Federal Labor Law.

The Fair Labor Standards Act of 1938 ("FLSA") establishes national fair labor standards, including minimum wage, overtime pay, and child labor protections.  29 U.S.C. § 201 *et seq.*  Many of the substantive FLSA provisions reference work performed in the production of "goods."  *See* 29 U.S.C. § 206 (minimum wage for employees "engaged in commerce or in the production of goods"); § 207 (maximum hours for employees "engaged in commerce or in the production of goods"); § 212 (prohibiting shipment of "any goods produced" by oppressive child labor).  Given the repeated reference to "goods," Congress defined the term:

> "Goods" means goods (including ships and marine equipment),
> wares, products, commodities, merchandise, or articles or subjects
> of commerce of any character. . . .

29 U.S.C. § 203(i).  The FLSA definition is very similar to the phraseology of Section 3 of the Robinson-Patman Act.  15 U.S.C. § 14 ("goods, wares, merchandise, machinery, supplies, or other commodities").  It also is very close to many dictionary definitions.

The federal agency administering the FLSA, the Department of Labor, has determined that "[g]oods includes. . . electrical energy or power. . . ." 29 C.F.R. § 776.20(b) (Interpretative Bulletin on the General Coverage of the Wage and Hours Provisions of the Fair Labor Standards Act). Judicial decisions construing the FLSA are in accord. For example, in *Walling v. Conn. Co.*, 62 F. Supp. 733, 734 (D. Conn. 1945), *aff'd* 154 F.2d 552 (2d Cir. 1946), the court determined that the FLSA applied since, among other things, "a substantial part of the goods produced by [the powerhouse employees] is produced to be used in interstate commerce, that is, the [electric] current which goes into the operation of the New Haven Railroad and the drawbridges of the city." Thus, the *Walling* court equated electric current with "goods."[19]

H.     Electrical Energy Constitutes "Goods" under the Federal Power Act.

The Federal Power Act governs the transmission and sale of electrical energy in interstate commerce. 16 U.S.C. § 824 *et seq.* Congress vested the Federal Power Commission ("FPC"), later replaced by the Federal Energy Regulatory Commission ("FERC"), as the federal agency charged with regulation and enforcement of federal law governing the interstate transmission and sale of electrical energy, including establishment of "just and reasonable" wholesale electrical energy rates. 16 U.S.C. § 824d(a); *see also In re Enron*, 328 B.R. 75, 80-81 (Bankr. S.D.N.Y. 2005) (discussing broad jurisdiction grant to FERC).

The FPC and the FERC repeatedly and consistently have determined that Article 2 (Sales) of the UCC governs contracts for the interstate sale of electrical energy. But, as discussed previously, Article 2 of the UCC is only applicable to "transactions in goods." COLO. REV. STAT. § 4-2-102(1); WYO. STAT. ANN. § 34.1-2-102(1). Thus, in ruling that Article 2 of the UCC governs transactions for the interstate sale of electrical energy, the FRC and FERC both effectively have determined that electrical energy is a "good."

*Minnesota Power & Light Co.*, 52 FPC 617 (FPC 1974), illustrates the point. In that case, the dispute "centered solely upon the language set forth in [interstate electrical energy] contracts" between a public electric utility and its customers (various Minnesota municipalities). *Id*. at 618. In interpreting the language of the contracts, the FPC stated:

> We note that the Uniform Commercial Code. . . has substantially altered the parol evidence rule relied upon by the Cities. A contract for the sale of electric power has been held to be a contract for the sale of '*goods*' within the scope of Article 2 of the Uniform Commercial Code. Further, the Uniform Commercial Code represents the modern rules applicable to the interpretation and construction of commercial contracts. We believe that that fact warrants the application of relevant Uniform Commercial Code standards by analogy to the interpretation of contracts for the sale of electric power.

---

[19]     The *Walling* court also determined that the powerhouse employees were engaged in interstate commerce.

*Id*. at 619 (emphasis added; citations omitted).  Some years later, the U.S. Court of Appeals for the Fifth Circuit confirmed that state contract law governs FERC-regulated contracts (at least to the extent that "there is no significant conflict between any federal interest and the use of state law").  *Pennzoil Co. v. F.E.R.C.*, 645 F.2d 360, 387 (5th Cir. 1981).  And, the applicable state law "is the law that would govern the parties' dealings were there no [federal] regulation at all of the contract's subject matter."  *Id.*

Relying on *Pennzoil* and FERC precedent, many FERC decisions have applied UCC sale of goods law to electrical energy sale contracts.  *Golden Spread Elec. Coop., Inc.*, 123 FERC ¶ 61,047, at 61,260 n.273 (FERC Apr. 21, 2008) (applying general UCC law to interpret settlement concerning electric energy sale issues); *Villages of Jackson Ctr.,* 91 FERC ¶ 63,013 (FERC June 29, 2000) (referencing UCC to define "course of conduct" and noting: "Electricity is a commodity.  With commodities, there is no way to differentiate the product . . . . "); *Golden Spread Elec. Coop., Inc.*, 40 FERC ¶ 61,348 (FERC Sept. 29, 1987) (applying Texas UCC law to assignment of electrical energy sale contracts); *Cent. Ill. Pub. Serv. Co.*, 20 FERC ¶ 61,043 at 61,092 (FERC July 12, 1982) (applying Illinois UCC to electric energy sales contract).  These FPC and FERC decisions confirm that electrical energy is "goods."

I.    Electrical Energy That Has Been Delivered to a Customer is a "Product" in State-Law Tort Cases.

Electrical energy is a virtual necessity for modern living.  However, inadvertent contact with electric current can result in grave personal injury and substantial property loss.  Given its pervasive use through the United States, electrical energy has been the subject of much tort litigation.  A critical legal issue in tort cases is whether electrical energy is a "product" or a "service."  The distinction is important for determining the applicable substantive law.  And, the term "product" is virtually synonymous with "goods."  *See* 29 U.S.C. § 203(i) (defining "goods" as including "products"); Brian Garner, BLACK'S LAW DICTIONARY 331 (Thompson Reuters 10th ed. 2014) (defining "commodity" as "An article of trade or commerce.  The term embraces only tangible *goods*, such as *products* or merchandise, as distinguished from services.") (emphasis added); AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE at 757 (Houghton Mifflin Harcourt 5th ed. 2011) ("goods" means "a product. . . .").

The focus on the term "product" in tort litigation is driven by the Restatement of Torts (Second) (the "Restatement") which has been adopted in most States in the United States.  Under the title "Special Liability of Seller of Product for Physical Harm to User or Consumer," Section 402A of the Restatement provides:

 (1) One who sells any *product* in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a *product*, and

29

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(Emphasis added.)

Some of the bankruptcy court cases considering Section 503(b)(9) also have considered state tort law as analogous. So, is electric energy a "product" under Restatement Section 402A and applicable state tort law? The clear majority of States considers electrical energy to be a "product," not a "service" and, therefore, subject to the framework of Restatement Section 402A for most purposes. In fact, "the majority of the state courts considering this issue have encountered little difficulty deciding that electricity is a product. . . . [because] electricity is 'a form of energy that can be made or produced by men, confined, controlled, transmitted and distributed . . . ." *Bryant v. Tri-County Elec. Membership Corp.*, 844 F. Supp. 347, 349 (W.D. Ky. 1994) (citing *Ransome v. Wis. Elec. Power Co.*, 275 N.W.2d 641, 643 (Wis. 1979). Further, even those few jurisdictions that sometimes characterize electrical energy as a "service" draw a distinction between the location of the electrical energy in the distribution channel. If the electrical energy is in high voltage wires and has not been delivered to a customer, then the minority jurisdictions consider the electrical energy to be a "service" for tort purposes. (This is similar to the approach that some state courts have taken under the UCC.) However, if the electrical energy has "passed the meter" and been delivered to a customer, then most of the minority jurisdictions deem the delivered electric energy to be a "product" under Restatement Section 402A.

Precedent in the following jurisdictions confirms that electrical energy that has passed the customer's meter is a "product" for strict liability purposes under Section 402(A) of the

Restatement:  California;[20] Colorado;[21] Connecticut;[22] Georgia;[23] Illinois;[24] Indiana;[25] Pennsylvania;[26] Texas;[27] Wisconsin;[28] and the Virgin Islands.[29]  In fact, the Court has been unable to locate any legal authority under Restatement Section 402A suggesting that electrical

---

[20]     *Pierce v. Pac. Gas & Elec. Co.*, 166 Cal.App.3d 68, 82-84 (Cal. App. 1985) (electricity delivered in marketable state to customer is a "product").

[21]     *Smith v. Home Light & Power Co.*, 695 P.2d 788, 789 (Colo. App. 1985) ("We agree that electricity itself is a product, but conclude that its distribution is a service."), *aff'd*, 734 P.2d 1051 (Colo. 1987) ("at least until the electricity reaches a point where it is made available for consumer use, it is not a 'product' that has been 'sold'").

[22]     *Travelers Indem. Co. of Am. v. Conn. Light & Power Co.*, 2008 WL 2447351, at *5 (Conn. Super. Ct. June 4, 2008) ("It is the opinion of this court that the electricity is a product for the purposes of [Connecticut law] once it passes through the meter of a consumer").

[23]     *Monroe v. Savannah Elec. & Power Co.*, 465 S.E.2d 508, 510 (Ga. App. 1996) ("electricity may only be considered a product within the meaning of Georgia's strict liability statute when it has been 'sold' or placed in the stream of commerce, i.e., the utility has placed the electricity in the hands of and under the control of a consumer"), *aff'd*, 471 S.E.2d 854, 855-56 (Ga. 1996) ("we concur with the rationale presented in the majority view and accordingly hold that electricity is  product").

[24]     *Elgin Airport Inn, Inc. v. Commonwealth Edison Co.*, 410 N.E.2d 620, 624 (Ill. App. 1980) ("Having in mind that electrical energy is artificially manufactured, can be measured, bought and sold, changed in quantity or quality, delivered whenever desired and has been held . . . to be personal property [that can be stolen], we are of the opinion that it is a product . . . ."), *aff'd in part and rev'd in part on other grounds*, 432 N.E.2d 259 (Ill. 1982).

[25]     *Hedges*, 396 N.E.2d. at 935 (recognizing that electricity can be a "product" which may be sold; but declining to apply strict liability under Restatement Section 402A since the electricity had not been delivered through the meter but was still in a high-voltage wire).

[26]     *Cincinnati Ins. Co. v. PPL Corp.*, 979 F. Supp. 2d 602, 609-10 (E.D. Pa. 2013) (electricity is a "product" under Restatement Section 402A after it passes through the customer's meter); *Schriner v. Pa. Power & Light Co.*, 501 A.2d 1128, 1134 (Pa. Super. Ct. 1985) ("electricity only becomes a product, for purposes of strict liability, once it passes through the customer's meter and into the stream of commerce").

[27]     *Houston Lighting & Power Co. v. Reynolds*, 765 S.W.2d 784, 785 (Tex. 1988) ("We agree with the better reasoned opinions of other jurisdictions which hold electricity to be a product. Electricity is a commodity, which, like other goods, can be manufactured, transported and sold . . .  Electricity is a form of energy that can be made or produced by man, confined, controlled, transmitted and distributed to be used as an energy source for heat, power and light."); *Hanus v. Tex. Util. Co.*, 71 S.W.3d. 874, 878 (Tex. App. 2002) ("Because it is a commodity that can be manufactured, transported, and sold like other goods, electricity is considered a product for strict liability purposes after it has been converted, as it had been here, to a form usable by consumers.").

[28]     *Ransome*, 275 N.W.2d at 643 ("While there probably are numerous technical definitions of 'electricity' . . . suffice it to say it is a form of energy that can be made or produced by men, confined, controlled, transmitted and distributed to be used as an energy source for heat, power and light and is distributed in the stream of commerce. The distribution might well be a service, but the electricity itself, in the contemplation of the ordinary user, is a consumable product.").

energy actually metered and delivered to a customer is anything other than a "product."[30]  Since the electrical energy sold in this case by PacifiCorp was metered and delivered to the Debtor, state law suggests that the electrical energy should be considered to be a "product" at least for tort purposes.

J.    Electrical Energy Frequently Is Defined as "Tangible Personal Property" Under Tax Law.

At least 22 States expressly define "electricity" as "tangible personal property" in connection with state taxation.[31]  Wyoming is typical.  WYO. STAT. ANN. § 39-15-101(a)(ix) states:

> "Tangible personal property" means all personal property that can be seen, weighed, measured, felt or touched, or that is in any other manner perceptible to the senses.  *Tangible personal property"*

---

[29]    *DeJesus v. V.I. Water and Power Auth.*, 2011 WL 5864552 (V.I. Super. Ct. Oct. 26, 2011) (recognizing that electricity is a product but only after metering).

[30]    Two state court decisions frequently are characterized as suggesting that electrical energy is never a "product" under Restatement Section 402A:  *Otte v. Dayton Power & Light Co.*, 523 N.E.2d 835 (Ohio 1988) and *Farina*, 438 N.Y.S.2d 645.  In the Court's view, the holdings in *Otte* and *Farina* are more narrow.  *Otte* involved a claim of injury to dairy cattle caused by stray voltage.  But, the stray voltage was not marketable.  *Otte* simply did not involve tort injury allegedly caused by marketable electrical energy after metering and delivery.  *Farina* involved a death caused by a person coming into contact with high voltage wires while removing an antenna.  The intermediate appellate court in *Farina* court specifically noted that the electricity was not in a marketable state.   Since the electrical energy in *Farina* was not in marketable state and had not been metered and delivered, the decision seems to have little import for this case.

[31]    (Arkansas) ARK. CODE ANN. § 26-52-103(21)(B); (Georgia) GA. CODE ANN. § 48-8-2(37); (Iowa) IOWA CODE ANN. § 423.1(59); (Kansas) KAN. STAT. ANN. § 79-3602(pp); (Maine) 36 ME. REV. STAT. ANN. § 1752(17); (Massachusetts) MASS. GEN. LAWS ANN. Chap. 64H § 1; (Minnesota) MINN. STAT. ANN. § 297A.61(10); (Nebraska) NEB. REV. STAT. § 77-2701.39; (Nevada) NEV. REV. STAT. ANN. § 360B.485; (New Jersey) N.J. STAT. ANN. § 54:32B-2(g); (New Mexico) N.M. STAT. ANN. § 7-9-46(F)(1); (North Dakota) N.D. CENT. CODE ANN. § 57-39.2-01(25); (Ohio) OHIO REV. CODE. ANN. § 5739.01(YY); (Oklahoma) 68 OKLA. STAT. ANN. § 1352(24); (Rhode Island) R.I. GEN. LAWS ANN. § 44-18-16; (Tennessee) TENN. CODE ANN. § 67-6-102(89)(A); (Utah) UTAH CODE ANN. § 59-12-102(125)(b); (Vermont) 32 VT. STAT. ANN. § 9701(7); (Virginia) VA. CODE ANN. § 58.1-400.2(C); (Washington) WASH. REV. CODE ANN. § 82.08.010(7); (West Virgina) W. VA. CODE ANN. § 11-15A-1(12); (Wyoming) WYO. STAT. ANN. § 39-15-101(a)(ix).  Some other States do not specifically categorize electrical energy.  Some States recognize that electricity generally is tangible personal property but exclude it from the general provisions for taxation of tangible personal property.  And, some States, such as Colorado, have defined the sale of electrical energy for commercial consumption as a "service" for taxation purposes.  *See* COLO. REV. STAT. §§ 39-26-104(1)(a) and (d.1); *Dep't of Revenue v. Pub. Serv. Co. of Colo.*, 330 P.3d 385 (Colo. 2014).

> *includes electricity*, water, gas, steam and prewritten computer
> software.

(Emphasis added.)  The definition means that Wyoming has determined that electrical energy can be "seen, weighed, measured, felt or touched" or is otherwise perceptible to the senses. Furthermore, many States that have not expressly defined the phrase "tangible personal property" in their tax statutes nevertheless have determined that electrical energy falls within the meaning of the phrase.  *See Powerex Corp. v. Dep't of Revenue*, 346 P.3d 476, 491 (Or. 2015) ("electricity is tangible personal property [for tax purposes]. . . . It is perceptible to the senses, most significantly to the sense of touch.  It can be physically located within a state and shipped from one state to another. . . . And the physical properties of electricity are what makes it valuable to a purchaser. . . .").

At the federal level, the IRS agrees.  In a pair of almost identical Private Letter Rulings, the IRS determined that "Producers of electric energy are subject to IRC § 263A.  Generation of electric energy constitutes production of tangible personal property."  IRS Priv. Ltr. Rul. 200152012, 2001 WL 1659979 (Dec. 28, 2001); IRS Priv. Ltr. Rul. 200152014, 2001 WL 1659981 (Dec. 28, 2001) (same).

K.    Electrical Energy Constitutes "Goods" under Multilateral Treaties between the United States and Other Nations.

    1.    Electrical Energy is "Goods" under the North American Free Trade Agreement.

The United States, Mexico, and Canada entered into a multilateral treaty, the North American Free Trade Agreement ("NAFTA"), to facilitate the movement of goods in international commerce.  NAFTA, Can.-Mex.-U.S., Dec. 17, 1992, 32 I.L.M. 289 (1993). Treaties form part of the "supreme law of the land."  U.S. CONST. Art. VI.  Chapter Six of the NAFTA is titled "Energy and Basic Petrochemicals" and its purpose is to "strengthen the important role that trade in energy and basic petrochemical *goods* plays in the free trade area and to enhance this role. . . ."  NAFTA Article 601(2) (emphasis added).  NAFTA Article 602(1) confirms that Chapter Six "applies to measures related to energy and basic petrochemical *goods* originating in the territories of the Parties. . . ." (emphasis added).

But, what "goods" are "energy and basic petrochemical goods" within the ambit of NAFTA?  The treaty identifies the "energy and basic petrochemical goods" by cross reference. NAFTA Article 602(2)(h) states that "energy and basic petrochemical *goods* refer to those *goods* classified under the Harmonized System as. . . heading[]. . . 27.16. . . ." (emphasis added). NAFTA Article 201 defines "Harmonized System" as "the Harmonized Commodity Description and Coding System, and its legal notes, and rules as adopted and implemented by the parties in their respective tariff laws."  In turn, Heading 2716.00 of the Harmonized Tariff Schedule of the United States (Supp. 2016)[32] lists "Electrical energy" in units of "MWh" as duty free.  To put it

---

[32]    The Harmonized Tariff Schedule of the United States is promulgated by the U.S. International Trade Commission and available at:  www.hts.usitc.gov/current.

more plainly and without all the cross-referencing, electrical energy is "goods" under the NAFTA and can be imported duty free throughout the North American trade zone. *See* Gary Horlick and Christiane Schuchhardt, *NAFTA Provisions and the Electricity Sector*, Background Paper No. 4 at 4, Secretariat Report to Council under Article 13 of the North American Agreement on Environmental Cooperation (June 2002) ("The fact that electricity would be considered as a good under current trade rules is further supported by the treatment of electrical energy under the NAFTA.").[33]

>    2.    Electrical Energy Constitutes "Goods" (Albeit Excluded) under the United
>           Nations Convention on the International Sale of Goods.

The United Nations Convention on the International Sale of Goods ("UNCISG") is the international functional equivalent of Article 2 of the UCC. The United States ratified the UNCISG and the treaty entered into force between the United States and ten other nations as of January 1, 1988. S. Treaty Doc. No. 98-9, 98th Cong. 1st Sess. 22 (1983), reprinted at 15 U.S.C. App. 52 (2002), 19 I.L.M. 668. Subsequently, many other nations joined. Currently, 85 countries are parties to the UNCISG. *See* Status of Conventions and Model Laws, United Nations General Assembly Note by Secretariat UN Doc A/CN.9/876 (May 17, 2016).

As the title of the treaty suggests, the UNCISG generally applies to "contracts of sale of *goods* between parties whose places of business are in different States." UNCISG Art. 1(1) (emphasis added). The UNCISG does not specifically define the term "goods"; however, the treaty lists certain categories of goods that are exempted from coverage by the UNCISG. In addition to excluding consumer goods, the UNCISG excludes "sales. . . of electricity." UNCISG Art. 2(f). The express exclusion of electricity in the UNCISG suggests that electrical energy is a "good." The Secretariat of the United Nations Commission on International Trade Law confirmed as much in the Explanatory Note accompanying the UNCISG:

> The Convention contains a list of types of sales that are excluded
> from the Convention, either because of the purpose of the sale
> (goods bought for personal, family or household use), the nature of
> the sale (sale by auction, on execution or otherwise by law) or the
> nature of the goods (. . . electricity).

Explanatory Note by the UNCITRAL Secretariat on the United Nations Convention on Contracts for the International Sale of Goods at ¶ 10.[34] Stated succinctly, electricity was acknowledged to be a "good," but the parties chose to exclude it from the general category of goods subject to the

---

[33]    Available at: www3.cec.org/islandora/en/item/1821-nafta-provisions-and-electricity-sector-en.pdf.

[34]    Available at: www.uncitral.org/uncitral/en/uncitral_texts/sale_goods/1980CISG.html. The Explanatory Note was prepared by the Secretariat of the United Nations Commission on International Trade Law at the time that the UNCISG became effective. However, the Explanatory Note states that it is "for informational purposes" and is "not an official commentary on the Convention."

UNCISG because of its nature.  In contrast, neither Section 503(b)(9) nor the UCC excludes electrical energy.

      3.      <u>Electrical Energy is "Goods" in Other International Trade Arrangements</u>.

The World Trade Organization ("WTO") is an intergovernmental organization that regulates international trade.  The United States and 163 other nations are members of the WTO. Run by member governments, the WTO develops international trade rules and agreements designed to lower customs tariffs trade barriers covering both goods and services.  The WTO Secretariat characterizes electrical energy as "goods."  For example, in the 2010 World Trade Report, the WTO Secretariat discussed some unique features of electricity but concluded that "we may still consider refining and electricity generation to represent the minimum amount of processing necessary to allow these *goods* to be traded" and it is "more natural to view electricity as a manufactured good."  2010 World Trade Report at 54-55, WTO Secretariat.[35]  Legal commentators also concur that "electricity energy" is "considered to qualify as a good. . . subject to the rules of the World Trade Organization."  Leonardo Macedo, *Electricity Energy and the WTO Customs Valuation Agreement* at 1.[36]  *See also* Thomas Cottier et al., *Energy in WTO Law and Policy*, at 4 ("Accordingly, electrical energy qualifies as a good under WTO law and is, as such, subject to the rules of GATT 1994"; the European Court of Justice also recognizes that electrical energy is "goods").[37]

L.      <u>Electrical Energy Constitutes "Goods" Under Section 503(b)(9)</u>.

      1.      <u>General Conclusion</u>.

As we have seen, the word "goods" is an especially broad and encompassing term in common usage.  The same is true in legal texts and cases outside of bankruptcy, including under the UCC, federal antitrust law, federal labor law, federal energy regulatory law, state tort law, state tax law, and international treaties.   The Court adopts the UCC Section 2-105 legal definition of "goods" for purposes of Section 503(b)(9).  However case law, regulations, administrative rulings, and secondary sources construing the words "goods," "commodities," and "products" as used in the Robinson-Patman Act, the FLSA, the Federal Power Act, state tort laws, state tax laws, NAFTA, and UNCISG also clearly are analogous and further confirm, in a

---

[35]      Available at: www.wto.org/english/res_e/publications_e/wtr10_e.htm.
[36]      Available at:
www.wto.org/english/res_e/publications_e/wtr10_forum_e/wtr10_2july10_e.htm.
[37]      Available at: www.wto.org/english/res_e/publications_e/wtr10_7may10_e.pdf.
The General Agreement on Tariffs and Trade ("GATT") includes electrical energy as part of the Schedule of Commitments thereby suggesting that it is a "good."  Gary Horlick and Christiane Schuchhardt, *NAFTA Provisions and the Electric Sector*, Background Paper No. 4 at 4, SECRETARIAT REPORT TO COUNCIL UNDER ARTICLE 13 OF THE NORTH AMERICAN AGREEMENT ON ENVIRONMENTAL COOPERATION (June 2002).  However, there has been some discussion regarding reclassifying electricity (or at least some of its value chain activities such as transmission and supply) as services under the General Agreement on Trade in Services.  *Id*. Such recharacterization has not occurred.

remarkably consistent fashion, both the common meaning and more specialized legal meaning of the term "goods" under UCC Section 2-105. *See Darden*, 503 U.S. at 322-28 (using the common law meaning of "employee" to construe the term in ERISA statute); *Cmty. for Creative Non-Violence*, 490 U.S. at 739-41 (utilizing conventional common law understanding to ascertain meaning of federal statute). The Court finds that electrical energy constitutes "goods" in both ordinary and legal usage. To hold otherwise would be contrary to the plain understanding of the term "goods" and would upset established legal meaning across many areas of law.

The Debtor has offered no compelling argument why "goods" should have a different meaning under the Bankruptcy Code than under the consistent usage in dictionaries, UCC Section 2-105, federal antitrust laws, federal labor laws, federal energy regulatory law, state tort law, state tax law, and international treaties. Under Section 503(b)(9), Congress expanded creditors' rights substantially by establishing an administrative priority for the very broad and general category of "goods." Electrical energy plainly falls within the scope of the term.

     2.     <u>The Debtor's Other Arguments Are Not Compelling</u>.

         a.     <u>References to "Services" in the Contract and the Regulations of the Wyoming Public Service Commission Do Not Transform Electrical Energy into "Services."</u>

The Debtor highlighted evidence showing that PacifiCorp used the word "services" when referring to the supply of electrical energy. For example, the Invoices identify the main charges as for "Electric Service" and some of the tables on the Invoices contain the heading: "Service Period." (Ex. 6 at 2-3, 5-6 and 9). Neither the Debtor nor PacifiCorp introduced any supply contracts. But, the Court construes the Invoices as part of the contractual arrangement between the Debtor and PacifiCorp. Furthermore, PacifiCorp is a public utility and its rates are regulated by the "Wyoming Public Service Commission." (Stipulated Fact No. 2.) The Wyoming Tariff Information identifies "Applicable Wyoming Rate Schedules." (Ex. 7.) All of the Applicable Wyoming Rate Schedules (including Rate Schedules 25, 26 and 46) refer to "service." The Debtor suggests that the numerous references to "services" may show the parties' intent and should be used as a basis to reject electrical energy being classified as "goods."

Regarding the "services" language in the Invoices, the Court determines that the use of the word "services" is not determinative. Instead of looking at the labels used on the Invoices, the Court must look at the substance of the transactions and the economic reality. A recent U.S. Supreme Court case is instructive: *U.S. v. Eurodif, S.A.*, 555 U.S. 305 (2009). In that case, the U.S. Department of Commerce sought to impose "antidumping" duties pertaining to uranium enrichment transactions. The defendant argued that the Tariff Act of 1930, 19 U.S.C. § 1673, did not apply because the transactions were for "services," rather than for "foreign merchandise." The defendant pointed out that the underlying contracts characterized the transactions as the sale of uranium enrichment "services." Despite the use of the word "services" in the contracts, the government contended that the transactions really were "sales of goods rather than services . . . ." *Id*. The U.S. Supreme Court determined that the government agency "may reasonably treat the transaction as the sale of goods" even though the transaction was labeled as a "service" contract. *Id*. at 322. Although the *Eurodif* decision deals with a tax and regulatory issue, the same

36

principle applies to this case. *See Erving Indus.*, 432 B.R. at 364 n.18 (usage of the word "services" in electric energy contract was "loose" and not dispositive). And, as set forth above, the Court determines that electrical energy qualifies as "goods."

In terms of the Wyoming Public Service Commission, that entity was established to regulate "every public utility" in the State of Wyoming. WYO. STAT. ANN. § 37-2-112. Wyoming law defines the phrase "public utility" as including all companies that own, operate or control "any plant, property or facility": (1) "for the generation, transmission, distribution, sale or furnishing to or for the public of electricity"; (2) "for the manufacture, distribution, sale or furnishing to or for the public of natural or manufactured gas"; (3) "for the supply, storage, distribution or furnishing to or for the public of water"; and (4) "for the transportation or conveyance to or for the public of oil or gas." WYO. STAT. ANN. § 37-1-101. The Wyoming Public Service Commission, has passed regulations governing utility service, quality, adequacy, change in service, service interruptions, service connections, refusal to serve, discontinuation of service, and rates. Wyoming Public Service Commission Regulations Chapter 3 (Electric, Gas and Water Utilities). The rates are set forth on tariff schedules for electricity, water, and natural gas service. The word "service" is pervasive throughout the Wyoming statutes and regulations governing electrical energy, natural gas and water sales. From this, the Debtor infers that the statutory and regulatory scheme (and use of the word "services") dictates that electrical energy is not "goods" but "services." The same type of regulatory regime is present in most other states.

There is no doubt that natural gas and water are "goods" within the meaning of the UCC. COLO. REV. STAT. § 4-2-107 ("A contract for the sale of minerals or the like (including oil and gas) . . . is a contract for the sale of goods . . . if they are to be severed by the seller . . . ."); WYO. STAT. ANN. § 34.1-2-107 (same); *see also Pilgrim's Pride*, 421 B.R. at 241 ("natural gas falls within the term 'goods'"); *NE Opco*, 501 B.R. at 251-52 (acknowledging that natural gas and water are "goods"); *In re Plastech Engineered Prods., Inc.*, 397 B.R. 828, 839 (Bankr. E.D. Mich. 2008) (natural gas is "goods"). The Court determines that use of the word "service" in relation to natural gas and water in Wyoming public utility statutes and regulations cannot somehow transform products that are "goods" into something else and is irrelevant. The same is true of electrical energy. *See GFI Wis.*, 440 B.R. at 801 ("Wisconsin's rules for electrical utilities" are irrelevant for Section 503(b)(9) analysis).

b.    Sections 366 and 546(c) Do Not Defeat the Administrative Expense Claim.

Although the Debtor did not directly raise the argument in the Response, some of the bankruptcy cases cited by the Debtor discuss the application of Sections 366 and 546(c). Section 366 is titled: "Utility Service" and governs certain aspects of "utility service" for "electricity, water and gas" after the commencement of bankruptcy proceedings. Alan N. Resnick and Henry J. Somer, 3 COLLIER ON BANKRUPTCY ¶ 366.01 (Lexis Nexis 16th ed. 2016). Does use of the phrase "utility service" in Section 366 mean that electrical energy is not a "good" under Section 503(b)(9)? The Court thinks not. The issue is similar to the Debtor's argument raised under the Wyoming public utilities statutes and regulations. Section 366 simply does not purport to change categories of "goods" (such as natural gas, water, and electrical energy) into "services."

37

Every court that has considered the issue has determined that Section 366 is irrelevant for purposes of interpreting the word "goods" in Section 503(b)(9).  *See NE Opco*, 501 B.R. at 255 ("Section 366 of the Bankruptcy Code cannot control whether something is a good under the U.C.C. and, by extension, section 503(b)(9)."); *GFI Wis.,* 440 B.R. at 801 (same); *Pilgrim's Pride*, 421 B.R. at 241 ("Congress could have —but did not — except from section 503(b)(9) . . . providers that are acting as utilities [under Section 366]").  The Court agrees.  The *GFI Wisconsin* court stated the rationale for rejecting the argument succinctly:

> Just because a seller of goods may also be a utility that is entitled to the protection of § 366 for the sale of utility services post-petition to a debtor does not mean it is prohibited from allowance of a § 503(b)(9) administrative expense claim to the extent that it has sold goods to the debtor that qualify under § 503(b)(9). Section 503(b)(9) addresses the sale of goods pre-petition and § 366 addresses the provision of utility services postpetition. The sections are not mutually exclusive. A utility provider may provide both goods and services within the meaning of each section. In sum, the rights afforded by § 503(b)(9) to a seller of goods are not dependent either explicitly or implicitly upon the availability of other remedies under the Code for the seller.

*GFI Wis.*, 440 B.R. at 801.

The Section 546(c) argument is similar.  Section 546(c) governs reclamation rights in "goods" sold to a bankruptcy debtor "if the debtor has received such goods while insolvent, within 45 days before [the bankruptcy]" and provides that the creditor makes a reclamation demand within the statutory time frame.  The Debtor hints, indirectly through citations, that Section 503(b)(9) administrative priority should be limited only to "goods" that are reclaimable under Section 546(c).  The suggestion is that electrical energy is not reclaimable because it is consumed almost immediately.  The short reason why this contention does not carry the day for the Debtor is because Sections 503(b)(9) and 546(c) are not linked.  In other words, the statutory text of Section 503(b)(9) does not indicate that administrative priority is limited only to those goods for which reclamation is available under Section 546(c).  Again, every court presented with the argument has rejected it.  *NE Opco*, 501 B.R. at 255 ("To argue that section 546(c) defines the limit of what constitutes a good under section 503(b)(9) or the Bankruptcy Code as a whole turns the statute on its head."); *GFI Wisconsin,* 440 B.R. at 801 ("Had Congress intended to limit administrative priority claim under § 503(b)(9) to only the subset of goods that could qualify for reclamation under § 546(c), Congress could have said so."); *Erving Indus.,* 432 B.R. at 372-373 ("Section 546 does not limit or control in any way the rights that claimant has under § 503(b)(9)").  The Court concurs.

      c.    <u>Statutory Interpretation Rules and General Bankruptcy Policy Do Not Require a "Narrow Interpretation" of the Word "Goods."</u>

For its final argument, the Debtor contends that "a narrow construction of § 503(b)(9) is warranted."  Response at 4.  The "narrow construction" advocated by the Debtor supposedly

would exclude electrical energy from being included as "goods" subject to administrative priority under Section 503(b)(9).

The Debtor is correct that the U.S. Supreme Court ruled that bankruptcy priority claims should be "tightly construed." *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 657 (2006); *see also U.S. v. Embassy Rest.*, 359 U.S. 29, 31 (1959) ("if one claimant is to be preferred over others, the purpose should be clear from the statute"). But that principal only applies when the statute is not clear. *Howard Delivery*, 547 U.S. at 668 (applying the narrow construction approach but only where U.S. Supreme Court "found it far from clear" that the asserted priority claim fit the priority statute).

The Court simply does not find any ambiguity in the term "goods." The word "goods" is an extremely broad and encompassing term. Its common meaning and well-established legal meaning include electrical energy. And, as noted earlier, "the presumed point of using general words is to produce general coverage — not to leave room for courts to recognize ad hoc exceptions      . . . . [I]n the end, general words are general words, and they must be given general effect." READING LAW at 101. Maybe Congress did not consider or anticipate that the word "goods" in Section 503(b)(9) would include electrical energy. (There is no specific evidence of Congress' intent one way or the other.) But, "the fact that a statute can be 'applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.'" *Yeskey*, 524 U.S. at 212. Since the Court does not find the term "goods" to be ambiguous, the Court rejects resort to the doctrine of strict interpretation. *Id.* (declining to apply doctrine of constitutional doubt since statute was not ambiguous); *see also Erving Indus.*, 432 B.R. at 373-74 (rejecting a narrow construction of term "goods" because there was no ambiguity; "electricity easily falls within the definition [of goods]").

Furthermore, "if Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent." *Lamie v. U.S. Trustee*, 540 U.S. 526, 542 (2004). If Congress meant to exclude electrical energy from Section 503(b)(9) coverage, it could has done so expressly as was done in the UNCISG. In the context of this case, the invitation to engage in a "narrow reading" is a euphemism for changing the law enacted by the Legislative Branch.

V.    <u>Conclusion</u>.

So, that brings us to the nut of the matter. In the absence of a Congressional exclusion of electrical energy in Section 503(b)(9), the Debtor is seeking to have the Court impose a policy preference in favor of debtors and against electric utilities in bankruptcy cases. The Debtor suggests that such a policy is consistent with principles of equitable distribution amongst creditors in bankruptcies and may promote reorganization. Perhaps.[38] But, it is not the Court's

---

[38]    Some suggest that Section 503(b)(9) should be repealed entirely or changed because of its alleged negative impacts on corporate reorganizations. *See* Brendan M. Gage, *Should Congress Repeal Bankruptcy Code Section 503(b)(9)?*, 19 AM. BANKR. INST. L. REV. 215 (2011) (arguing that "unless Congress provides some sort of legislative gloss on why section 503(b)(9)

role to announce its preferred result in place of Congress. *Lamie,* 540 U.S. at 542. Instead, the Court only may interpret Section 503(b)(9), which plainly enlarges creditors' rights, as written. A fair reading of the statutory text dictates the result today. In the Court's assessment, the metered electrical energy delivered by PacifiCorp to the Debtor constitutes "goods" under the unambiguous text of Section 503(b)(9). Accordingly, the Court:

GRANTS the Application. PacifiCorp shall have an allowed administrative priority claim under Section 503(b)(9) in the amount of $84,253.95 for electrical energy delivered to the Debtor in the 20 days prior to the Petition Date.

DATED this 10th day of February, 2017.

BY THE COURT:

*Thomas B. McNamara*

Thomas B. McNamara,
United States Bankruptcy Judge

---

was passed and then revises the section to advance that objective, section 503(b)(9) should be repealed").