## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In Re: | ) |
| | ) Case No. 15-22395-TBM |
| ESCALERA RESOURCES CO., | ) Chapter 11 |
| | ) |
| EIN: 83-0214692 | ) |
| | ) |
| Debtor. | ) |

### MOTION OF DEBTOR FOR ORDER (A) APPROVING THE SALE OF DEBTOR'S ATLANTIC RIM ASSETS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) FOR RELATED RELIEF

Escalera Resources Co. ("Debtor"), as the debtor and debtor-in-possession, pursuant to 11 U.S.C. §§ 363(b), (f), and (m) and 365, Rules 2002, 6004, 6006 and 9014 of the Fed. R. of Bankr. P. (the "Bankruptcy Rules") and Local Bankruptcy Rule 6004-1, files this motion (the "Motion") seeking approval of the sale of certain of its properties, as follows:

### Preliminary Statement

1.      Debtor, together with its Senior Secured Lenders, determined that a sale of substantially all of Debtor's assets would be in the best interests of its estate and creditors.  After preliminary marketing activity through Seaport Global Securities LLC "(Seaport Global"), its investment banker, Debtor and the Senior Secured Lender's determined that a joint sales effort with Warren Resources, Inc., Warren E&P, Inc. ("Warren E&P") and Warren Energy Services, LLC ("WES") (WRI, Warren E&P and WES are sometimes collectively referred to as "Warren") for sale of Debtor's assets with Warren's Atlantic Rim assets would be advisable.

2.      As a result of two (2) competitive bidding procedures (the first procedure of which set a minimum bid amount and did not produce any lasting competitive bids), Debtor ultimately received a bid for its Atlantic Rim assets (the "Assets") from Aspen Oil and Gas Partners, LLC ("Aspen"). Debtor now seeks approval of the sale of its Assets to Aspen.

**Procedural Background**

3.      On November 5, 2015 (the "Petition Date"), Debtor filed voluntary a petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"). Debtor continues to operate its business as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

4.      On November 13, 2015, the United States Trustee appointed an Official Unsecured Creditors Committee (the "Committee").

5.      The Committee filed a motion to appoint a chapter 11 trustee on October 16, 2016. Debtor filed a response, and the parties informally agreed to put the matter on hold while Debtor obtained and hired financial advisors to conduct a sale process and file a new Plan.

6.      On January 3, 2018, the U.S. Trustee (the "UST") filed its Motion to Dismiss or Convert Chapter 11 Case Pursuant to U.S.C. § 1112(b). [Docket Nos. 531, 532] A hearing on this motion is currently set for April 16, 2018.

**Jurisdiction**

7.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §157(b), and the Court may enter a final order consistent with Article III of the United States Constitution.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The bases for the relief requested herein are Bankruptcy Code §§ 105(a), 363(b), 363(f), 363(m), 365(a), 365(b), 365(e), 365(f) and 502(b)(3) and Bankruptcy Rules 2002(a)(2), 2002(c)(1), 2002(d), 6004(a), 6004(c), 6004(f), 6004(h), 6006(a) and 6006(d).

**Debtor and its Affiliated Related Entities**

10.     Debtor is a publicly-held independent energy company engaged in the exploration, development, production and sale of natural gas and crude oil, primarily in the Rocky Mountain basins of the western United States. Its core operations are natural gas wells in Wyoming. Debtor was incorporated in Wyoming in 1972 and reincorporated in Maryland in 2001.

11.     Debtor's current production consists primarily of natural gas from one core area in southern Wyoming, the Atlantic Rim area of the eastern Washakie Basin, in which it has coalbed methane reserves.

12.     Although Debtor has six wholly-owned subsidiaries, and one of these subsidiaries, PetroSearch Energy Corporation, a Nevada corporation, has nine wholly-owned subsidiaries, only one of Debtor's subsidiaries, Eastern Washakie Midstream LLC, a Wyoming corporation ("Eastern Washakie"), is considered to be operating in any fashion. Eastern Washakie is a midstream company that owns and operates a pipeline that primarily transports Debtor's gas.

**Oil and Gas Properties**

13.     Debtor's primary property interests lie in the Catalina Unit and the Cow Creek Unit, which are part of what is commonly known as the "Atlantic Rim" in Carbon County, Wyoming. Eastern Washakie owns and operates a pipeline that services the Catalina Unit and the Cow Creek Unit. Debtor is the operator of these contiguous units.

14.     Warren holds a minority interest in the Catalina Unit. Under the Catalina Unit Operating Agreement, Warren is entitled to a right of first refusal for a sale of Debtor's interests in the Catalina Unit except when Debtor proposes "to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its oil and gas assets to any party." Debtor's proposed sale of its interests in the Catalina Unit would be part of the "sale of all

or substantially all of its oil and gas assets." Accordingly, Debtor believes that the right of first refusal does not apply to its proposed sale.

15.     Debtor's rights in the Catalina Unit and the Spyglass Hill Unit (described below and operated by Warren) include certain "deep rights," which are rights to all depths below the Mesa Verde formation ("Deep Rights").

16.     Under the Cow Creek Unit Operating Agreement, holders of minority interests in the Cow Creek Unit are entitled to a right of first refusal for a sale of any unit owner's interests in the Cow Creek Unit except when the seller proposes a sale "of all or substantially all of its oil and gas properties within the state [i.e. Wyoming] in which the Unit Area is located." Debtor's proposed sale is a "sale of all or substantially all of its oil and gas properties" in Wyoming. Accordingly, the right of first refusal does not apply.

17.     WRI is the majority owner of interests in, and Warren E&P is the operator of, the Spyglass Hill Unit in the Atlantic Rim in Carbon County, Wyoming. The Spyglass Hill Unit and the Catalina Unit are contiguous properties.  Debtor owns a minority interest in the Spyglass Hill Unit.

18.     WES owns and operates a pipeline that services the Spyglass Hill Unit and transports Debtor's gas from the Spyglass Hill Unit to Eastern Washakie's pipeline by way of an interconnect.

19.     The Spyglass Hill Unit Operating Agreement provides an identical right of first refusal in favor of interest holders in the Spyglass Hill Unit, including Debtor, in the event of a sale of Warren's interests in the Unit.  Although the Operating Agreement provides an exception to the first refusal right if the sale is of all or substantially all of Warren's oil and gas assets, Debtor does not believe that a sale of Warren's interests in the Spyglass Hill Unit, including WES'

pipeline, would constitute such a sale, and in all events, the joint sale process renders the right of first refusal moot.

### Reasons for Filing Chapter 11

20.     Debtor is a party to a Credit Agreement dated as of August 29, 2014 (as amended, restated or otherwise modified from time to time, the "Credit Facility") among Debtor as Borrower and Société Générale and the financial institutions listed therein led by Société Générale (collectively the "Senior Secured Lenders"). Société Générale serves as the Administrative Agent under the Credit Facility. The Credit Facility was generally a revolving credit facility under which the amount of credit available for borrowing was determined by a borrowing base that was in turn determined by the value of Debtor's oil and gas reserves on a periodic basis. As of the Petition Date, Debtor was indebted to the Senior Secured Lenders for not less than: (i) $36,886,300.00 in aggregate principal amount; (ii) accrued and unpaid interest and fees of $389,640.83; and (iii) additional amounts claimed as owed under the Credit Facility. These amounts substantially exceeded the borrowing base as re-determined as of September 30, 2015.

21.     As of the Petition Date, the Credit Facility was collateralized by substantially all of Debtor's oil and gas producing properties and substantially all other assets. The Credit Facility is guaranteed by Eastern Washakie.

22.     Since filing of this chapter 11 case, the Senior Secured Lenders have permitted use of cash collateral under a Final Order (A) Authorizing Postpetition Use of Cash Collateral; (B) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 507, Bankruptcy Rules 2002, 4001, and 9014; and (C) Granting Related Relief [Docket No. 112] entered on December 2, 2015 (the "Cash Collateral Order"). Pursuant to this Cash Collateral Order, the Senior Secured Lenders have been granted certain adequate protection liens encumbering virtually all

Debtor's assets not already encumbered. As of the filing of this Motion, Debtor estimates that the amount of cash collateral it has expended since the Petition Date, which is the measure of the adequate protection lien, exceeds $5.7 million because Debtor has generally operated at a loss.

23.     As an exploration and development company, the value of Debtor's assets, revenue, and general financial condition are primarily correlated to the price of natural gas. The sharp decrease in natural gas prices following the origination of the Credit Facility made it difficult to operate at a profitable level or to obtain capital for further development of Debtor's leasehold interests or acquisition of new properties to increase cash flow.

24.     Debtor and the Senior Secured Lenders had negotiated a prepetition term sheet setting forth the material provisions for a plan of reorganization with a view toward a relatively quick exit from chapter 11. However, the continued deterioration of natural gas prices in the few months following the Petition Date caused the parties to pause the reorganization process to evaluate alternative restructuring options.

25.     Whereas Debtor's cash flow improved as natural gas prices recovered, the recovery has been insufficient to date to produce positive cash flow. In October 2016, the Senior Secured Lenders approached Debtor with their request to adopt a dual strategy in the chapter 11 case: the marketing and possible sale of Debtor's assets, with the option to elect out of a sale and elect into a reorganization of Debtor on terms substantially similar to those proposed in the Petition Date term sheet. As a result of Debtor's initial marketing efforts prior to the Term Sheet with Warren, it became apparent that if there were a plan in this case, it would be a liquidating plan.

26.     Currently, however, it is the consensus of Debtor and the Senior Lenders that the case be dismissed upon completion of a sale of substantially all of Debtor's assets.

### **Marketing and Bidding Process**

27.     As a result of the foregoing, effective December 9, 2016, and as approved by Court order [Dkt# 407], Debtor retained Seaport Global, an experienced investment banking and financial firm, to market and sell substantially all of its assets.

28.     Seaport Global conducted an exhaustive marketing process. Among other things, it distributed a market teaser to approximately 208 potentially interested parties[1] as potential acquirers, equity investors, debt financiers and/or asset sale purchasers. Seaport also called and met with other potentially interested parties. Approximately 10 parties signed confidentiality agreements, and Seaport Global provided confidential information to these parties via a virtual data room it created. Debtor met with several interested parties.  By March 1, 2017, three bids were received.

29.     During this process, several things became apparent. First, Warren, which Debtor considered the most likely buyer of Debtor's properties, would not be a bidder.

30.     Second, some prospective buyers indicated an interest in acquiring Warren's interests in the Spyglass Hill Unit, in effect as a condition to purchase of Debtor's properties. Indeed, the most attractive bid was later withdrawn for that reason. This was not unanticipated. Debtor has long believed that the combination of the Atlantic Rim properties offers efficiencies in terms of size and operation that make a sale more attractive.

31.     Third, Warren indicated an interest in selling its interest in the Spyglass Hill Unit. Accordingly, Debtor and Warren commenced discussions through Seaport Global about a joint sale effort.

---

[1] The universe of parties interested in coal bed methane production is significantly smaller than the universe of buyers of oil and other natural gas.

32.     These discussions ultimately led to a Stipulation between Warren and Debtor dated April 14, 2017, in which, among other things, the parties agreed to jointly market their Atlantic Rim properties and Warren agreed to engage Seaport Global to assist in such effort pursuant to a Term Sheet (the "Term Sheet"). [Dkt #443-1]. By Order dated June 1, 2017, the Court granted the Motion to approve the Stipulation (the "Order Approving Stipulation") and the Term Sheet, authorizing Debtor to engage in a joint sale effort with Warren.  [Dkt #462]

33.     The Term Sheet set forth the parameters for a joint sale process.  The Term Sheet outlines the method for dividing proceeds from a joint sale of the Atlantic Rim properties and makes clear that while the process is cooperative, the Debtor and Warren each retain independent authority to determine whether to consummate a transaction.

34.     Seaport Global undertook an extensive effort to sell Debtor's and Warren's Atlantic Rim properties (the "Joint Assets"). In July 2017, in anticipation of receiving a "stalking horse" bid, Debtor filed Motion for Entry of Orders: (I) Establishing Bidding and Sale Procedures; (II) Establishing Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (III) Approving the Sale of Assets; and (IV) Granting Related Relief. Ultimately, however, no party was willing to act as a "stalking horse bidder," and the Court denied the motion.

35.     Debtor and Warren, in consultation with the Senior Secured Lenders and Seaport Global, then determined that a minimum bid auction was the best course to sell the joint assets. Accordingly, the parties agreed to bid procedures for an auction, which procedures were circulated to parties who had expressed an interest in bidding.[2]

---

[2] Since no breakup fee or approval of a stalking horse bid was involved, it was not necessary for Debtor to obtain Court approval of the auction procedures.

36.     By November 6, 2017, the parties received two qualified bids: one bid for all the joint assets and one bid for $1 million for the Deep Rights only from Anschutz Exploration Corporation ("Anschutz"). However, Anschutz subsequently withdrew its offer since it could not reach a satisfactory agreement with Warren, and the other bidder never made the required deposit. The auction scheduled for November 13, 2017 was cancelled.

37.     After the auction was cancelled, Seaport continued its efforts to bring interested buyers to the table. Debtor, after consulting with the Senior Secured Lenders, Seaport Global and Warren, determined to re-open bidding for the Assets with no minimum bid requirement. By the deadline set by the parties of February 16, 2018, Debtor received three bids. After negotiations, two bids remained: Aspen's bid for $2,424,000 for Debtor's Assets, but not the Deep Rights; and Anschutz' bid of $1.0 million for the Deep Rights.

38.     During negotiation of the purchase and sale agreements, certain issues arose that complicated a separate sale of the Deep Rights. Aspen then offered to raise its price for the Joint Assets by $1.0 million to include the Deep Rights and miscellaneous overriding royalties, royalties and non-working interests of Debtor. Pursuant to the Term Sheet, Debtor's share of the price allocated to the Deep Rights is about $242,000, raising the total price for its Assets to $2,666,000.

39.     Debtor and Aspen entered into a purchase and sale agreement for the Assets on April 13, 2018 (the "PSA"), an executed copy of which is attached hereto as **Exhibit A**.

**Assets to be Sold**

40.     L.B.R. 6004-1(b)(1): the Assets are located primarily in Carbon County, Wyoming[3] and consist of the interests of Debtor and Eastern Washakie in the following:

(a)     the oil and gas leases, lands and units described in Section 1.2(a) of the PSA and Exhibit A thereto;

(b)     all oil, gas water or injection wells located on the Lands, as described in Section 1.2(b) of the PSA and Exhibit A-1 thereto;

(c)     the pools or units which include any Lands, Leases or Wells, as described in Section 1.2(c) of the PSA and Exhibit A-1 thereto;

(d)     all contracts and agreements, other than Leases and Surface Contracts, which relate to the Assets, as described in Section 1.2(d) of the PSA and Schedule 1.2(d) thereto;

(e)     all easements, permits and other surface contracts pertaining to the Lands, as [4]described in Section 1.2(e) of the PSA and Schedule 1.2(e) thereto;

(f)     the equipment, machinery, vehicles, fixtures, and other tangible personal property and improvements located on the Lands, as described in Section 2.1(f) of the PSA and Exhibit A-2 thereto;

(g)     all flow lines, pipelines, gathering systems and appurtances thereto located on the Lands, as described in Section 2.1(g) of the PSA and Schedule 1.2(g) thereto;

(h)     all facilities used or held for use primarily in connection with operation of the properties including water injection facilities, power generation facilities and the pipe yard facilities, as described in Section 2.1(h) of the PSA;

---

[3] The legal description of the real estate is contained in Exhibit A and Exhibit A-1 of the PSA.
[4] Two of the working interests are owned by PetroSearch.

(i)      all Hydrocarbons[5] produced from or attributable to the Leases, Lands and Wells after the Effective Time, as described in Section 2.1(i) of the PSA;

(j)      miscellaneous overriding royalties, royalties and non-working interests;

(k)     records relating to the foregoing, as described in Section 1.2(j) of the PSA; and

(l)      all unit interests, net profits interests, overriding royalty interests, all mineral owned in fee and seismic data, as described in Section 2.1(k) of the PSA.

## Material Terms of PSA and Proposed Order

41.     L.B. R. 6004-1: the material terms of the PSA and the proposed order approving the sale (the "Sale Order") are as follows:[6]

(a)     <u>Purchase Price</u>. The purchase price for the Assets is $2,666,000 (*PSA §2.1*), subject to certain adjustments (*PSA §2.2*);

(b)     <u>Deposit</u> (6004-1(d)(E)). Aspen is required to make an earnest money deposit of $133,300 by April 17, 2018 (within 2 Business Days of the execution of the PSA) (*PSA §2.4*). The Deposit becomes non-refundable unless Aspen delivers a notice regarding title or environmental defects that exceed a specified threshold by noon on May 4 (*PSA §3.5*). The deposit shall be applied against the Purchase Price if Closing occurs.  (*PSA §2.4*)*.* If Seller terminates the PSA because Purchaser has failed to comply with any provision of Section 8.1 of the PSA or as the result of any default or breach by Purchaser of Purchaser's obligations thereunder, then Seller may retain the Deposit as liquidated damages. (*PSA §10.3(a)*). If the PSA is terminated for any reason other than the reasons set forth in Section 10.3(a) of the PSA, then as Purchaser's sole and exclusive remedy, Seller shall deliver the Deposit to Purchaser.

---

[5] All capitalized terms not defined in this Motion shall be the meaning set forth in the PSA.
[6] The terms of the PSA provided herein are a summary only.  In the case of any discrepancy with the PSA, the PSA controls.

(c)    <u>Excluded Assets</u>. Certain property which may be associated with the Assets are excluded from the sale, as identified in the PSA and on Exhibit B thereto (*PSA §1.3*).

(d)    <u>Contracts and Leases</u>. Debtor will assume and assign certain executory contracts and unexpired leases pursuant to a Designation Notice to be delivered by Purchaser (*PSA §4.3(a)*) (the "Purchased Contracts").

(e)    <u>Releases (</u>6004-1(d)(B)). The PSA contains a "Limitation on Damages" clause, in which both Debtor and Aspen waive any claims either party may have against the other for punitive damages or their respective consequential or indirect damages in connection with the PSA and the transactions contemplated therein regardless of fault.  This is a customary provision found in purchase and sale agreements and is for the benefit of both parties.   (*PSA §12.15*)

(g)    <u>Private Sale  (</u>6004-1(d)(C)). The PSA does not contemplate an auction. Debtor attempted two auctions, neither of which resulted in an acceptable bid.  The Assets have been marketed for over a year by a highly-sophisticated and experienced investment banking firm.

(g)    <u>Closing and Other Deadlines (</u>6004-1(d)(D)). The Closing of the transaction must occur no later than fifteen (15) days after entry of the Sale Order. (*PSA §9.1(a)*) The Deposit must be delivered upon the execution of the PSA. (*PSA §2.4*) Aspen has until May 4, 2018, to deliver a Defect Notice; if so delivered, Debtor has until ten Business Days thereafter in which to dispute or remedy the defect. (*PSA §3.5(a)*)

(h)    <u>Use of Proceeds</u> (6004-1(d)(G)). The sale proceeds will be distributed to the Senior Lenders less an amount agreed upon to fund any senior liens; approved administrative expenses (including professional fees); UST fees; and the fee of Seaport Global of $250,000. The senior adequate protection liens of the Senior Lenders under the Cash Collateral Order far exceed the amount of proceeds from the sale, and the agreed reserve covers all applicable carve-outs.

(i)     <u>Interim Arrangements with Proposed Buyer</u> (6004-1(d)(A); (6004-1(d)(F)). The PSA provides that Debtor and Purchaser will enter into a Transition Services Agreement at Closing, under which Debtor will provide Purchaser with transition support services as requested by Purchaser. Such agreements are typical in sales of oil & gas properties because of the lag in time between closing and approval by various regulatory authorities, e.g. BLM, of the buyer as the owner and operator of the properties. (*PSA §7.8*)[7] There are no other agreements or discussions relating to Debtor's management or key employees, and Aspen.

(j)     <u>Record Retention</u> (6004-1(d)(I)). Debtor may retain the Records described in the PSA, which are sufficient to enable it to administer what little is still required in its bankruptcy case. (*PSA §1.2(j)*)

(k)     <u>Finding of Good Faith Purchaser</u>. As requested later in this Motion (and as per the PSA), the proposed Sale Order contains a provision that Aspen is a good faith purchaser under § 363(m) of the Bankruptcy Code. (*PSA §4.2*) The PSA was negotiated in good faith at arms' length, without collusion or fraud of any kind. Aspen is not an Insider of Debtor. Debtor is unaware of any connections between Aspen and Debtor or any other party involved in the sale process. Debtor is unaware of any conduct by Aspen that would prevent the application of § 363(m) of the Bankruptcy Code.

(l)     <u>Relief from Bankruptcy Rule 6004(h) and 6006(d)</u> (6004-1(d)(N)). As requested later in this Motion, the proposed Sale Order contain a provision that such order will become effective immediately upon entry pursuant to Bankruptcy Rules 6004(h) and 6006(d), rather than being stayed until the entry of 14 days after the entry of the Sale Order. While Section 9.1(a) of the PSA allows for a Closing fifteen days after entry of the Sale Order, the parties wish

---

[7] Regulatory approval is necessary even when the buyer is an approved operator in the state, as is Aspen.

to close as quickly as possible since the estate operates at a loss and thus desire that the Sale Order be a final order.

The PSA contains more extensive detailed terms and conditions which are beyond the summary provided for in this Motion. Interested parties are urged to read the PSA for a complete description of the terms of the sale.

### Holders of Preferential Purchase Rights

42.     Debtor is unaware of any holder of a preferential purchase right that applies to the sale.

### Liens, Claims and Encumbrances (LBR 6004-1(e))

43.     The Assets are being sold subject to the following Interests (called "Permitted Encumbrances" in the PSA):

a.     Royalties and overriding royalties, reversionary interests and other burdens;

b.     All leases, unit agreements, pooling agreements, operating agreements, Hydrocarbon production sales contracts, division orders and other contracts, agreements and instruments applicable to the Assets;

c.     Transfer Requirements applicable to the Assets;

d.     Liens for current Taxes or assessments not yet delinquent (or, if delinquent, (i) being contested in good faith by appropriate actions, or (ii) which will attach to the sale proceeds at Closing pursuant to the Sale Order);

e.     Materialman's, mechanic's, repairman's, employee's, contractor's, operator's and other similar liens or charges arising in the ordinary course of business for amounts not yet delinquent (including any amounts being withheld as provided by Law), or, if delinquent,

(i) being contested in good faith by appropriate actions, or (ii) which will attach to the sale proceeds at closing pursuant to the Sale Order;

   f. Rights of reassignment arising upon final intention to abandon or release the Assets, or any of them;

   g. Easements, rights-of-way, servitudes, permits, surface leases and other rights in respect of surface operations;

   h. All rights reserved to or vested in any Governmental Body to control or regulate any of the Assets in any manner and all obligations and duties under all applicable Laws, or under any franchise, grant, license or permit issued by any such Governmental Body;

   i. Any encumbrance on or affecting the Assets which Aspen expressly assumes, bonds or pays at or prior to Closing or which Debtor discharges at or prior to Closing;

   j. Calls on Hydrocarbon production under existing Contracts;

   k. Any other liens, charges, encumbrances, defects or irregularities which do not, individually or in the aggregate, materially interfere with the use or ownership of the Assets subject thereto or affected thereby (as currently used or owned), which would be accepted by a reasonably prudent purchaser engaged in the business of owning and operating oil and gas properties; and

   l. Liens granted under applicable joint or unit operating agreements.

44. The Assets are being sold pursuant to § 363(b) and (f)(2) and (5) of the Bankruptcy Code free and clear of all liens, claims and encumbrances (collectively, "Interests") except as set forth above. (*PSA § 3.2*).

  a. The names and estimated amounts owed to each holder of a claim allegedly secured by a lien against the Assets are:

| Name of Creditor | Amount |
|---|---:|
| Fremont County Treasurer | $1,608.99 |
| Campbell County Treasurer | $23,651.62 |
| Carbon County Treasurer | $2,648,806.97 |
| Natrona County Treasurer | $10,787.78 |
| Fremont County Treasurer | $1,608.99 |
| Sweetwater County Treasurer | $211.34 |
| Warrior Welding & Backhoe Service LLC | $55,063.60 |
| Senior Secured Lenders | $37,275,940.83 |

b.  Justification:

   i.   The Senior Secured Lenders have consented to the sale; the liens of the Senior Lenders will attach to the proceeds of the sale, subject to the agreed carve-outs.

   ii.   The claims of the county taxing authorities are for tax assessments against property of the estate and in each exceed the value of Debtor's interest in the Assets because the liens of the Senior Secured Lenders are prior to the tax liens pursuant to Wyoming law; therefore, the claims of the county taxing authorities are disallowed pursuant to § 502(b)(3) of the Bankruptcy Code.

c.  The lien of Warrior Welding will be paid at closing.

d.  Each lienholder will have been served with a copy of the Motion and its attachments as shown by the Certificate of Service.

**Assumption and Assignment of Executory Contracts and Unexpired Leases**

45.    Debtor also seeks approval of the assumption and assignment of the Purchased Contracts pursuant to § 365(f) of the Bankruptcy Code in connection with the sale. Debtor will have served this Motion and the 9013 Notice on all contract counterparties to a Contract listed on

Exhibits 1.2(d), 1.2(e) and 5.8(b), without conceding that any of such contracts are executory contracts that require assumption and assignment under § 365 of the Bankruptcy Code. Debtor is not in default under any such contracts. To the extent Aspen provides Debtor a timely "Designation Notice" under the PSA, Debtor will serve such contract counterparties further notice (a "Contract Notice") identifying: (a) the executory contracts and unexpired leases that may be assumed and assigned to Purchaser; (b) the name and address of the contract counterparties thereto; (c) the earliest proposed effective date of the assignment (subject to the right of Debtor and Purchaser to either (i) withdraw such request for assumption and assignment of any Purchased Contract prior to the Closing or (ii) otherwise extend such effective date); (d) Debtor's determination of the amount, if any, necessary to be paid to cure any existing default in accordance with §§ 365(b) and 365(f)(2) of the Bankruptcy Code (the "Cure Amount"); and (e) the deadlines pursuant to the applicable bankruptcy rules by which any such contract counterparty must file an objection to the Cure Amount and any other objections to the assumption and assignment of any Purchased Contract; provided that the listing of any executory contract or unexpired lease on such Contract Notice does not constitute a binding determination to assume or assign such executory contract or unexpired lease.

### Limitation on Notice to Equity Security Holders

46.     The proceeds realized by Debtor from the sales, together with its other assets, will not be sufficient to pay the secured creditors in full, nor will there be sufficient funds to pay any general unsecured creditors. Accordingly, there is no realistic possibility that any distribution of any amount will be made to the holders of equity securities of Debtor.

47.     Debtor is a widely held public company, but the stock was delisted shortly after the petition was filed. Further, on February 18, 2016, Debtor issued a press release stating that it

contemplated a plan of reorganization under which equity security holders would receive nothing. The press release was filed on February 24, 2016 with the Securities and Exchange Commission in connection with the filing of a form 8-K.

48.     Bankruptcy Rule 2002(d) provides that notice to equity security holders of a sale of all or substantially all of a debtor's assets under § 363 of the Bankruptcy Code is to be provided "unless otherwise ordered by the court." The Notes of Advisory Committee on Rules—1983 make clear that in some cases, "there is no purpose to be served" by giving notice. The proposed sale here is such a case.  Debtor cannot conceive of a scenario in which any distribution would be made to equity security holders as a result of a sale. Accordingly, requiring notice would serve no purpose and would be a waste of estate assets.

49.     Debtor therefore requests that the Court order that notice to equity security holders under Bankruptcy Rule 2002(d) need not be provided except to the extent an equity security holder has filed a request for notice with the Court.

## Legal Authority

A.     *Sale of Assets*

50.     A debtor in possession has "ample discretion to administer the estate, including authority to conduct public or private sales of estate property." *In re Psychometric Sys, Inc.*, 367 B.R. 670, 674 (Bankr. D. Colo. 2007) (Brown, J.) quoting *In re Bakilis*, 220 B.R. 525, 532 (E.D.N.Y. 1998). The authority to sell assets conferred upon a debtor by section 363(b) "include[s] a sale of substantially all the assets of an estate." *Otto Preminger Films, Ltd, v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc.)*, 950 F.2d 1492, 1495 (9th Cir. 1991). Likewise, bankruptcy courts are given a great deal of discretion when deciding whether to authorize a sale of a debtor's assets outside of the ordinary course of business.  *See In re*

*Chateaugay Corp.,* 973 F.2d 141, 144 (2d Cir. 1992). A sale should be authorized if the debtor-in-possession demonstrates the proposed sale reflects sound business judgment. *See Committee of Equity Security Holders v. Lionel Corporation (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Castre*, Inc., 312 B.R. 426, 428 (Bankr. D. Colo. 2004); *see also*, *In re Thomson McKinnon Secs., Inc.*, 120 B.R. 301, 307 (Bankr. S.D.N.Y. 1990); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986).

51.     Courts consider the following factors in determining whether the debtor-in-possession has exercised proper business judgment: (1) any improper or bad motive; (2) whether the price is fair and the negotiations or bidding occurred at arm's length; and (3) the adequacy of the sale procedures. *In re Castre*, Inc., 312 B.R. at 428. As demonstrated below, Debtor has properly exercised its business judgment for the proposed sales.

52.     Given Debtor's continuing losses and the lack of any significant upward movement in gas prices, Debtor concluded that a reorganization was no longer feasible, and therefore embarked upon a marketing effort. Debtor retained Seaport Global, a highly experienced investment banking firm, to market its assets.

53.     As previously described, the assets have been heavily marketed and Debtor was unable to obtain any firm offers until now. Bankruptcy Rule 6004(f)(1) provides that a sale of property outside of the ordinary course of business may be by private sale or public auction. As a result of the final marketing efforts which did not require a minimum bid, Debtor has entered into the PSA with Aspen. Debtor and its Senior Secured Lenders are satisfied that all possible reasonable efforts have been made to maximize the value of the Assets and that the PSA represents the best price that could be obtained under the circumstances.

54.     Bankruptcy Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets of the estate. See, e.g., *Official Committee of Subordinated Bondholders v. Integrated Resources. Inc.* (*In re Integrated Resources, Inc.*), 147 B.R. 650, 656-57 (Bankr. S.D.N.Y. 1992) The bid procedures ensured that the sales were conducted in a fair and orderly manner and that participants are bona fide bidders with the ability and desire to consummate the proposed transactions.

55.     Based upon the foregoing, the potential sale of the Assets is in the best interests of Debtor, its estate, and its creditors, and is based upon sound, reasoned and informed business judgment warranting this Court's approval.

## B.     *The Court Should Authorize the Sale of the Assets Free and Clear of All Interests Pursuant to § 363(f) of the Bankruptcy Code*

56.     Debtor seeks to sell Debtor's assets free and clear of all liens, claims, encumbrances, and other interests pursuant to § 363(f) of the Bankruptcy Code. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of any interest in such property if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

57.     Because § 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of anyone of its five requirements is sufficient to permit the sale of Debtor's assets "free and clear" of liens and interests. *Mich. Empl. Sec. Comm'n v. Wolverine Radio Co*. (*In re Wolverine Radio*

*Co.*), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991); see also *In re Kelistrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002).

58.    Pursuant to L.B.R. 6004-1, the lienholders whose property rights are affected by the sale and the amount of their claimed liens are set forth in paragraph 45 above. As to the liens of taxing authorities, the Sale is free and clear only of liens for taxes past due as of the Closing, and <u>not</u> free and clear of liens for taxes not yet delinquent.

59.    The proceeds that the Debtor will realize from the sale will be insufficient to pay the senior secured claim of the Secured Lenders as of the Petition Date. The Debtor believes that the ad valorem liens in favor of any Wyoming County are second in priority to those of the Senior Secured Lenders and are therefore disallowed pursuant to § 502(b)(3). Debtor, the Secured Lenders, and Carbon County are in continuing discussions regarding relative lien priority, and Debtor expects the issue to be resolved either by agreement prior to the Sale Hearing or by the Sale Order.

60.    The Debtor submits that the standards of § 363(f) nonetheless will be met by the sales. Unless the holder of an interest in any of the Assets being sold objects to this Motion, the holder will be deemed to have consented to the sale pursuant to § 363(f)(2).

## C.    *The Court Should Grant Purchaser the Protections Afforded a Good Faith Purchaser under § 363(m) of the Code*

61.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). A good faith purchaser is one who purchases in "good faith" and for "value."

*In re Bel Air Associates, Ltd.*, 706 F.2d 301, 305 n.12 (l0th Cir. 1983); *In re Abbotts Dairies of*

*Pennsylvania, Inc*. 788 F.2d 143 (3ʳᵈ Cir. 1986). To constitute a lack of good faith, a party's conduct in connection with the sale usually must amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders or the trustee." *In re Crowder*, 314 B.R. 445, 450 (B.A.P. 10th Cir. 2004).

62.     In this case, the PSA was negotiated in good faith at arms' length, without collusion or fraud of any kind. Debtor is unaware of any connections between Aspen and Debtor or any other party involved in the sale process. Debtor is unaware of any conduct by Aspen that would prevent the application of § 363(m) of the Bankruptcy Code. Debtor anticipates making the appropriate showing at a hearing that Aspen has acted in good faith and otherwise in accordance with the statutory standards.

**D.      *Assumption and Assignment of Executory Contracts and Unexpired Leases Should be Authorized under the Bankruptcy Code***

63.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See, e.g., *In re Grayhall Res., Inc*., 63 B.R. 382,384 (Bankr. D. Colo. 1986). In this case, the assumption and assignment of the selected executory contracts is a necessary and integral part of the Sale of Debtor's assets.

64.     Pursuant to § 365(b)(I) of the Bankruptcy Code, a debtor must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. 365(b)(I). Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.

65. Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract ... only if the trustee assumes such contract ... and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). Adequate assurance of future performance is to be given a practical, pragmatic construction based upon the facts and circumstances of each case. *In re Colorado Sun Oil Processing LLC*, No. BR 10-24424-SBB, 2011 WL 3585565, at *12 n.74 (Bankr. D. Colo. Aug. 12, 2011) (citing *In re Bon Ton Restaurant & Pastry Shop, Inc*., 53 B.R. 789 (Bankr . N.D. Ill. 1985).

66. Debtor is not aware of any executory contracts and unexpired leases to be assumed and assigned that are past due.

## Notice

67. Debtor has served this Motion on (a) the Office of the United States Trustee; (b) the twenty largest creditors; (c) all parties who are known to assert liens with respect to Debtor's Assets; (d) the Committee; (e) all parties who have timely filed a request for notice under Bankruptcy Rule 2002; (f) all governmental agencies, including all taxing authorities; (g) all holders of preference rights, if any; (h) all counterparties to executory contracts that Debtor seeks to assume and assign; (i) all operators of leases and wells in which Debtor has an interest; and (j) all parties who have expressed an interest in the possible purchase of Debtor's Assets.

## Immediate Effect

68. Debtor requests that the order approving this Motion become effective immediately upon entry pursuant to Bankruptcy Rules 6004(h) and 6006(d).

**WHEREFORE,** Debtor respectfully prays this Court to enter its order: (i) granting this Motion; (ii) authorizing the assignment and assumption of certain executory contract and

unexpired leases and approving the Assumption and Assignment Procedures; (iii) approving the

sale of Debtor's assets; and (v) granting such further relief as is just and proper.

Dated: April 14, 2017.

Respectfully submitted,

**Onsager | Fletcher | Johnson, LLC**

*s/ Christian C. Onsager*
Christian C. Onsager, CBN 6889
Alice A. White, CBN 14537
1801 Broadway, Suite 900
Denver, Colorado 80202
Ph: (303) 512-1123
Fax: (303) 512-1129
consager@OFJlaw.com
awhite@OFJlaw.com

*Attorneys for Debtor*

**EXHIBIT A**
**PURCHASE AND SALE AGREEMENT**